**KESSLER TOPAZ**
  **MELTZER & CHECK, LLP**
JENNIFER L. JOOST (Bar No. 296164)
ELI GREENSTEIN (Bar No. 217945)
STACEY M. KAPLAN (Bar No. 241989)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel: (415) 400-3000
Fax: (415) 400-3001
jjoost@ktmc.com
egreenstein@ktmc.com
skaplan@ktmc.com

[*Additional Counsel on Signature Page*]

*Counsel for Lead Plaintiff SEB Investment*
*Management AB and Lead Counsel for the*
*Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| SEB INVESTMENT MANAGEMENT AB, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> ALIGN TECHNOLOGY, INC., JOSEPH M. HOGAN, JOHN F. MORICI, RAPHAEL S. PASCAUD, and EMORY M. WRIGHT, <br><br> Defendants. | Case No. 5:18-cv-06720-LHK <br><br> **CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br> **DEMAND FOR JURY TRIAL** <br><br> Judge: Hon. Lucy H. Koh <br> Courtroom: 8, 4th Floor |

1

## <u>**TABLE OF CONTENTS**</u>

2

**Page**

3    I.     INTRODUCTION ................................................................................ 1

4    II.    JURISDICTION AND VENUE .......................................................... 4

5    III.   PARTIES ............................................................................................ 5

6           A.    Plaintiff ................................................................................... 5

7           B.    Defendants .............................................................................. 6

8           C.    Relevant Non-Party ............................................................... 8

9           D.    Former Employees ................................................................. 8

10   IV.   FACTUAL ALLEGATIONS ........................................................... 10

11          A.    Background on Align ........................................................... 10

12          B.    Early Clear Aligner Competitors ......................................... 12

13          C.    Align Experiences Material Patent Expirations and Faces a Significant Increase in Competition ................................ 13

14

15                 1.    Align Begins to Lose Its Patent Protection ............... 15

16                2.    Defendants Tracked and Frequently Discussed Competitive Pressures Impacting Align Before and During the Class Period .............. 17

17                3.    Align Modifies Its Advantage Loyalty Program to Address Competition ................................................. 19

18

19                4.    Defendants Reassure Investors That the Company Will Not Be Impacted by New Competitors ................. 21

20                5.    Align Competitors Announce the Launch of New Competitive Products During the AAO Annual Session ................. 23

21

22                6.    Defendants Continue to Mislead Investors Regarding the Impact of Competition on the Company ................. 25

23                7.    Defendants and Other Insiders Cash in on Their Fraud ........................... 26

24          D.    Defendants Implement an Undisclosed Third Quarter Promotion in a Desperate Attempt to Stave Off the Impact of Competition ................................ 29

25

26          E.    Defendants Mislead Investors Regarding the Company's ASP and Immunity to Competition ........................................ 30

27          F.    Defendants Continue to Falsely Deny That Align is Experiencing Any Impact from Competition ......................................... 32

28

---

G.      Revelation of the Relevant Truth ........................................................ 36

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
AND OMISSIONS ................................................................................................ 37

A.      1Q 2018 Conference Call ..................................................................... 38

B.      May 23, 2018 Investor Day ................................................................... 43

C.      June 12, 2018 Goldman Sachs Global Healthcare Conference ............................. 47

D.      June 14, 2018 William Blair Growth Stock Conference ...................................... 48

E.      2Q 2018 Conference Call ..................................................................... 50

F.      September 5, 2018 Robert W. Baird Global Healthcare Conference ................... 54

VI.   LOSS CAUSATION ............................................................................................ 56

VII.  ADDITIONAL ALLEGATIONS OF SCIENTER ........................................................ 60

VIII. CLASS ACTION ALLEGATIONS ........................................................................... 67

IX.   THE FRAUD ON THE MARKET PRESUMPTION OF RELIANCE APPLIES .......... 69

X.    THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE
ARE INAPPLICABLE ........................................................................................... 70

XI.   CAUSES OF ACTION ......................................................................................... 71

XII.  PRAYER FOR RELIEF ........................................................................................ 75

XIII. DEMAND FOR JURY TRIAL ............................................................................... 75

1    Lead Plaintiff SEB Investment Management AB ("Plaintiff" or "SEB"), by and through its

2    undersigned counsel, brings this action individually and on behalf of all other persons and entities

3    who purchased or otherwise acquired the common stock of Align Technology, Inc. ("Align" or the

4    "Company") between April 25, 2018 and October 24, 2018, both dates inclusive (the "Class Period"),

5    and who were damaged thereby.

6    Plaintiff alleges the following upon personal knowledge as to itself and its own acts, and upon

7    information and belief as to all other matters. Plaintiff's information and belief is based upon, among

8    other things, the investigation conducted by and through its attorneys, which included, *inter alia*,

9    interviews with numerous individuals, including former employees of Align, a review of Align's

10   public documents, conference calls concerning Align, United States Securities and Exchange

11   Commission ("SEC") filings, wire and press releases published by Align, analyst reports and

12   advisories about the Company, media reports concerning Align, and information obtainable on the

13   Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations

14   set forth herein after a reasonable opportunity for discovery.

15   **I.    INTRODUCTION**

16   1.    Align designs, manufactures, and sells clear aligners for the treatment of

17   malocclusion, or the misalignment of teeth, under the trademark Invisalign. Until the third quarter of

18   2017, Align held a virtual monopoly over the clear aligner market due to its extensive network of

19   patents covering the technology necessary to manufacture aligners to meet each patient's individual

20   needs.

21   2.    Prior to the start of the Class Period, Defendants repeatedly told investors that Align

22   had not been impacted by any of the then-available competitive offerings. Convinced that Align had

23   nothing to fear from competitors, analysts published future growth and revenue expectations for Align

24   that assumed no competitive impact. Accordingly, and as Defendants were well aware at the time,

25   any confirmation or admission that competition was impacting Align in any way would have had a

26   material impact on investors' view of the Company's stock price.

27   3.    In October 2017, however, Align's clear aligner patents began to expire. The

28   expiration of these patents removed Align's critical monopoly over these processes, allowing

---

competitors to plan and manufacture patient-specific clear aligners using the same technology and ultimately offer them at a lower price-point. Analysts noted in early 2018 that the new competitive entries following the expiration of these patents could affect Align's pricing and market share and, critically, "pressure [average sale prices] more significantly than [analysts] have modeled." Accordingly, analysts repeatedly questioned management about these trends.

4.      On the first day of the Class Period, April 25, 2018, against the backdrop of heightened market apprehension regarding the expiration of Align's key patents and the expected influx of new competitive clear aligner products over the coming weeks, Defendants reassured the market that Align was seeing no impact from new competitors. In fact, Defendant Hogan categorically denied that there had been any changes with respect to competition, stating "[n]o, we haven't seen any change at all" and referred investors to the Company's forecast for the second half of 2018 as evidence of Defendants' views regarding the likely impact of competition on Align.

5.      In the wake of Align's patent expirations, a wave of new competitors entered the clear aligner market during the May 4-8, 2018 American Association of Orthodontists ("AAO") Annual Session. Three weeks later, at Align's Investor Day, Defendants once again represented to investors that the Company had seen no changes in competition and, importantly, would not respond to competitive threats with price reductions. Defendants Morici and Hogan reiterated these sentiments at industry conferences on June 12, 2018 and June 14, 2018.

6.      The undisclosed reality was far different. Defendants began preparing for additional competitors before the Class Period started, warning Align's sales employees at the National Sales Meeting in January 2018: "they're coming." Additionally, during quarterly All-Hands meetings at Align's headquarters in San Jose, Defendants repeatedly spoke about the fact that Align's key patents were expiring, allowing competitors to get access to Align's "recipes" and sell clear aligners at a lower price point. Following these meetings, Defendant Wright told his subordinates that Align intended to address the patent expirations and increased competition by, among other things, running promotions and offering cheaper alternatives. Defendants also frequently discussed the impact of competition on Align at monthly meetings of the Executive Management Committee ("EMC"), of which all Defendants were members, received regular reports regarding one of Align's key metrics—

average sales price or ASP—and had access to data demonstrating the financial health of the business on a daily, weekly, and monthly basis.

7.    Moreover, by April 25, 2018, Defendants already had taken steps to address the impact of competition on the Company. For instance, Defendants implemented significant changes to the Company's Invisalign Advantage Program as of January 1, 2018. Whereas under the pre-2018 Advantage Program, doctors received rebates based on the number of Align's high-end products they sold during the prior quarter, the 2018 Advantage Program gave doctors discounts at the time of purchase based on the number of points they accumulated through sales over the prior six months for Align's Invisalign offerings, including certain less complex, non-comprehensive products.

8.    Taken together, these changes were intended to attract dentists to Align's products and offer discounts on lower-end products, two competitive pain points for the Company. Significantly, while the market was generally aware that Defendants had changed the Advantage Program, Defendants did not disclose to investors that they had instituted the changes specifically to counteract the impact of competition on the Company (and its stock price) following the 2017 patent expirations.

9.    Defendants' statements before and following the AAO Annual Session and analysts' positive, reinforcing commentary around the lack of competitive impact on the Company and its Invisalign pricing, led the price of Align's common stock to increase throughout the spring and summer of 2018, from a closing price of $239.66 on April 24, 2018 to a closing price of $392.98 on September 25, 2018, a 64% increase over five months. Each of the Defendants cashed in on their fraud, selling significant amounts of stock at inflated prices. Defendant Hogan in particular sold 110,998 shares of Align common stock for $37.8 million in proceeds during the Class Period. All told, Align insiders (including Defendants) sold 272,110 shares of Align common stock generating $83.3 million in proceeds. Notably, all of these Company insiders sold their stock at Class Period high prices.

10.    As the Company's stock price continued to increase, Defendants took even more drastic steps to address competition. Specifically, and unbeknownst to investors, the Company rolled out the "summer sizzler" promotion ("3Q Promotion") on July 1, 2018 as a direct response to competition. Under the terms of the 3Q Promotion, doctors would receive a $200 discount on every

qualifying Invisalign case they sold above the number they sold in the same quarter during the previous year. For example, if a doctor sold ten qualifying cases in the third quarter of 2017, they would receive a $200 discount for the eleventh case and every additional case that they sold during the third quarter of 2018. However, the 3Q Promotion operated in addition to the revamped Advantage Program, such that, for a given case, doctors could receive both the $200 "summer sizzler" discount and the percentage discount corresponding to their Advantage Program tier. Thus, the 3Q Promotion resulted in a significant and undisclosed decrease in ASP.

11.    Notwithstanding the significant measures that Defendants put in place to counteract the impact of competition on Align and Defendants' knowledge of the resulting decline in the Company's Clear Aligner ASP, none of which was disclosed to investors, Defendants continued to deny that Align was being impacted by any increased pressure from competition throughout the third quarter of 2018. Indeed, on July 25, 2018, Defendants told investors "from a competitive standpoint, there's nothing really different than what we saw from an AAO standpoint" and Align had not "changed in any way [its] assessment of the competition that [it] saw at AAO," despite the fact that three weeks earlier, Defendants implemented the 3Q Promotion to address the impact of competition.

12.    Then, on October 24, 2018, the Company disclosed an $85 decline in its Clear Aligner ASP for the third quarter of 2018. During the Company's conference call on October 24, 2018, Defendant Morici attributed the significant and unexpected decline to the combined impact of the 3Q Promotion and the changes to the Advantage Program and the shift to less expensive products among dentists. As a result, Align's stock price declined precipitously, from a closing price of $290.83 per share on October 24, 2018 to a closing price of $232.07 per share on October 25, 2018—a $58.76 or 20% decline in one trading day.

## II.    JURISDICTION AND VENUE

13.    The claims asserted herein arise under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) 78n(a), and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

14.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and under 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

15.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), because Defendant Align's headquarters are located within this District, the Company conducts substantial business in this District, and many of the acts and practices complained of herein occurred in substantial part in this District.

16.     Assignment to the San Jose Division of this District is proper under Northern District of California Civil Local Rule 3-2(c) because a substantial part of the events or omissions which give rise to Plaintiff's claims occurred within the District and Defendant Align's principal executive offices are located in San Jose, California. Pursuant to Northern District of California Civil Local Rule 3-2(e), all civil actions which arise in Santa Clara County shall be assigned to the San Jose Division.

17.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## III.    PARTIES

### A.    Plaintiff

18.     Lead Plaintiff SEB Investment Management AB is one of the largest asset managers in Northern Europe. Headquartered in Stockholm, Sweden (corporate identity number 556197-3719), SEB offers a broad range of funds and tailored portfolios for institutional investors, as well as for retail and private banking clients. SEB purchased Align securities during the Class Period, as described in SEB's certification pursuant to the Private Securities Litigation Reform Act of 1995 (ECF No. 45-3), at artificially inflated prices and suffered substantial damages as a result of the misconduct alleged herein.

**B.     Defendants**

19.     Defendant Align is a global medical device company engaged in the design, manufacture, and marketing of Invisalign® clear aligners and iTero® intraoral scanners and services for orthodontics, restorative, and aesthetic dentistry. Align is incorporated in Delaware, and the Company's principal executive offices are located at 2820 Orchard Parkway, San Jose, California 95134. Align's common stock trades on the NASDAQ under the ticker symbol "ALGN."

20.     Defendant Joseph M. Hogan ("Hogan") served at all relevant times as the Company's President and Chief Executive Officer ("CEO"). Hogan additionally has served as a member of Align's Board of Directors since 2015. In his role as President and CEO, Hogan frequently spoke on behalf of Align at various conferences and meetings during the Class Period. As alleged herein, Hogan made materially false and misleading statements during the Company's April 25, 2018 and July 25, 2018 earnings conference calls, Align's May 23, 2018 Investor Day, and the June 14, 2018 William Blair Growth Stock Conference.

21.     When Hogan became Align's CEO and President on June 1, 2015, he received 111,000 Market Stock Units ("MSU"), which vested on June 1, 2018. MSUs are convertible to shares of Align common stock based on Align's stock price performance as compared to the NASDAQ Composite Index during a set three-year performance period. If Align outperforms the NASDAQ Composite Index, the percentage at which the MSUs convert to shares will be increased from 100%, at a rate of two to one (a two-percentage-point increase in units for each percentage point of over-performance), with a maximum percentage of 150%. During the performance period applicable to Hogan's MSU award, Align outperformed the NASDAQ Composite Index by 329%. As a result, Hogan earned a maximum payout of 150% of his June 2015 target award—i.e., he received 166,500 shares of Align stock.

22.     Following the vesting of his MSUs, Hogan sold a total of 110,998 shares of Align stock in two sales on June 1, 2018 and August 14, 2018, for over $37 million in proceeds. Hogan's sales represented nearly 40% and over 19% of his currently-held shares of Align on these respective dates.

23.     Defendant John F. Morici ("Morici") served at all relevant times as the Company's Senior Vice President of Global Finance and Chief Financial Officer ("CFO"). In this role, Morici was responsible for managing the Company's global finance and financial strategy during the Class Period. As alleged herein, Morici made materially false and misleading statements during the June 12, 2018 Goldman Sachs Global Healthcare Conference, the Company's July 25, 2018 earnings conference call, and the September 5, 2018 Robert W. Baird Healthcare Conference. In addition, Morici participated in Align's April 25, 2018 earnings conference call and attended the Company's May 23, 2018 Investor day, as well as the June 14, 2018 William Blair Growth Stock Conference. During the Class Period, Morici sold 2,405 shares of Align stock, or approximately 82% of his then-current holdings, on May 30, 2018, for total proceeds of $796,907.

24.     Defendant Raphael S. Pascaud ("Pascaud") served at all relevant times as the Company's Chief Marketing, Portfolio and Business Development Officer ("CMO"). In this role, Pascaud reported directly to Hogan and was responsible for global growth strategy, customer experience, brand equity, professional marketing and consumer demand, portfolio innovation, and business development during the Class Period. As alleged herein, Pascaud made materially false and misleading statements at Align's May 23, 2018 Investor Day. During the Class Period, Pascaud sold 10,500 shares of Align stock, or more than 29% of his then-current holdings, on August 23, 2018, for proceeds of over $3.7 million. On October 24, 2018, Align announced that Pascaud would be stepping down from his position as CMO and transitioning to the position of Senior Vice President, Business Development and Strategy, in February 2019.

25.     Defendant Emory M. Wright ("Wright") served at all relevant times as the Company's Senior Vice President ("SVP") of Global Operations. In this role, Wright reported directly to Hogan and was responsible for Align's global manufacturing and operation activities during the Class Period. Wright joined Align in 2000, and was promoted to Vice President of Operations in December 2007. As alleged herein, Wright made materially false and misleading statements at Align's May 23, 2018 Investor Day. During the Class Period, Wright sold 27,492 shares of Align stock, or 66% of his then-current holdings, on May 7, 2018, for proceeds of over $7.2 million.

26.     Hogan, Morici, Pascaud, and Wright are referred to herein as the "Individual Defendants."

**C.     Relevant Non-Party**

27.     Christopher C. Puco ("Puco") was Align's SVP and Managing Director, Americas during the Class Period. Before his promotion to SVP, Puco served as the Vice Present of North America from December 2012 to December 2017. During the Class Period, Puco reported directly to Hogan. On November 1, 2019, Align unexpectedly announced that Puco was resigning from his position as SVP.

**D.     Former Employees[1]**

28.     FE 1 was a Regional Sales manager for Align from several years prior to the Class Period through May 2018, supervising between five and ten Territory Managers. FE 1 reported to the Director of Sales for the Southwest area, Joe Ghiz, who reported to the West Area Vice President of Sales, Kevin Connolly, who in turn reported to Puco. FE 1 had access to Align's Sales Force reporting system and used this system to send weekly reports to the Regional Director of Sales, who reported to the West Area Vice President of Sales. FE 1 added that Sales Force data included information regarding ASPs. FE 1 attended quarterly business review meetings, which Puco occasionally attended. During these meetings, the attendees discussed ASP and other Sales Force targets.

29.     FE 2 was an Invisalign Territory Manager from several years prior to the Class Period through early in the second quarter of 2018 in a Southwest area, selling Invisalign products to dentists and orthodontists. FE 2 reported to a Regional District Manager who reported to the West Area Vice President of Sales, Kevin Connolly. In this role, FE 2 was personally familiar with Align's Advantage Program and the Company's other Invisalign promotions as a result of his sales efforts. FE 2 attended Align's annual National Sales Meeting in 2017 and 2018, during which Defendant Hogan discussed strategies to enable Align's sales team to combat competitive pressures.

30.     FE 3 was a mid-level manager at Align from several years prior to the Class Period through early in the second quarter of 2018, responsible for purchasing direct materials and

---

[1]     Former Employees ("FEs") will be identified herein by number (FE 1, FE 2, etc.). Regardless of gender, all FEs will be described in the masculine to protect their identities.

1    supporting marketing. FE 3 reported to the Director of Supply Chain, Cory Robertson, who reported

2    to Wright, who in turn reported to Defendant Hogan. FE 3 attended Align's quarterly All-Hands

3    meetings where Defendant Hogan addressed patent expirations and competition. FE 3 also attended

4    meetings with the Vice President of Operations that followed each quarterly All-Hands meeting.

5           31.    FE 4 was Senior Support Assistant at Align during the entirety of the Class Period. In

6    this role FE 4 supported a sales and operations executive who reported directly to Defendant Hogan.

7    FE 4 was closely involved with and privy to information regarding Align's Advantage Program and

8    interacted regularly with Defendant Hogan. FE 4 also had access to the agendas prepared for the

9    monthly meetings of the EMC, attended by Hogan and all of his direct reports, including Pascaud and

10   Wright.

11          32.    FE 5 was a member of Align's corporate Financial Planning and Analysis group at the

12   Company's corporate headquarters beginning early in the second quarter of 2018, through the end of

13   the Class Period. FE 5 was part of Align's Financial Planning & Analysis team at the Company's

14   corporate headquarters, reporting indirectly to Defendant Morici through other managers. In this role,

15   FE 5 worked directly with Defendant Morici, and attended meetings during which Defendant Morici

16   spoke about the competitive pressures facing Align and its impact on ASP. FE 5's team was involved

17   in the modeling of Align's ASP and participated in a large project to analyze ASP that began around

18   August or September 2018.

19          33.    FE 6 was an Invisalign Territory Manager in a Northeast metropolitan area from

20   several years prior to the Class Period through early in the first quarter of 2018. FE 6 reported to a

21   Regional Manager, who reported to Andrew Pepe, the Director of Sales, Northeast/Canada, who in

22   turn reported to Puco. In this role, FE 6 sold Invisalign products to dentists and orthodontists and was

23   personally familiar with Align's Advantage Program and the Company's other Invisalign promotions.

24   FE 6 had access to and used the Company's Sales Force reporting system for sales information.

25          34.    FE 7 was an Invisalign Territory Manager for a Midwest area during the entirety of

26   the Class Period and reported to a Regional Manager. In this role, FE 7 sold Invisalign products to

27   dentists and orthodontists and dealt directly with Align's Advantage Program and the Company's

28   other Invisalign promotions. FE 7 attended Align's annual National Sales Conference at the beginning

of 2018, at which Company executives, including Defendant Hogan participated in general sessions. During this conference, an entire breakout session was devoted to ideas for combatting competitive pressures.

## IV.     FACTUAL ALLEGATIONS

### A.     Background on Align

35.     Founded in 1997, Align was the pioneer of invisible orthodontic technology. After introducing its first Invisalign system in 1999, the Company rapidly expanded. By 2001, Align had manufactured one million clear aligners and had trained over ten thousand doctors to use its products. Align is divided into two segments: Clear Aligner and Scanners and Services. The Clear Aligner segment is comprised of the Company's clear aligner products, while the Scanners and Services segment is comprised of the Company's intraoral scanning devices and related software and services.

36.     The Company reports a variety of financial metrics, on a calendar-year basis, for its Clear Aligner segment in its press releases and Forms 10-Q and 10-K filings with the SEC. One of these metrics is Average Selling Price ("ASP")—the average price at which Invisalign cases are sold to doctors. Align frequently discloses ASP to investors in discussions of financial performance and as part of growth projections. Analysts following the Company often cite and rely upon this metric.

37.     Malocclusion, or the misalignment of teeth, is a common feature among approximately 60% to 70% of the worldwide population, i.e., billions of people. Invisalign provides an alternative to the traditional bracket and wire braces that are used to treat the majority of patients looking to correct malocclusion. The Invisalign system uses doctor-prescribed, custom-manufactured, clear plastic removable aligners to straighten or realign a patient's teeth.

38.     Align's business model centers around dentists and orthodontists. As the Company stated in its 2017 Form 10-K: "We sell the vast majority of our products directly to our customers: orthodontists and general practitioner dentists [ ], as well as to restorative and aesthetic dentists, including prosthodontists, periodontists, and oral surgeons." Invisalign is offered exclusively through in-office treatment by an Invisalign-trained orthodontist or general dentist. In order to provide Invisalign treatment to their patients, orthodontists and dentists must complete an Invisalign training course.

39.     To begin Invisalign treatment, a patient first visits an Invisalign-trained dental professional who prepares and sends to Align a data package that includes a physical impression of the patient's relevant dental arches or an intraoral digital scan. The scans are created using Align's iTero scanner or a third-party scanner. Using proprietary software, Align generates a three-dimensional treatment plan simulation, called a ClinCheck plan. The ClinCheck plan is then provided to the treating doctor for review, modification, and approval.

40.     After approval by the treating doctor, Align uses the data underlying the treatment plan and a form of 3-D printing to construct molds that depict the future position of the patient's teeth. These molds replicate the position of the patient's teeth at each stage of the course of treatment. Aligners are then fabricated by pressure-forming polymeric sheets over each of the molds. The aligners correspond to the stages of the ClinCheck plan. The aligners are shipped directly to the treating doctor, who dispenses them to the patient at regular intervals during follow-up appointments. The patient wears each set of aligners for a period of time prescribed by the ClinCheck plan—usually one week—before moving to the next set, advancing tooth movement at each stage.

41.     During the Class Period, Align sold its aligners in "cases" that included a series of aligners intended for one patient. Align offered two types of aligner cases: comprehensive products and non-comprehensive products. The non-comprehensive products generally included fewer aligners compared to the comprehensive products and were suitable for less severe malocclusion, while the comprehensive products could treat more severe cases. Invisalign Full, Invisalign Teen, and Invisalign Assist are Align's comprehensive products. Invisalign Express 5, Invisalign Express 10, Invisalign Lite, and Invisalign Go are the non-comprehensive products that the Company offered before and during the Class Period.

42.     According to Align's Form 10-K for 2017, of the ten million patients who start orthodontic treatment each year, approximately 60% or six million are eligible for Invisalign treatment. Align claimed that an additional three hundred million people suffer from malocclusion and could benefit from teeth straightening but are unlikely to seek treatment from a dental professional. As Align explained, these potential patients "represent[] an incremental opportunity for us as we expand the market for orthodontics by educating more consumers about the benefits of

straighter teeth using Invisalign clear aligners and connect them with an Invisalign doctor of their choice."

## B.   Early Clear Aligner Competitors

43.    Although Align was the near-exclusive manufacturer of aligners for a number of years after its founding, its success led to several competitors entering the market in the mid-2000s. These initial competitors included: (i) ClearCorrect (acquired by Straumann Group in 2017), which was founded in 2006 and offered a set of clear aligners for between $1,500 and $8,000, depending on the complexity of the treatment, location, and other facts; (ii) Ormco (acquired by Danaher in 2005), which initially offered its Simpli 5 Express clear aligners comprised of five aligners and later introduced its Insignia Clearguide Express aligners in 2012; (iii) Dentsply Sirona, which entered the clear aligner market with its MTM (Minor Tooth Movement) clear aligners in 2014; and (iv) SmileDirectClub ("SDC"), which entered the market in 2014 with a direct-to-consumer model that did not require patients to get aligners through in-office visits with a dentist or orthodontist and offered a set of aligners for just $1,850.

44.    Although it was more expensive than these early competitors, Invisalign remained a superior product insofar as it could be used to treat severe cases of malocclusion. Most of the products offered by the other clear aligner manufacturers were only suitable for the treatment of mild to moderate malocclusion. As William Blair explained in an August 18, 2017 analyst report discussing ClearCorrect, one of the Company's first competitors:

> [ClearCorrect] is a reasonable option for simple-to-moderate adult cases being treated by general dentists. This is the most price sensitive portion of the market. We do not believe the product has been configured to serve more complex cases to appeal to orthodontists and the teen consumer, which account for about 75% of the total ortho market.

Piper Jaffray similarly noted in a September 6, 2017 report that Align's primary competitors—which included Danaher, Dentsply and ClearCorrect—"currently compete at a lower price point with limited tooth movement capabilities."

45.    Moreover, as the first-to-market and the technology leader in this space, Align had successfully obtained hundreds of patents to protect its technology and manufacturing processes, including its computer-aided design (CAD) and computer-aided manufacturing (CAM) technology,

which allowed Align to efficiently develop, manufacture, and sell large volumes of high-quality clear aligners, in stark contrast to its early competitors. As Piper Jaffray stated in an August 17, 2017 report, "we [] believe Align's 10-year head start in manufacturing, patient data, customer relationships, software, and overall trade secrets will allow them to remain the dominant clear aligner player for years to come." William Blair similarly observed in a September 1, 2017 report: "Align has nearly 700 issued patents for Invisalign, so we do not expect [] competitors to be able to match the product's functionality."

46.     Focusing on Align's superior technology and intellectual property protections, Piper Jaffray summarized the Company's key competitive advantages in a September 6, 2017 report:

> Since 2010 alone, ALGN has spent more than $400M on R&D and that has yielded the ability to 'express movement through plastic', which is an elegant term for placing the appropriate force to obtain the correct alignment of teeth (with the company's proprietary and patented SmartTrack technology the key here). Additionally, the company has developed algorithms for tooth movement, digital planning, and built a powerful brand, all of which we believe will be difficult to replicate.

47.     Because of Align's significant intellectual property advantages, its competitors were forced to resort to far less efficient means of designing and manufacturing clear aligners. For example, ClearCorrect was initially creating its aligner models through a manual process that took about an hour per model, and only started experimenting with CAM in 2008. Before and during the Class Period, Defendants repeatedly touted Align's 10-year or, in some cases, 21-year head start on its competitors to investors.

### C.    Align Experiences Material Patent Expirations and Faces a Significant Increase in Competition

48.     The Company's early clear aligner competitors posed little threat to its business. Align had significant advantages over these competitors resulting from its early entry into the market, established brand recognition, mastery of the relevant technology, and intellectual property rights. However, in October 2017, these barriers began to fall away with the expiration of key patents, allowing competitors access to Align's technology and the introduction of viable competitors into the clear aligner market in 2018. As the Class Period began, the threat of increasing competition,

especially with respect to lower-priced, non-comprehensive products, registered internally among the highest levels of Align's management.

49.     As the market anticipated the looming expiration of certain of Align's early patents, and new manufacturers prepared to enter the clear aligner market in 2018, investors were keenly focused on the risks that potential competition posed to Align's future success. The majority of analysts reporting on Align throughout 2017 and into early 2018 discussed the possibility of new market entrants and competitive launches and noted that one of the key risks facing the Company in 2018 and beyond was a material increase in competition. Among the principal competitive concerns was whether Align could maintain its margins on Invisalign.

50.     For example, in an April 27, 2017 report, Credit Suisse stated that "[r]isks to our call include increased product competition" and further identified "the competitive landscape intensifies" and "price competition worsens" as risks potentially affecting the Company's ability to achieve the analyst's target price. In an April 28, 2017 report, Morgan Stanley similarly identified "[n]ew competitive entry with aggressive pricing in '17 and '18" as a risk to achieving their price target for Align and noted that "key risks to our price target for ALGN include . . . competitive entries to the market." Stephens stated in a July 28, 2017 report that "[w]hen evaluating an investment in Align Technology, we believe investors should consider the following risks: 1) market competition and new market entrants that could jeopardize the Company's growth prospects . . . ."

51.     Confirming the market's heightened focus on competition, analysts frequently queried Defendants about the impact of competition on Align throughout 2017 and into early 2018. For instance, at the November 7, 2017 Credit Suisse Healthcare Conference, a Credit Suisse analyst asked Morici, "how should we be thinking about the competitive landscape and the dynamics of how much of that's embedded into your longer-term forecast?" Similarly, during Align's January 30, 2018 conference call with analysts to discuss the Company's fourth quarter 2017 financial results, an analyst from Goldman Sachs asked Defendant Hogan whether Align's revenue outlook "contemplate[s] any change in the competitive landscape." Defendants frequently reassured analysts that with regard to competition, there were no changes in the landscape or the Company's strategy for dealing with competition, representing, for example, that "it doesn't change anything at all," that

"[t]here's been nothing out there recently that's changed any position that we've had from a competitive standpoint," and that the Company's forecasts "reflect[ed] any kind of competition we might see."

52.     In light of Defendants' reassurances, the analysts following Align assumed a lack of competition in setting their future growth and revenue expectations for the Company. For example, Morgan Stanley stated in its reports throughout 2017—including those issued on April 28, 2017, May 2, 2017, June 19, 2017, July 28, 2017, October 27, 2017, November 27, 2017, and January 16, 2018— that its "InvisAlign growth expectations continue to assume no incremental competition despite potential entrants in the near term."

53.     Accordingly, Defendants were well aware prior to the start of the Class Period that any confirmation or admission that competition was affecting the Company would have a material impact on the price of Align's common stock.

### 1.     Align Begins to Lose Its Patent Protection

54.     Beginning in October 2017, Align's arsenal of patents—one of its key competitive advantages over other clear aligner manufacturers—began to expire. Specifically, forty of the Company's early patents, including those that protected the process that Align uses to digitally plan and manufacture aligners, began to expire. As *Forbes* noted in an April 25, 2017 article titled "Out of Silicon Valley, A Billion-Dollar Orthodontics Business Built with Plastic and Patents," following this initial wave of patent expirations, an average of twenty-three patents will expire each year through at least 2028. Quoting Jacob Sherkow, an intellectual property expert and New York Law School professor, *Forbes* explained: "Patents are very, very important in the medical device context. At the high end, I think people are going to trust [Align] over Joe's Fly-By-Night Custom Orthodontics, but [without patent protection,] nothing's stopping a cheaper competitor from coming along and doing for the most part the exact same thing."

55.     The expiration of these early patents took away Align's critical monopoly over certain of its CAD and CAM technology, thus allowing Align's competitors to plan and manufacture cases using generic technology and ultimately offer clear aligners at a lower price-point. The following

chart compiled by Piper Jaffray identified the patents and expiration dates, which confirmed that many of the expiring patents protected the Company's computer design technology:

Exhibit 1

**ALGN Key Patents and Estimated Expiration Dates**

| Patent # | Patent Title | Patent Issue Date | Patent Expiration Date (estimate) |
|---|---|---|---|
| 5,975,893 | METHOD AND SYSTEM FOR INCREMENTALLY MOVING TEETH | Nov-99 | Oct-17 |
| 6,217,325 | METHOD AND SYSTEM FOR INCREMENTALLY MOVING TEETH | Apr-01 | Oct-17 |
| 6,309,215 | ATTACHMENT DEVICES AND METHODS FOR A DENTAL APPLIANCE | Oct-01 | Oct-17 |
| 6,398,548 | METHOD AND SYSTEM FOR INCREMENTALLY MOVING TEETH | Jun-02 | Oct-17 |
| 6,554,611 | METHOD AND SYSTEM FOR INCREMENTALLY MOVING TEETH | Apr-03 | Oct-17 |
| 6,722,880 | METHOD AND SYSTEM FOR INCREMENTALLY MOVING TEETH | Apr-04 | Oct-17 |
| 6,625,666 | METHOD AND SYSTEM FOR INCREMENTALLY MOVING TEETH | Sep-03 | Feb-18 |
| 6,629,840 | METHOD AND SYSTEM FOR INCREMENTALLY MOVING TEETH | Sep-03 | Feb-18 |
| 7,134,874 | COMPUTER AUTOMATED DEVELOPMENT OF AN ORTHODONTIC TREATMENT PLAN AND APPLIANCE | Nov-06 | Jun-18 |
| 6,471,511 | DEFINING TOOTH-MOVING APPLIANCES COMPUTATIONALLY | Oct-02 | Oct-18 |
| 8,070,487 | SYSTEM AND METHOD FOR POSITIONING TEETH | Dec-11 | Dec-18 |
| 7,125,248 | ATTACHMENT DEVICES AND METHODS FOR A DENTAL APPLIANCE | Oct-04 | Jan-19 |
| 6,210,612 | CREATING A POSITIVE MOLD OF A PATIENTS DENTITION FOR USE IN FORMING AN ORTHODONTIC | Apr-01 | May-19 |
| 6,685,469 | SYSTEM FOR DETERMINING FINAL POSITION OF TEETH | Feb-04 | May-19 |
| 6,299,440 | SYSTEM AND METHOD FOR PRODUCING TOOTH MOVEMENT | Oct-01 | Jan-20 |
| 6,705,863 | ATTACHMENT DEVICES AND METHODS FOR A DENTAL APPLIANCE | Mar-04 | Apr-21 |
| 7,578,674 | METHODS FOR CORRECTING TOOTH MOVEMENTS MIDCOURSE IN TREATMENT | Aug-09 | Oct-21 |

Source: Company Reports

56.     Piper Jaffray further noted in a September 6, 2017 report that "computer-assisted case planning [is] the most important feature competitors will be able to copy" when the first wave of patents expired. Piper Jaffray also recognized the importance of patents and intellectual property protections to Align, observing that while ClearCorrect was Align's largest competitor, "[o]ver the past several years, [Align] has leveraged its strong IP portfolio against ClearCorrect with various lawsuits," including an International Trade Commission finding that ClearCorrect infringed on several of Align's patents and the resulting recommendation of a permanent cease and desist order. Piper Jaffray concluded: "As a result of this lawsuit, Align maintained very limited competition for multiple years within the clear aligner segment (mostly for complex cases and digital planning)."

57.     The expiration of this initial set of patents led analysts to focus even more intently on Align's existing and potential competitors. As William Blair stated in its September 25, 2017 report, "[i]n anticipation of the initial patent expirations . . . we are taking a closer look at the current and future competitive landscape in the clear aligner market, and what it could mean for the business model and the stock." The William Blair report confirmed "the expiration of the early patents will allow competitors to introduce products that can compete on less complex cases with a higher level of precision offered by CAD CAM fabrication," further explaining that "[t]hese new entrants could affect pricing and share—particularly in the general practitioner market where most cases are less

1  complex and where demand has been shown to be elastic to price changes." In an April 20, 2018

2  report, Berenberg Capital noted with respect to the expected influx of competitors that "new entrants

3  could also pressure ASPs more significantly than we have modeled . . . ."

4         **2.**       **Defendants Tracked and Frequently Discussed Competitive Pressures**
   **Impacting Align Before and During the Class Period**

5

6        58.      Multiple Former Employees confirmed that Defendants were keenly focused on the

7  impact that competition would have on Align and its stock price. FE 1 explained that in or around

8  early 2017, Align became more focused on the impact of competition entering the market and on the

9  Align sales team's ability to handle this competition. According to FE 2, at Align's National Sales

10  Meeting held in Arizona in January 2018, both Hogan and Puco expressly addressed the issue of

11  competition. FE 2 recounted that the message from Hogan was that while the competitors were

12  trailing Align, "they're coming."

13        59.      FE 3 similarly stated that Align was worried about patents expiring and competitors

14  entering the market and selling products at a lower price. According to FE 3, at quarterly All-Hands

15  meetings in San Jose, with Hogan and the leadership team (which usually included Pascaud and

16  Morici) in attendance, "all they talked about" was the expiration of Align's patents and the fact that

17  the Company's competitors would "get access to [the Company's] recipes" and sell the aligners for

18  less. Following these meetings, FE 3 attended mandatory meetings with the SVP of Global

19  Operations, Defendant Wright, at which Wright would reinforce the CEO's message from the All-

20  Hands meeting. During these meetings, Wright made clear that Align intended to address its concerns

21  regarding the patent expirations and increased competition by running promotions and offering

22  cheaper alternatives, among other things.

23        60.      FE 4 stated that competition was a regular topic of conversation at Align's EMC

24  meetings. As FE 4 explained, the Company had monthly EMC meetings attended by Hogan and all

25  of his direct reports, including Morici, Pascaud, and Wright. FE 4 stated that between six and eight

26  of these monthly meetings would be held in San Jose and the remaining meetings would be held in

27  different locations, depending on the travel schedules of the EMC members. FE 4 further stated that

28  an agenda would be circulated to the attendees prior to each EMC meeting. FE 4 saw some of these

1  agendas and recalled that the meeting topics included competition. FE 4 further reported that

2  competition always seemed to be a topic of conversation during these meetings. In addition, FE 4

3  stated that before each EMC meeting, Puco, one of Align's SVPs, would meet with his direct

4  reports—i.e., sales directors—to discuss competition, among other topics.

5       61.    Multiple Former Employees further confirmed that Defendants tracked and had access

6  to data concerning ASP, revenue, and sales volume—all key indicators of the impact of competition

7  on Align. Notably, this data also allowed Defendants to track the real-time impact on the Company

8  of any steps Defendants took to address the impact of competition, like promotions and the sale of

9  cheaper products.

10       62.    For instance, the Individual Defendants received bi-weekly and monthly reports

11  reflecting ASP. FE 5 indicated that the data regarding the Company's ASP was collected on a monthly

12  basis and provided to Defendants Morici and Hogan. FE 5 stated that after the accounting close at the

13  end of each month, a set of reports that reflected all of the financial figures for the month, including

14  ASP, was prepared. This package of reports was then delivered to the executive team—including

15  both Defendants Hogan and Morici—via email. FE 4 stated that Puco, as SVP and Managing

16  Director, received reports approximately twice a week that highlighted sales volume, revenue, and

17  ASP, among other metrics. According to FE 4, Puco watched these reports very closely and it was

18  FE 4's understanding that these same reports were sent to Defendants Hogan, Morici, Pascaud, and

19  Wright. In addition, FE 4 stated that revenues and ASP also were included as topics on the agendas

20  for Align's monthly EMC meetings.

21       63.    In addition, multiple Former Employees confirmed that Align had an internal

22  reporting system called "Sales Force" and that the Company used this system to track and report

23  various sales information, including volume, revenues, and ASP.

24       64.    For example, FE 6 stated that ASP was reflected in Sales Force. Sales Force could be

25  accessed through a tablet interface called Compass and every doctor visit was logged in Sales Force.

26  As FE 6 explained, Sales Force tracked the number of cases accepted, the number of cases pending,

27  and the number of cases starting, all in real time and by product. FE 6 further stated that Sales Force

28  allowed sales data to be broken down by product, customer, salesman, and territory. FE 6 also stated

1    that access to Sales Force was based on responsibility—while FE 6 could only access detailed

2    information regarding his sales in his territory, FE 6's Regional Manager, Robert Maughan, had

3    access to the data for all Territory Managers in his region. This same system of access applied all of

4    the way up to Defendants Hogan and Morici.

5    65.    FE 1 similarly identified Sales Force as Align's outlet for sales analytics. FE 1 stated

6    that Sales Force was updated twice daily and the program could be used to generate reports detailing

7    ASP, trends in year-over-year sales, and actual-to-plan comparisons, including by product, for the

8    month, quarter, or year. FE 1 also confirmed his understanding that executives, including Puco and

9    Defendant Hogan, had access to Sales Force and reports generated by the program. FE 4 similarly

10   stated that Defendants Wright and Pascaud both had access to Sales Force and Sales Force reports.

11   66.    As such, before and during the Class Period, Defendants had access to daily, weekly,

12   and monthly information regarding the impact of competition—and the steps they had implemented

13   to address competition—on Align's ASP, sales volume, and revenues. Moreover, it was clear within

14   the Company (but not to investors) that Defendants were hyper-focused on ensuring that there would

15   be no visible competitive impact on these metrics.

16   ### 3.    Align Modifies Its Advantage Loyalty Program to Address Competition

17   67.    On January 1, 2018, on the heels of the first wave of patent expirations, Align

18   implemented significant changes to its loyalty program for doctors, called the Invisalign Advantage

19   Program (the "Advantage Program"). These changes effectively offered doctors a more competitive

20   price-point for Invisalign products.

21   68.    The pre-2018 Advantage Program rewarded doctors for sales of Invisalign products

22   through rebates on the cost of Invisalign cases, and other perks, such as placement on the Company's

23   provider directory website. The pre-2018 Advantage Program utilized a volume-based tier system

24   whereby a doctor needed to sell a certain number of Invisalign cases to qualify for a tier, and then to

25   move up to the next tier. Each tier provided incremental increases in accompanying benefits,

26   including the amount of the rebates offered for qualifying cases.

27   69.    The 2018 Advantage Program included four main changes: (i) doctors qualified for

28   tiers based on accumulated points, rather than numbers of cases sold; (ii) doctors received percentage

discounts in place of the rebates under the pre-2018 Advantage Program; (iii) additional non-comprehensive aligner products were eligible for the promotion (e.g., Invisalign Assist, Invisalign Go, and Invisalign Lite); and (iv) tier qualification was based on point totals from the prior six months, instead of the prior three months.

70.     FE 7 confirmed the 2018 Advantage Program changed to a point-based system, similar to an airline miles loyalty rewards program. Doctors received 1,000 points for every Invisalign Full or Invisalign Teen case that they sold and 500 points for every Invisalign Assist, Invisalign Go, and Invisalign Lite case. There were point thresholds for each of the tiers, and doctors received a percentage discount that corresponded to their tier level. FE 7 recalled that his highest-selling doctor earned around 100,000 points over the applicable six-month period and received a discount of approximately 28%. FE 7 explained that the highest discount was approximately 38% and that a doctor had to earn 200,000 points to receive this discount. FE 7 also stated that Align maintained a doctor site through which providers could log on and view the points that they had earned through the Advantage Program. This site detailed the relevant time period, number of cases, and point calculations.

71.     As FE 2 likewise explained, while under the pre-2018 Advantage Program doctors received rebates based on the number of cases they sold during the prior quarter, the 2018 Advantage Program gave doctors discounts at the time of purchase based on the number of points they accumulated through sales over the new applicable period—i.e., six months. The six-month period allowed doctors more time to accumulate the points needed to move up to the next tier. In addition, FE 2 further explained that the 2018 Advantage Program rewarded doctors for sales of a wider variety of products. Specifically, Invisalign Assist, Invisalign Go, and Invisalign Lite were covered by the 2018 Advantage Program, but were not included in the pre-2018 Advantage Program.

72.     FE 2 stated that the changes to the Advantage Program were intended to get lower volume doctors and doctors who were not comfortable with comprehensive cases excited about selling the lower-cost, non-comprehensive cases. As a result of these changes, more doctors were selling Invisalign products and doctors who typically sold the lower-end products, like Invisalign Assist, Invisalign Go, and Invisalign Lite, tried to increase their sales volume to get to the next tier.

Like FE 2, FE 7 stated that the 2018 Advantage Program was put in place to give more doctors an opportunity to benefit from the program because the pre-2018 Advantage Program had mainly benefitted the highest-selling, premier providers. The changes were intended to "loop in" and incentivize a wider range of providers, including general dentists, who typically sold fewer cases.

73.     Internally, Defendants instituted the 2018 Advantage Program in order to insulate the Company (and its stock price) from the competitive pressures they expected to follow the October 2017 patent expirations. In fact, FE 4 confirmed that the January 1, 2018 changes to the pre-2018 Advantage Program were put in place specifically to fight off competition and allow Align to stay competitive with other market players.

74.     Significantly, while investors were aware of some of the changes Defendants implemented to the pre-2018 Advantage Program as of January 1, 2018, investors remained in the dark with respect to *why* Defendants had rolled out the 2018 Advantage Program (to counteract the effects of competition on Align) and the ***impact*** the 2018 Advantage Program had on the Company's key financial metrics, including ASP. Defendants, however, were well aware of both the reason for and the impact of these changes.

75.     Specifically, because a doctor's tier placement was determined based on that doctor's sales from the prior period—i.e., six months—Defendants knew as of January 1, 2018 how many doctors qualified for each of the program's different tiers. In addition, Align had detailed, nonpublic information regarding doctors' historical and real-time sales (*see* Section IV.C.2, *supra*) such that Defendants knew or were deliberately reckless in not knowing how the 2018 Advantage Program was impacting the Company's results throughout 2018 and, more importantly, that the changes to the pre-2018 Advantage Program, including the focus on dentists and the provision of discounts on certain non-comprehensive products, were not sufficient to counteract the impact of competition on Align.

### 4.     Defendants Reassure Investors That the Company Will Not Be Impacted by New Competitors

76.     On the first day of the Class Period, April 25, 2018, against the backdrop of heightened market apprehension regarding the expiration of the Company's initial patents and the expected influx

of new competitive clear aligner products over the coming weeks, Defendants assured the market that Align was not concerned about these potential new competitors.

77.     Specifically, during Align's first quarter 2018 earnings call, a William Blair analyst asked Defendant Hogan directly whether Align was "seeing any changes, perhaps in promotional activity or pricing from competitors at least at the low end?" In response, Hogan categorically denied that there had been any changes, stating "[n]o, we haven't seen any change at all" and referred investors to the Company's forecast for the second half of 2018 as evidence of Defendants' views regarding the likely impact of competition on Align. During the same call, in response to repeated questions from analysts regarding the impact of competition on Align, Hogan reiterated this theme, stating that competition "hasn't changed for a year" and is "not new to us." Hogan denied the existence of a "patent cliff" and confirmed that it would "take time to ramp for our competition." In fact, Hogan was sanguine about the incoming competition, telling investors that when it emerged, it "will lift share" for the clear aligner market.

78.     Analysts were encouraged by Defendants' denials that they were seeing any changes in competition, as well as their reassurances that Align would not be affected by the new competitive launches. For example, Credit Suisse issued an April 25, 2018 report stating: "[T]hough management expects 3M to launch a clear aligner at AAO (May 4-8) and is aware of Dentsply Sirona's (XRAY, Outperform) recent investment in OraMetrix (see note), it has not experienced any competitive changes in the marketplace and it noted its superior portfolio, supported by its continuous innovation, is a key competitive advantage" and that the growth trends "should continue with recent innovation efforts clearly geared toward meeting the needs of a wider scope of dental practitioners."

79.     Similarly, William Blair noted the expected launch of a new 3M clear aligner product in its April 26, 2018 report but nonetheless called for a "[s]tatus [q]uo [c]ompetitive [e]nvironment."

80.     Defendants' positive external statements stood in stark contrast to their internal statements and actions. For example, contrary to his representation to investors that there were "no changes" in competition, Defendant Hogan told Align employees in January 2018 that competition was "coming," and Defendant Wright told his subordinates that Align was already planning to respond to competition by offering promotions and additional non-comprehensive products. In fact,

by January 2018, Defendants already had made material changes to the pre-2018 Advantage Program specifically to counteract the impact of competition on Align, including targeting dentists with discounts on certain non-comprehensive products. Additionally, while Defendants gave the false impression that competition would help the Company (e.g., it "will lift share") and downplayed the patent expirations (e.g., no "patent cliff" and a long "time to ramp"), internally, they bemoaned the fact that the patent expirations meant that competitors would have access to Align's "recipes," allowing the new market entrants to sell clear aligners for less.

81.     Moreover, by April 25, 2018, Defendants already had four months of data regarding the failure of the 2018 Advantage Program to sufficiently address the impact of competition on Align. Accordingly, by no later than April 25, 2018, Defendants knew or were deliberately reckless in not knowing that the changes to the pre-2018 Advantage Program meant to engage dentists and provide discounts on certain non-comprehensive products were not sufficient to counteract the impact of competition on Align.

### 5. Align Competitors Announce the Launch of New Competitive Products During the AAO Annual Session

82.     In the wake of Align's patent expirations, and as the analysts predicted, a flurry of new competitors entered the clear aligner market during the May 4-8, 2018 AAO Annual Session. The AAO is the oldest and largest dental specialty organization, with nearly 19,000 orthodontist members throughout the world. The AAO's Annual Session is held every year in the spring and provides an opportunity for members of the orthodontic industry to showcase their present and future products.

83.     On May 4, 2018, the first day of the AAO Annual Session, Henry Schein announced its entry into the clear aligner market with the launch of its SLX Clear Aligner. The SLX Clear Aligners were priced at $1,550 for a full comprehensive treatment. Commenting on the Henry Schein announcement, Leerink Partners stated in a May 4, 2018 report that "clear aligner competition headlines are coming" and further stated that "[i]t is still too early to know what any definitive impact from competition will have on the near-term clear aligner market dynamics . . . [p]erhaps at the

margin it will impact Align at the 'lower end of the mkt'—we contemplate price pressure in our model already."

84.     3M likewise launched its Clarity Aligners and Dentsply Sirona introduced its SureSmile Clear Aligner at the AAO Annual Session. The new 3M Clarity Aligners were priced at approximately $1,884 for a comprehensive full aligner treatment and the Dentsply Sirona SureSmile Aligners were priced at $1,695 for a comprehensive full aligner treatment.

85.     Following the Henry Schein, 3M, and Dentsply Sirona announcements, Leerink Partners stated in a May 7, 2018 report that "ALGN could be volatile in the near-to-intermediate term as rising competition naturally raises questions about potential future pricing pressure, share shifts, competitive trialing impact, etc. . . . we will need to do more work over the coming qtrs. to truly understand how increasing competition in the clear aligner segment may or may not impact ALGN's growth prospects." In this same report, Leerink Partners stated:

> [W]e recognize there is an appetite for trialing new offerings. But we think most of this is likely to impact Align at the "lower end of the mkt" (i.e. less complex cases) until competitive offerings are proven to be as reliable and clinically effective as Invisalign. Towards this end, we already contemplate some price pressure in our model . . . .

86.     Importantly, Leerink Partners further noted that these new competitors were not offering "major" discounts on their products or, in other words, did not intend to initially compete on price:

> [The] [n]ew players aren't debuting with major price discounts (at least not initially). Comprehensive full treatment offerings prices (i.e. "all-in" in the ~$1600 - $1700 range based on our understanding/discussions at the booths) do not appear to be dramatically below the ~$1850 ALGN ASP. Importantly, we'd note that many higher volume Invisalign users are well-below the ~$1830 level in the $1100-$1300 range.

87.     Significantly, Morgan Stanley observed in a May 7, 2018 report that certain of the new competitors could potentially erode Align's long-standing dominance in the high-end of the market, noting "[b]oth [Dentsply Sirona] and 3M marketing materials suggested use of attachments in their aligners (polymer adhesions to teeth which allow for aligner traction/grasping to speed tooth movement), which we long believed ALGN held patents on through the mid-2020s and was a source of their competitive advantage at the high-end of the market." Morgan Stanley concluded: "This suggests there could be risk to ALGN's moat amongst more comprehensive cases. For the high end

of the market, competitors appear likely to assert their hybrid wire/bracket/aligner systems are the superior approach."

### 6. Defendants Continue to Mislead Investors Regarding the Impact of Competition on the Company

88.     Following the AAO announcements, and despite their heightened internal concerns regarding the increase in competition and the Company's implementation of changes to the Advantage Program to combat the impact of competition (*see* Sections IV.C.2 and IV.C.3, *supra*), Defendants continued to represent to investors that the Company had seen no changes in the impact from competition. Defendants even materially ***increased*** the Company's long-term growth predictions from 15-25% to 20-30%. In addition, Defendants gave investors the misleading impression that, to the extent competitive threats arose, the Company ***would not*** respond to these threats with price reductions.

89.     For instance, during Align's May 23, 2018 "Investor Day," Defendant Wright dismissed the new competitive launches at the AAO Annual Session, characterizing these competitors as "very far behind." Wright stated:

> And so to put that in perspective, we have – competitors are in the market that are making aligners, doing treatment plans. They're – we saw some new entrants in AAO. We believe they are coming in the market 10-plus years ago from a technology perspective, ***so they're very far behind. And if they had to try to make aligners at the scale in which we make them, they would need 3 to 4x the number of people that we have in our process. So that just kind of puts it into perspective where we are from a scale.***

90.     During the question and answer portion of the event, an analyst asked Defendant Hogan about the potential competitive threat posed by one of the alternative clear aligner business models. In response, Hogan represented that the Company would respond to competitive threats through its technology and ***not*** price changes, stating: "we'll be competitive in that segment, but we'll get – we want to make sure that we continue the value offering that we have . . . and not just get caught in a price game in that sense too. . . . I want to make sure that we compete with our capabilities, and it just doesn't become a black hole in price in that."

91.     Analysts were buoyed by Defendants' representations regarding competition and pricing. Based on Defendants' statements about the new competitors announced at the AAO session,

1    William Blair stated that they were "comfortable that this momentum can persist over the coming

2    five years despite the recent entry of 3M [], Henry Schein [], Straumann [], and Dentsply Sirona [] to

3    the clear aligner category." Piper Jaffray similarly stated that "[m]anagement addressed competitive

4    products with commentary around the barriers placed around its business and the products being as

5    expected (with 10-year-old technology), so we continue to believe competitors have a herculean task

6    in competing with ALGN."

7         92.    Similarly, Credit Suisse "walked away [from ALGN's investor day] incrementally

8    encouraged on [Align's] competitive positioning, despite an evolving landscape" and noted that

9    Defendants' statements "prove[d] just how far behind competitors are on the innovation and learning

10   curve in terms of clear aligner products" and that Align "emphasized that competitors clearly need to

11   invest further in their solutions to make more meaningful inroads." Commenting on Align's increase

12   to its growth predictions, William Blair noted, "it provides a reassuring signal that management

13   expects competition to expand the market rather than erode volumes and pricing."

14        93.    Over the course of the next month, Defendants continued to conceal from investors

15   the impact of competition on Align following the expiration of its patents, the fact that the Company

16   already had taken affirmative action (the 2018 Advantage Program), which included discounts on

17   non-comprehensive products to address the impact of competition, and that the 2018 Advantage

18   Program was not effectively counteracting the competitive impact on Align. For instance, at the June

19   12, 2018 Goldman Sachs Healthcare Conference, Defendant Morici represented with respect to

20   competition that "there's nothing that disrupts us from what we would've expected" and two days

21   later, at the June 14, 2018 William Blair Growth Stock Conference, Defendant Hogan stated that

22   there was a "solid patent wall" and a "significant moat" around the Company's aligner technology.

23        **7.    Defendants and Other Insiders Cash in on Their Fraud**

24        94.    Defendants' statements before and after the AAO Annual Session and analysts'

25   positive, reinforcing commentary led to an unprecedented increase in Align's stock price, as

26   demonstrated in the chart below depicting the price of Align's common stock from January 1, 2001

27   to December 31, 2018 (utilizing 1-week intervals):

28



95.     Align went public on January 26, 2001 at $13.00 per share. From 2001 to 2011, Align common stock traded below $30.00 per share. The price for Align common stock crossed the $50.00 threshold on October 18, 2013, closing at $57.98 per share. Thereafter, the price of Align's common stock traded at prices between $40 and $65 per share through May 31, 2015.

96.     On June 1, 2015, Defendant Hogan was hired as CEO of Align. In recognition of his role, Hogan was granted 111,000 MSUs. These MSUs vested on June 1, 2018, and the number of MSUs Hogan ultimately received was based on Align's performance compared to the NASDAQ Composite Index during a set three-year performance period. If Align outperformed the NASDAQ Composite Index, the MSUs would convert to shares at a rate of two to one (a two-percentage-point increase in units for each percentage point of over-performance), with a maximum percentage of 150%.

97.     Eighteen months after Hogan became CEO, Align's common stock closed at $96.96 per share on January 3, 2017, a $35.22 per share increase from the closing price on June 1, 2015 ($61.74). Twelve months later, Align's common stock closed at $231.20 per share on January 3, 2018, a $134.24 per share increase from the closing price on January 3, 2017.

98.     Align common stock closed at $239.66 per share on April 24, 2018, the day before the start of the Class Period. By May 3, 2018, the day before the AAO Annual Session, Align common

stock was trading at $255.14 per share, a $15.48 increase in nine days. By the end of the AAO Annual Session, Align common stock closed at $265.46 per share on May 8, 2018, a $25.80 increase over the first two weeks of the Class Period. Align common stock closed at $297.86 on May 22, 2018, the day before the Company's Investor Day, a $58.20 increase since the beginning of the Class Period, nearly one month prior. The price of Align common stock closed more than $10 higher on May 23, 2018. Significantly, in just one month, the price of Align common stock increased nearly double the amount it had in Defendant Hogan's first eighteen months as CEO. Over the course of the three-year performance period applicable to Defendant Hogan's MSUs, Align outperformed the NASDAQ Composite Index by 329%. As a result, Defendant Hogan received the maximum payout of 150% of his June 2015 target award—i.e., 166,500 shares of Align stock.

99. This run-up in Align's stock price was no accident. Just days after the Company's May 23, 2018 Investor Day, and armed with nonpublic knowledge of the impact of competition on Align, the steps Align already had taken to counteract it (including taking steps to attract dentists and offering discounts on certain non-comprehensive products), and the available data demonstrating the failure of the 2018 Advantage Program to sufficiently address the impact of competition on the Company, Defendants Hogan and Morici offloaded significant amounts of Align stock.

100. Specifically, Defendant Morici sold nearly 82% of his Align common stock holdings on May 30, 2018, selling 2,405 shares at $331.35 per share, for total proceeds of $796,907. Had Defendant Morici sold these shares prior to the start of the Class Period, he would have realized only $567,382 in proceeds (utilizing the closing price on April 24, 2018), or nearly 30% less in proceeds from this sale. Two days later, on June 1, 2018, the same day that his MSU award vested, Defendant Hogan sold 85,998 shares—nearly 40% of his holdings—at $333.00 per share, for proceeds of more than $28,645,073. If Align's stock price had been trading at pre-Class Period levels on June 1, Defendant Hogan would have recognized more than $8 million (nearly 30%) less in proceeds from this sale.

**D.     Defendants Implement an Undisclosed Third Quarter Promotion in a Desperate Attempt to Stave Off the Impact of Competition**

101.     Contrary to their repeated representations to the market, Defendants continued to see an impact from competition on Align and knew that their changes to the pre-2018 Advantage Program, including targeting dentists and offering discounts on certain non-comprehensive products, were not enough to neutralize that impact. In response, at the end of the second quarter of 2018, Defendants designed a secret promotion for the third quarter of 2018 that offered significant discounts on the Company's comprehensive products.

102.     According to FE 7, Align rolled out the "summer sizzler" promotion for the 2018 third quarter—i.e., on July 1, 2018. This 3Q Promotion awarded discounts to doctors based on their Invisalign sales numbers compared to their sales from the same quarter during the prior year. FE 4 stated that the 3Q Promotion was put in place because the numbers were on a downward trend. FE 4 further stated that Puco, as SVP, would have approved this new 3Q Promotion, along with all other promotions, including the January 2018 changes to the Advantage Program.

103.     As FE 7 explained, under the terms of the 3Q Promotion, doctors received a $200 discount for every qualifying Invisalign case they sold above the number they sold in the same quarter during the previous year. For example, if a doctor sold ten qualifying cases in the third quarter of 2017, they received a $200 discount for the eleventh case and every additional case that they sold during the third quarter of 2018. The cases that qualified for the discount were the full Invisalign cases—i.e., the Invisalign Full and Invisalign Teen cases—as well as the Invisalign Assist cases.

104.     FE 7 stated that the 3Q Promotion was intended mainly to benefit general dentists, who were selling fewer Invisalign cases, and help them grow their sales. FE 7 explained that the third quarter was typically the busiest season for orthodontists and that these doctors generally saw the biggest uptick in new Invisalign patients during this quarter, due in large part to the fact that many teenagers started orthodontic treatment during the summer, before heading back to school. The general dentists, however, did not see this same third-quarter uptick. FE 7 also stated that the 3Q Promotion was implemented in response to complaints that under the Advantage Program, "the rich get richer and the fat get fatter." In addition, FE 7 explained that the doctors from smaller practices

struggled to advance the upfront cost of the cases, as they did not receive full payment from their patients until the conclusion of the treatment. The $200 discount would help to ameliorate some of these financial issues.

105.    However, FE 7 stated that the 3Q Promotion operated in addition to the Advantage Program, such that, for a given case, doctors could receive both the $200 "summer sizzler" discount and the percentage discount corresponding to their Advantage Program tier. Thus, as FE 7 explained, instead of helping the lower-volume doctors, the 3Q Promotion actually benefitted the doctors who were already selling a high number of cases. For these high-volume doctors, it was not difficult to sell one or two or even ten additional cases, each at a $200 discount. These doctors also moved patients targeted for the fourth quarter into the third quarter in order to boost their sales numbers and take advantage of the promotion.

106.    FE 5 stated that he was involved in conversations with Align's finance department wherein Defendant Morici talked about competition. Specifically, FE 5 attended meetings that included Defendant Morici. During these meetings, Defendant Morici talked about Align's competitors, including ClearCorrect, SDC, and 3M, and explicitly linked the 3Q Promotion to the Company's concerns about competition. FE 5 stated that Morici was "very, very aware of Align's competition." According to FE 5, Align offered discounts like the 3Q Promotion to increase product volume and secure a competitive edge. However, FE 7 reported that the 3Q Promotion resulted in a significant decrease in ASP.

**E.    Defendants Mislead Investors Regarding the Company's ASP and Immunity to Competition**

107.    Almost a month into the third quarter, rather than acknowledge the effect of competition on Align and the impact that Defendants' efforts to combat competition were already having on the Company's ASP, Align concealed those adverse facts and falsely represented that it expected an ***increase*** in the ASP during the upcoming quarter. For example, on July 25, 2018, Defendant Morici stated:

> [W]e expect the third quarter to shape up as follows: Invisalign case volume is expected to be in the range of 302,000 to 307,000 cases, up approximately 28% to 30% over the same period a year ago. We expect Q3 revenues to be in the range of

$493 million to $503 million, an increase of approximately 28% to 31% year-over-year. We expect Q3 gross margin to be in the range of 74% to 74.4%, reflecting higher expenses as we regionalize our treatment planning and manufacturing operations, *partially offset by higher ASPs*.

108.   An analyst from Leerink Partners specifically questioned Morici regarding whether "[a]ny kind of impact from competition" was factored into the Company's third quarter guidance. In response to this question, Defendant Morici stated:

[A]s we guide and as we forecast, we're always looking at what's happening in the market, products that are coming, what's happening with competition. So that's in our way that we look at our guidance and what we expect to see coming. So when we look at our revenue that we talked here for 2018 to low to mid-30s, *that is inclusive of what we see from a competitive standpoint*.

109.   This response left investors with the misleading impression that any impact from competition was already reflected in the Company's forecasted revenues and ASP. Moreover, it concealed the fact that the Company's ASP was declining due to the combined impact of the revamped Advantage Program and the secret 3Q Promotion, both of which Align put in place in direct response to the impact of competition on the Company.

110.   In light of Defendants' statements, Evercore maintained its "long-term revenue model . . . largely unchanged (25-30% growth in 2019 – 2020), as we remain bullish on ALGN's long term market opportunity and superior execution" and noted that it observed "no signs that lower cost entrants are making a dent in the market overall." William Blair was similarly reassured by Defendants' statements regarding competition, stating in a July 25, 2018 report:

Management commentary on new clear aligner entrants was unchanged. There is no sign as yet that new entrants are impacting volumes or pricing, but this topic will remain a key concern now that all of [sic] three of the traditional orthodontic leaders have clear aligner products in their portfolios. We view Align as the clear leader in aligners and believe it has many levers to not only defend share but also expand the market. . . . We maintain our Outperform rating on Align despite the stock's lofty valuation.

111.   The undisclosed facts were far different. Significantly, at the time Defendants issued the guidance calling for *higher* ASPs, while assuring investors that this guidance reflected Defendants' views regarding the impact of competition on the Company's financial results, Defendants had access to detailed, real-time information reflecting declining ASPs for the Company's Clear Aligner segment. FE 4 stated that Puco reviewed the third quarter financial numbers almost on

1   a daily basis as the end of the quarter approached. FE 6 confirmed that "there is no way [Defendants

2   Hogan and Morici] didn't know" that Align's ASP was declining in the third quarter of 2018.

3        112.    Armed with nonpublic knowledge of the impact of competition on Align, the steps

4   Align already had taken to counteract it (including the changes to the pre-2018 Advantage Program

5   and the secret 3Q Promotion), and the available data demonstrating not only the inability of these

6   promotions to address competition, but the deleterious impact that the combined promotions were

7   having on ASPs, Defendants Hogan and Morici dumped sizable portions of their Align holdings. In

8   the months leading up to these sales, Align's stock price had continued to increase, closing at $381.77

9   per share on July 25, 2018 and August 31, 2018 at $386.49 per share. On August 14, 2018, Defendant

10  Hogan sold 25,000 shares of Align common stock at $367.48 per share, resulting in total proceeds of

11  $9,186,990. This sale represented just over 19% of Hogan's then-held Align stock. On August 23,

12  2018, Pascaud sold 10,500 shares—29% of his holdings at the time—at $361.00 per share, for total

13  proceeds of $3,790,500.

**F.    Defendants Continue to Falsely Deny That Align is Experiencing Any Impact from Competition**

16       113.    Notwithstanding the significant measures that Defendants put in place to combat

17  competition and Defendants' knowledge of the resulting decline in the Company's Clear Aligner

18  ASP, none of which was disclosed to investors, Defendants continued to deny that Align was being

19  impacted by any increased pressure from competition throughout the third quarter of 2018.

20       114.    For example, during the Company's presentation at the Robert W. Baird Global

21  Healthcare Conference on September 5, 2018, Defendant Morici addressed the issue of competition

22  in response to an analyst question regarding Straumann. Defendant Morici represented that

23  competition was not a concern, stating: "Nothing of note. . . . But competing with [Straumann] in the

24  marketplace like we have in the past, whether it's in U.S. or other places, and we continue to find

25  ways. . . . It's up to us to continue to maximize and drive value in this market." Notably, Morici stated

26  that the Company "find[s] ways" to deal with Straumann on the competitive front but concealed that

27  one of these "ways" was to implement a secret, promotion that offered significant discounts leading

28  to a material, undisclosed, and deleterious impact on Align's ASP.

115.    In reality, however, Defendants had seen a significant impact on Align's ASP and already were taking steps to "figure out how to stop the bleeding."

116.    Significantly, FE 5 stated that while ASP was a focus prior to July 2018, Align implemented a large project to analyze ASP in approximately August or September of 2018—shortly after the Company rolled out the 3Q Promotion. FE 5 explained that ASP was always part of the Company's regular quarterly reporting, but that the decline in ASP, which began in 2018, brought more attention to the issue. As part of this large project, FE 5's team conducted multiple rounds of analyses on the Company's ASP. After completing one analysis, the team would receive additional requests and would perform additional analyses. FE 5 further stated that periodic meetings with Defendant Morici, among others, were held as part of the ASP project. During these meetings, the attendees would discuss ASP and different ways to try and stop the ASP decline. As FE 5 explained, Align had to put the promotions in place in order to increase its sales volume, but then the Company had to "figure out how to stop the bleeding" with respect to the resulting decline in ASP.

117.    Five months of materially misleading statements regarding the existence and impact of competition on Align had a positive effect on the Company's stock price, as indicated in the below chart of Align's daily stock price from April 24, 2018 to October 23, 2018:



118.    On September 25, 2018 Align common stock closed at $392.98 per share, the highest price not only during the Class Period but in Align's history as a publicly traded company. In just five months, this increase—$153.32 higher than the closing price on April 24, 2018—topped the $134.24 increase over twelve months in 2017 (as measured by subtracting the closing price on January 3, 2017 from the closing price on January 3, 2018) and eclipsed the increase of $35.22 per share over Defendant Hogan's first eighteen months as CEO (as measured by subtracting the closing price on June 1, 2015 from the closing price on January 3, 2017).

119.    Align insiders sold significant amounts of the Company's common stock during the Class Period. As the following chart indicates, Company insiders (excluding the Individual Defendants) sold 120,715 shares for $33,650,548 in combined proceeds between April 25, 2018 and October 23, 2018:

| Date | Seller | Number of Shares Sold | Approximate Price Per Share | Proceeds | Percentage of Shares Sold |
|---|---|---|---|---|---|
| 4/30/18 | Thomas M. Prescott (Director) | 82,000 | $252.75 | $20,725,786 | 37% |
| 5/7/18 | Jennifer Olson (Senior Vice President and Managing Director, Doctor-Directed Consumer Channel) | 4,063 | $263.99 | $1,072,591 | 43% |
| 5/24/18 | Roger E. George (Senior Vice President, Chief Legal and Regulatory Officer) | 3,537 | $313.23 | $1,107,904 | 43% |
| 5/24/18 | Stuart Hockridge (Senior Vice President, Global Human Resources) | 4,342 | $315.12 | $1,368,248 | 89% |
| 5/24/18 | Andrea L. Saia (Director) | 4,067 | $311.89 | $1,268,436 | 19% |
| 5/29/18 | Greg J. Santora (Director) | 5,500 | $324.07 | $1,782,385 | 25% |

| Date | Seller | Number of Shares Sold | Approximate Price Per Share | Proceeds | Percentage of Shares Sold |
|---|---|---|---|---|---|
| 5/31/18 | Jennifer Olson (Senior Vice President and Managing Director, Doctor-Directed Consumer Channel) | 1,505 | $334.05 | $502,747 | 28% |
| 6/20/18 | Stuart Hockridge (Senior Vice President, Global Human Resources) | 2,636 | $364.70 | $961,349 | 45% |
| 8/14/18 | Zelko Relic (Chief Technology Officer and Senior Vice President, Global Research & Development) | 6,417 | $366.83 | $2,353,960 | 28% |
| 8/15/18 | Stuart Hockridge (Senior Vice President, Global Human Resources) | 2,753 | $366.73 | $1,009,608 | 84% |
| 8/29/18 | Simon Beard (Senior Vice President and Managing Director, EMEA) | 3,895 | $384.47 | $1,497,534 | 52% |
| Totals | | 120,715 | | $33,650,548 | |

120.    As set forth in the chart below, between the first day of the Class Period and October 23, 2018, Defendant Hogan sold 110,998 shares for proceeds of $37,832,063, Defendant Morici sold 2,405 shares for proceeds of $796,907, Defendant Pascaud sold 10,500 shares for proceeds of $3,790,500, and Defendant Wright sold 27,492 shares for proceeds of $7,248,953.

| Date | Seller | Number of Shares Sold | Approximate Price Per Share | Proceeds | Percentage of Shares Sold |
|---|---|---|---|---|---|
| 5/7/18 | Wright | 27,492 | $263.6750 | $7,248,953 | 66% |
| 5/30/18 | Morici | 2,405 | $331.35 | $796,907 | 82% |

| Date | Seller | Number of Shares Sold | Approximate Price Per Share | Proceeds | Percentage of Shares Sold |
|---|---|---|---|---|---|
| 6/1/18 | Hogan | 85,998 | $333.00 | $28,645,073 | 40% |
| 8/14/18 | Hogan | 25,000 | $367.48 | $9,186,990 | 19% |
| 8/23/18 | Pascaud | 10,500 | $361.00 | $3,790,500 | 29% |
| Totals | | 151,395 | | $49,668,423 | |

## G.   Revelation of the Relevant Truth

121.   The impact of clear aligner competition and Align's affirmative steps to counteract it were revealed to investors on October 24, 2018, when the Company disclosed a significant decline in ASP for the third quarter of 2018. During the Company's conference call on October 24, 2018, Defendant Morici explained:

> Clear aligner revenue of $421.1 million was down 1.4% sequentially, driven by lower ASPs as a result of higher-than-expected discounts and unfavorable foreign exchange, partially offset by increased volume.

> . . . .

> As Joe mentioned earlier in his remarks, Q3 Invisalign ASPs were down sequentially and year-over-year due to a combination of promotional programs, unfavorable foreign exchange and product mix, partially offset by price increases across all regions.

> In Q3, we offered new product promotions designed to increase adoption of Invisalign treatment, and we saw much higher-than-expected uptake on some of these promotions. In addition, the beginning of the year, we created a more robust North America Advantage customer loyalty program, which has been very favorably received by our doctors. The new Advantage Program changed to a semiannual discount qualification period instead of a quarterly one, with additional tiers that provide doctors with more incentive to move up the tiers by increasing their Invisalign case volume. As a result, more doctors are moving up in tiers and achieving higher overall discounts than they were under the prior program.

> In Q3, we also saw a shift towards lower ASP non-comprehensive products. Some of which is tied to promotions and some is tied to continued progress, expanding our business with a GP dentist and DSOs. Specifically, Q3 ASPs were down by approximately $85 and increased $24 of unfavorable foreign exchange and down $80 year-over-year and includes $15 of unfavorable foreign exchange. Total Q3 Invisalign shipments of 319,300 cases were up 5.5% sequentially and up 35.3% year-over-year, driven by growth in the Americas and APAC, partially offset by seasonality in EMEA.

122.     During this same call, Defendant Hogan admitted with respect to the 2018 Advantage Program that "[i]t's a different type of an advantage structured program and these tiers are different and this take-up was ***completely different than what we've seen before***."

123.     Defendant Hogan also announced during this conference call that Pascaud would be stepping down as CMO, reducing his responsibilities and transitioning to a part-time position once the Company hired a replacement CMO.

124.     In the wake of this disclosure, the Company's stock price declined nearly $59 per share, from a close of $290.83 per share on October 24, 2018 to a close of $232.07 per share on October 25, 2018.

125.     Just a week later, on November 1, 2018, Align abruptly announced that Puco was resigning from his position as SVP and Managing Director of the Americas as of March 1, 2019, after eighteen years with the Company.

## V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

126.     In the months leading up to the start of the Class Period, Defendants consistently stated that Align was not seeing any changes in terms of competition with respect to the Company's core Clear Aligner segment. For example, at the November 7, 2017 Credit Suisse Healthcare Conference, a Credit Suisse analyst asked Defendant Morici, "how should we be thinking about the competitive landscape and the dynamics of how much of that's embedded into your longer-term forecast?" In response, Morici stated that there had been no change in the Company's strategy with respect to competition:

> There's been competition with competitors in other countries pretty much throughout from a clear aligner standpoint. . . . But it really comes down to -- we have a strategy to continue to provide more and more options to our orthodontic and dental community in terms of better products to be able to move teeth predictability in a way that allows those orthodontists and dentists to finish cases like they want. . . . And we're going to continue to have that strategy going forward because we know the benefits of our products and what it provides to the orthodontic community as well as, ultimately, to the patients.

127.     Almost three months later, during Align's conference call with analysts on January 30, 2018 to discuss the Company's fourth quarter financial results, an analyst from Goldman Sachs asked

1 Defendant Hogan whether Align's revenue outlook "contemplates any change in the competitive

2 landscape."  In response, Defendant Hogan stated: "There's been nothing out there recently that's

3 changed any position that we've had from a competitive standpoint."

4     128.    During the Class Period, Defendants continued to represent that Align was not seeing

5 any changes in the competitive landscape, notwithstanding the impact of competition on Align, the

6 steps Align already had taken to address it (including the changes to the pre-2018 Advantage Program

7 and the secret 3Q Promotion), and the available data demonstrating not only the inability of these

8 promotions to counteract competition, but the deleterious impact the combined promotions were

9 having on the Company's Clear Aligner ASP.

10     **A.**    **1Q 2018 Conference Call**

11     129.    On April 25, 2018, shortly after Align's early patents expired and just days before the

12 AAO Annual Session, Defendants held a conference call with analysts to discuss the Company's

13 financial results for the three months ended March 31, 2018 ("1Q 2018 Conference Call"). As part of

14 his introductory comments, Defendant Morici stated that Align expected the 2018 total revenue

15 growth would be above the Company's long-term model, and in the low 30% range.

16     130.    During the question and answer portion of the 1Q 2018 Conference Call, an analyst

17 from William Blair asked Defendant Hogan to "give us a sense in terms of the feedback that you're

18 hearing from your field sales force on the competitive front" and inquired as to whether Hogan was

19 "seeing any changes, perhaps in promotional activity or pricing from competitors at least at the low

20 end?" Hogan responded that Align was not seeing any changes in the competitive landscape:

> ***No, we haven't seen any change at all, John. I mean, we – I mean, the same cast of competitors are still out there that we had before***. Obviously, we expect the 3M product at the AAO. We are pretty sure to see one there. We saw the DENTSPLY announcement with the MTM expansion in the 510(k) that they've done. But we haven't seen that translate into any kind of strategy or implementation in the marketplace yet. We [only] expect to see that in the second half.

> Our guess, John, is pretty much what we've been telling you and the rest of the teams over the last couple of years is we expect this to be midrange products, so in the [26 aligner] or less kind of an area. We expect a kind of a slow ramp-up just because of the nature of how you have to scale in this business, take some time in treatment planning and also manufacturing. ***So I mean, you can see with our kind of bullish forecast for the second half of the year that John just called that we're pretty much – have this in place in the sense of what we thought we would face, and we haven't really changed that analysis since we put the plan together last year***.

131.    Later during the same question and answer portion of the 1Q 2018 Conference Call, Richard S. Newitter, an analyst from Leerink Partners also questioned Hogan on the impact of competition:

> NEWITTER: [J]ust going back to a question that was asked earlier on competition and how, if at all, it's factored into your outlook. I guess, can you comment on more specifically how you contemplated the impact of any incremental competition on your prior outlook? And I appreciate you've revised your outlook upward, and that's a bullish signal. But compare the current factoring of competition compared to kind of how you thought about it previously, and if could you get as specific as possible. Is it price? Is it maybe just a little less utilization you otherwise would've felt comfortable providing to The Street? Just how are you thinking about that and quantifying it.
>
> HOGAN: *It hasn't changed for a year, honestly*. I mean, you can tell what we initiated during the beginning of the year. We didn't think we'd have any really major competitive plays in that sense. We knew we'd see more competition. But we've basically looked at our business with the momentum of the business and projected that forward, and you're seeing it within our numbers. *There's no specificity that I want to share in the sense of what we think and how much in ASP and what areas. Just take a look at our bullish forecast going forward. And as competition becomes more visible to us and more in line, we'll share with you what we're seeing and how we look at the business.*

132.    Jeffrey D. Johnson a Robert W. Baird analyst, also questioned Hogan about competition:

> JOHNSON: Let me go after the competition question, maybe one other way here. I think we're all trying to circle around different things. But you guys are launching obviously a ton of stuff right now with the I Go and the Phase I and iTero expansion, all that stuff. What's your view? In the second half here, you guys expand the market quite a bit, and so competition gets some share, but you guys are expanding market so fast that you can put up that solid – that very strong second half guidance that seems to be implied there now. Or do you just really think competition doesn't get much traction? Your comps get tougher in that, so it's getting a little messy to try to figure out kind of how much of this is market expansion, how much maybe competition is or isn't having an impact. But just conceptually, how do you think it plays out that way?
>
> HOGAN: Jeff, I think the best way to look at this is don't look at this as binary, the competition comes in and just takes our share. *We actually think the competition to a certain extent will lift share because it'll give more legitimacy to clear aligners*. And so possibly, in that lower segment of the marketplace, could we lose some share? Sure. *Sure, we could, at the same time, we're expanding on the upper end with our product lines that you just saw with obviously mandibular advancement in teen and I Go in those areas*. Jeff, the other side of this, too, is it's – we've been saying this for a long time, it's hard to do this. I mean, treatment planning facilities; making sure that you can ship aligners and actually ship them in sequence, so first, second, third or really first, second, third aligners; putting a sales team out there that really can really walk through customers and hold their hand in a sense. *But it takes time to do this. It's not – this is not like a patent cliff we've been saying all along, that's something is a biosimilar, and you can put it in your portfolio and sell it the next day. It's not like that. It'll take time to ramp for our competition.*

133.    In addition, Jonathan David Block, an analyst from Stifel, Nicolaus, questioned Defendant Hogan's statements on competition and the relationship between the Company's new product offerings and pricing:

> BLOCK: So maybe 2 [questions]. The first one, just on the new I Go sort of iTero offering, is there a price point on that product? I didn't see it in the release. And clearly, you don't seem overly concerned with competition. But with that new I Go iTero offering, I believe it's up to 20 stages. Joe, is that sort of the part of the market that you do view as most susceptible when the competition does come in the next couple of weeks, where they're going to try to crack the code a bit? And then I've got a follow-up.
>
> HOGAN: Jon, you know this well in your analysis, right? If you take 15 up to 26, I mean, that's been kind of a vacancy in the product portfolio for years. And so I Go wasn't derived without an understanding of that, okay? Yes, we do – I wouldn't call that – when you do really stand back from this, trying to do a full case with all the complexity that has to do with full cases, if you were a competitor coming in here, it's a very difficult thing to do. You want to kind of gradually learn and ramp up to that. **So the logical – our logical conclusion is, yes, I mean, we'll probably going to see more competition in the below 30 area. The good thing about that, Jon, that's not new to us. We've seen competition from MTM and Angel Align, and you can go down the list of competitors we've seen globally, ClearCorrect or whatever in that specific area.**

134.    Following the 1Q 2018 Conference Call, analysts noted little or no impact from competition on Align in their analyses regarding the value of the Company's stock. For instance, Credit Suisse issued an April 25, 2018 report concluding that Align's innovation outweighed concerns regarding competition. Credit Suisse further noted "though management expects 3M to launch a clear aligner at AAO (May 4-8) and is aware of Dentsply Sirona's (XRAY, Outperform) recent investment in OraMetrix (see note), it has not experienced any competitive changes in the marketplace and it noted its superior portfolio, supported by its continuous innovation, is a key competitive advantage" and that the growth trends "should continue with recent innovation efforts clearly geared toward meeting the needs of a wider scope of dental practitioners." Credit Suisse also reported that "[w]hile [they] acknowledge competitors are clearly in the wings, ALGN remains well ahead in terms of innovation, evidenced by recent new product announcements (Invisalign First, next gen iTeros, Invisalign Go for mild-to-moderate cases), further expanding its addressable market."

135.    In an April 25, 2018 report, Piper Jaffray expressed its belief that "ALGN can outgrow competition," citing the fact that "[m]anagement raised '18 revenue guidance to ~low 30s, above the high-end of its long-term target of 15%-25%," which was "a noticeable bump, given management's

historical conservative stance and clear momentum in the business." In a report issued the following day, Stephens likewise stated that it did not expect the competition to substantially impact the Company in the near-term:

> To be clear, we reiterate our view that expected new market entrants will NOT be on par with ALGN's Invisalign offering. However, we do see the potential for heightened competition at the low-end of the marketplace and increasingly weight the potential ramifications of price competition at the low-end on the sustainability of not only higher-end pricing but also volumes. In our opinion, this is not a likely occurrence during the 2H of CY18 but rather more so a potential headwind for CY19 and beyond.

136.    According to an April 26, 2018 William Blair report, "[t]he key question with Align remains the timing of competitive entry to the clear aligner space and what impact that will have on growth and pricing." Describing it as a "Status Quo Competitive Environment," the report found that "six months beyond the initial patent expirations . . . there has been no uptick in competitive pressure" and "no impact yet from looming competition." Morgan Stanley similarly stated that "fundamental threats are limited and changes here will be iterative," that "bear cases on DTC competition . . . are premature if not simply overblown, as private competitors lack the funding/software to compete with ALGN," and that "competitive launches expected at AAO in May from 3M and XRAY are not expected to have any impact on guidance." Morgan Stanley further clarified their view that competition would be outweighed by innovation, stating that "estimates contemplate[d] competition ramping at the low-end of the market over the next few years, which ALGN will likely counter via new products such as Invisalign Lite and Go for GPs."

137.    Defendant Hogan's statements set forth in Paragraphs 130-133, *supra*, were materially false or misleading when made, or omitted material facts because, unbeknownst to investors, Defendants already were seeing and taking affirmative steps to address the impact of competition on Align. For instance, in response to analysts queries about the state of the competitive landscape and incremental competition, Defendant Hogan told investors that "we haven't seen any change at all" and "it hasn't changed for a year," respectively, when in reality, Defendants: (i) met frequently regarding competition issues, including monthly EMC meetings (¶¶ 58-60); (ii) were internally warning their employees about the consequences of the patent expirations and the fact that competition was coming prior to the start of the Class Period (e.g., "they're coming") (¶¶ 58-59);

(iii) internally made clear that they planned to address their concerns regarding the expiration of the Company's Invisalign patents and increased clear aligner competition by running promotions and offering cheaper alternatives (¶¶ 59, 73); (iv) already had taken steps specifically intended to address the increasing competition, including overhauling Align's Advantage Program in January 2018 to spur greater dentist participation and provide discounts for certain non-comprehensive products (¶¶ 67-75); and (v) based on the available data, knew or were deliberately reckless in not knowing that the 2018 Advantage Program was insufficient by itself to counteract the impact of competition on Align (¶¶ 61-66, 75).

138.   Moreover, Defendants created the false impression that any competition would not impact the Company's Clear Aligner revenues and ASP by augmenting its revenue growth targets for the full year. Indeed, Defendant Hogan told investors that any immediate concerns regarding the impact of competition on Align were unfounded, stating that competition is "not new to us," "[i]t'll take time to ramp for our competition," and competition "will lift [market] share," despite the fact that internally, Defendants: (i) warned employees that the expiration of its patents meant that competitors would get access to "our recipes" and allow competitors to sell aligners for less; (ii) already had taken steps to ensure that Align responded to the impact of competition following the October 2017 expiration of critical Align patents, including changing the pre-2018 Advantage Program to encourage greater participation by dentists and provide discounts on certain non-comprehensive products; and (iii) knew or were deliberately reckless in not knowing that the changes to the Advantage Program alone were insufficient to address the impact of competition on Align. *See* ¶¶ 58-75, *supra*.

139.   Following the 1Q 2018 Conference Call, and armed with nonpublic knowledge of the impact of competition on Align, the steps Align already had taken to address it (including efforts to attract more dentists and offering discounts on certain non-comprehensive products), and the available data demonstrating the relative inability of the 2018 Advantage Program to address the impact of competition on the Company, Defendant Wright sold significant amounts of Align stock. Defendant Wright sold 66% of his Align common stock holdings on May 7, 2018, selling 27,492 shares at $263.67 per share, for total proceeds of $7,248,953.

**B.      May 23, 2018 Investor Day**

140.   In the wake of the new clear aligner product launches by Henry Schein, 3M, and Dentsply Sirona at the May 4-8, 2018 AAO Annual Session, Align hosted an "Investor Day" on May 23, 2018. As part of Align's opening remarks at this event, Defendant Morici discussed Align's increase in its expected year-over-year revenue growth from 15- 25% up to 20-30%.

141.   During his presentation at Align's Investor Day, Defendant Hogan represented that the new competitive offerings announced at the AAO were in-line with the Company's expectations:

> *I believe what we told you back in 2016, what we thought about competition coming in with 10-year-old technology was pretty much confirmed by the AAO in May. That's basically what we saw. The prices, I think, frankly, surprised a lot of people, but not us.* This is very expensive to do, and that was reflected in our competitors' pricing, too. *So basically, our competition has come out with the product that we had and the system we had 10 years ago. And they're going to have a ways to go.* We're not negating the competition. I live paranoid every day. *But they pretty much showed us what we thought we would see. I know there's some comfort in that in that we weren't surprised.*

142.   Later during the Company's Investor Day, Defendant Pascaud touted Align's purported advantages over its competitors and indicated that these competitors were 21 years behind:

> So we believe *we're 21 years ahead*, and we have that first key mover advantage. We set the standard for clinical efficacy, for digital workflow, for brand appeal. Those of you who were at AAO probably saw that. *Our competitors are trying to somehow confuse the marketplace by coming in at separate parts of our value chain. You have to remember that to be able to obtain the results we have, you have to have that whole entire technology ready and integrated, something that our competitors don't have today*.

143.   During the Investor Day, Defendant Wright, also made a presentation and addressed competition in the following statements:

> So *we've had a 21-year first mover advantage*. We've been in it for the long haul – or we are in it for the long haul. We consider this kind of a marathon, not a sprint. *Competition. Others are going to come in and they're going to use 3D printing and they're going to use CAD/CAM technologies to kind of start playing the game, the game of making aligners. But there's a pretty significant difference between kind of playing in the game and mastering the game, and we're certainly the masters of this game.* For those of you in the audience who run, I'd like to think of it – use an analogy of running a marathon. If -- there's a difference between qualifying for the Boston marathon and winning the Boston marathon. So that's kind of how I – for me to keep it in my head.
>
> . . . .
>
> *And so to put that in perspective, we have – competitors are in the market that are making aligners, doing treatment plans. They're – we saw some new entrants in*

***AAO. We believe they are coming in the market 10-plus years ago from a technology perspective, so they're very far behind.*** And if they had to try to make aligners at the scale in which we make them, they would need 3 to 4x the number of people that we have in our process. So that just kind of puts it into perspective where we are from a scale.

144.    During the question and answer portion of the event, Jeffrey D. Johnson, an analyst from Robert W. Baird, questioned Defendants regarding the business model employed by certain of Align's competitors:

> JOHNSON: Maybe one other secular kind of item. We're starting to hear some others talk about disaggregating kind of the treatment planning and the aligner, manufacturing them or maybe if the dentist wants to design the case in office and then pay for aligner, and they could send it even to a couple different labs, whatever lab they want to send it to, things like that. Same question. I mean, is that a viable model? Is that model that at all concerns you or that you would see as a real competitive threat anytime down the road?
>
> HOGAN: Jeff, I think there's going to be a low end to this market that we've talked about before in these kinds of sessions, and that's 15 aligners or less. And this is where companies that don't have the capabilities Align have, they're going to have to play in that segment. So it's going to – there's going to be a scrum in that marketplace to a certain extent. I don't want to necessarily blur the Invisalign brand name down that rat hole if it becomes that in some way, labs want to make it, people want to do it in the back office or whatever. But we'll be competitive in that segment*,* but we'll get – we want to make sure that we continue the value offering that we have, which you understand, our digital front end, back end, SmartTrack, SmartForce stage, all the systems that we have and not just get caught in a price game in that sense too. ***So we're going to watch that really closely, but we're not afraid to compete. But I want to make sure that we compete with our capabilities, and it just doesn't become a black hole in price in that.*** I hope that helps.

145.    The following day, May 24, 2018, reports from several analysts again cast potential competition as a minor concern, or no concern at all, for Align, especially in light of the Company's decision to increase its revenue growth target. William Blair reported that this increased target "provides a reassuring signal that management expects competition to expand the market rather than erode volumes and pricing." The report pointed out that "[m]anagement's decision to raise its long-term growth target by 5 percentage points indicates that the product offerings and pricing decisions are not viewed as overly threatening, at least not in the near term." The report also stated that William Blair analysts were "comfortable that this momentum can persist over the coming five years despite the recent entry of 3M [], Henry Schein [], Straumann [], and Dentsply Sirona [] to the clear aligner category."

146.    Analysts from Stephens pointed in their reporting to "ALGN's significant and undeniable competitive scale advantages [that] were highlighted at the investor meeting." Piper Jaffray analysts reported:

> Management addressed competitive products with commentary around the barriers placed around its business and the products being as expected (with 10-year-old technology), so we continue to believe competitors have a herculean task in competing with ALGN. We continue to view Align as one of the most compelling growth stories in all of med tech that should continue to be owned.

147.    Credit Suisse likewise "walked away from ALGN's investor day incrementally encouraged on [Align's] competitive positioning, despite an evolving landscape" and reported on Align's response to competing product launches:

> [It] proves just how far behind competitors are on the innovation and learning curve in terms of clear aligner products. Management noted competing products are using technology that ALGN had used ~10 years prior, with new competitors lacking a more comprehensive clear aligner solution. We view ALGN's (21-year) first-mover advantage as a differentiator, and importantly, it doesn't view new competitor offerings as surprising/meaningful from a technology or (importantly) pricing standpoint.

> As a reminder, this year at the annual American Association of Orthodontists (AAO) Conference in Washington, DC (May 4-8), three companies launched new clear aligner offerings with digital software components (see note for more information), including Henry Schein (HSIC, Outperform), Dentsply Sirona (XRAY, Outperform), and 3M (MMM, Unrated). ALGN had expected these launches, and of note, it was surprised Danaher (DHR, Outperform) was conspicuously absent (in new clear aligner offerings), although we anticipate there are initiatives at DHR in the works (see note from recent DHR management meetings on 4/27). Importantly, it emphasized that competitors clearly need to invest further in their solutions to make more meaningful inroads.

148.    Defendants' statements set forth in Paragraphs 141-144, *supra*, were materially false or misleading when made, or omitted material facts because, unbeknownst to investors, Defendants were seeing and taking affirmative steps to address the impact of competition on Align. Defendants' statements during Align's Investor Day regarding competition including, for example, that Align was not "surprised" by the competitive offerings announced at the AAO, that the Company was the "master[] of this game" and "not afraid to compete," and that Align would not compete on price created the misleading impression (as confirmed by the analyst reports set forth above) that Defendants were not concerned about any competition in the clear aligner marketplace, including the new competitor products announced just weeks earlier at the AAO Annual Session. In reality,

however, and unbeknownst to investors, Defendants: (i) met frequently regarding competition issues, including monthly EMC meetings (¶¶ 58-60); (ii) were internally warning their employees about the consequences of the patent expirations and the fact that competition was coming prior to the start of the Class Period (e.g., "they're coming") (¶¶ 58-59); (iii) internally made clear that they planned to address their concerns regarding the expiration of the Company's Invisalign patents and increased clear aligner competition by running promotions and offering cheaper alternatives (¶¶ 59, 73); (iv) already had taken steps specifically intended to address the increasing competition, including overhauling Align's Advantage Program in January 2018 to spur greater dentist participation and provide discounts for certain non-comprehensive products (¶¶ 67-75); and (v) based on the available data, knew or were deliberately reckless in not knowing that the 2018 Advantage Program was insufficient by itself to counteract the impact of competition on Align (¶¶ 61-66, 75).

149.    Moreover, Defendants created the false impression that any competition would not impact the Company's Clear Aligner revenues and ASP by augmenting its revenue growth targets for the full year. Indeed, Defendants told investors that any immediate concerns regarding the impact of competition on Align were unfounded, because Align was "21 years ahead," had a "21-year first mover advantage," and any competitors out there are "com[ing] out with the product that [Align] had and the system [Align] had 10 years ago" and were "very far behind" because they "don't have" the "entire technology ready and integrated" despite the fact that internally, Defendants: (i) warned employees that the expiration of its patents meant that competitors would get access to "our recipes" and allow competitors to sell aligners for less; (ii) already had taken steps to ensure that Align responded to the impact of competition following the October 2017 expiration of critical Align patents, including changing the pre-2018 Advantage Program to encourage greater participation by dentists and provide discounts on certain non-comprehensive products; and (iii) knew or were deliberately reckless in not knowing that the changes to the Advantage Program alone were insufficient to address the impact of competition on Align. *See* ¶¶ 58-75, *supra*.

150.    Within days of the Company's May 23, 2018 Investor Day and armed with nonpublic knowledge of the impact of competition on Align, the steps Align already had taken to address it (including taking steps to attract dentists and offering discounts on certain non-comprehensive

products), and the available data demonstrating the relative inability of the 2018 Advantage Program to address the impact of competition on the Company, Defendants Morici and Hogan dumped significant amounts of Align stock. Defendant Morici sold almost 82% of his Align common stock holdings on May 30, 2018, selling 2,405 shares at $331.35 per share, for total proceeds of $796,907. Two days later, on June 1, 2018, Defendant Hogan sold 85,998 shares—almost 40% of his holdings— at $333.09 per share, for total proceeds of more than $28,645,073.

**C.     June 12, 2018 Goldman Sachs Global Healthcare Conference**

151.    On June 12, 2018, Align presented at the Goldman Sachs Global Healthcare Conference. During the question and answer portion of Align's presentation, Defendant Morici engaged in the following exchange with Robert Patrick Jones, an analyst from Goldman Sachs on the topic of competition:

> JONES: Obviously, the opportunity in front of you is vast, it is obviously not lost on others. So competition is always something that we get from investors. It seems like it's a bit heightened now relative to the time that we've followed the story at least. So I was wondering if maybe you could just take a couple of minutes and describe how you see the competitive landscape. How has it evolved? Is there anything new on the market or coming to the market that you think is a more formidable competitor than maybe what you've seen in the past?

> MORICI: *I think what we see – we've faced competition for a number of years, and especially outside the U.S. and what we saw the best analogy that you would look back or the time period you'd look back is perhaps at AAO. And during AAO, we saw different entrants into the market but they were coming in at a technology in a product that was something that we were producing 5 or 10 years ago. And at price points that were not so different than where we're currently priced at. So when we saw some of the additional competition come through, it was something that wasn't a surprise to us. We knew with the market like we've just – we've talked about that's growing that – as a company, we're growing within that market, and at good margins, we knew there would be increased competition, what we do see is that there's nothing that disrupts us from what we would've expected, and we're going to continue to execute as we have to be able to grow in this market.*

> JONES: You guys touched on this point at the Analyst Day, this idea that the new competition that you've seen come to market hasn't really come at a significant discount on pricing. So would you say you've yet to really been tested by a lower priced product? And how do you think that would play out in the market if somebody does come in and decide to try to compete more on the pricing around the [flow sheet].

> MORICI: I think it comes down to its know-how, to be able to know how to move teeth in a predictable, reliable way. So I think, there's a technology that goes into the product, and I think you'll also have to look at the economics. I mean, we've spent 20 years trying to improve the efficiencies, be able to make our aligners in an efficient and cost-effective way, 80% or so gross margins on that product, to be able to continue to take cost out, to be able to be at a point where we're competitive from a pricing

standpoint. Putting out 350,000 aligners a day, unique aligners a day, that's something that's very difficult, it's taken us a long time to do. ***That's what lends itself to the cost structure that we have. So we'll price product that is – that provides – is a reflection of the products that we have.*** A lot of technology that we put into that product to be able to make things easier and more cost-effective for our customers.

152.   Defendant Morici's statements set forth in Paragraph 151, *supra*, were materially false or misleading when made, or omitted material facts because, unbeknownst to investors, Defendants were seeing and taking affirmative steps to address the impact of competition on Align following the expiration of several of its significant patents in October 2017. For example, Morici's representations that the announcement of additional competitive offerings at the AAO "wasn't a surprise to [Align]" and that there is "nothing that disrupts us from what we would've expected" left the misleading impression that Align was not concerned about any competition or any change in competition in the clear aligner marketplace. In reality, however, and unbeknownst to investors, Defendants: (i) met frequently regarding competition issues, including monthly EMC meetings (¶¶ 58-60); (ii) were internally warning their employees about the consequences of the patent expirations and the fact that competition was coming prior to the start of the Class Period (e.g., "they're coming") (¶¶ 58-59); (iii) internally made clear that they planned to address their concerns regarding the expiration of the Company's Invisalign patents and increased clear aligner competition by running promotions and offering cheaper alternatives (¶¶ 59, 73); (iv) already had taken steps specifically intended to address the increasing competition, including overhauling Align's Advantage Program in January 2018 to spur greater dentist participation and provide discounts for certain non-comprehensive products (¶¶ 67-75); and (v) based on the available data, knew or were deliberately reckless in not knowing that the 2018 Advantage Program was insufficient by itself to counteract the impact of competition on Align (¶¶ 61-66, 75).

### D.   June 14, 2018 William Blair Growth Stock Conference

153.   On June 14, 2018, Align presented at the William Blair Growth Stock Conference. During this conference, Defendant Hogan was asked by an unidentified analyst to address the issue of whether Align could maintain its competitive advantage by relying on the Company's technology as the Company's patents expired. In response to this question, Hogan stated:

Yes, remember, we – you could arguably say we had 10 to 15 key patents burn off at the last – last part of last year and I call those CAD/CAM patents which means you could design something on a computer screen and then 3D print it and that's what choked most companies from getting into the marketplace because you really couldn't scale. We have over 800 patents that we've accumulated over those 21 years, and we'll assert those like we just recently did with 3Shape in a lawsuit that we have.

So I could take all day to go through whether it's material science like SmartTrack, which is a unique proprietary material force or the way we write our algorithms, the way we cut aligners, all these things there is a significant amount of patentability on them. The Invisalign First we just came out with has a lot of machine learning, artificial intelligence, as far as predicting the eruption of teeth and planning stages for the size of those teeth and when they'll come in by aligner. Our rapid palate expander will begin trials next year. ***There is a solid patent wall around those kinds of things too. So I'm not saying that we wall off everybody else from doing things, but it's really – we have a significant moat around a lot of things in this business that makes it, I think more arduous for competitors just to ramp up quickly in that sense. So. Yes***.

154.     Defendant Hogan's statements set forth in Paragraph 153, *supra*, were materially false or misleading when made, or omitted material facts because, unbeknownst to investors, Defendants already were seeing and taking affirmative steps to address the impact of competition on Align. For instance, in response to a query regarding Align's ability to maintain its competitive advantage following the recent patent expirations, Defendant Hogan stated that "there is a solid patent wall" or a "significant moat," making it "more arduous" for competitors to "ramp up quickly." In reality, however, and unbeknownst to investors, Defendants: (i) met frequently regarding competition issues, including monthly EMC meetings (¶¶ 58-60); (ii) were internally warning their employees about the consequences of the patent expirations and the fact that competition was coming prior to the start of the Class Period (e.g., "they're coming") (¶¶ 58-59); (iii) internally made clear that they planned to address their concerns regarding the expiration of the Company's Invisalign patents and increased clear aligner competition by running promotions and offering cheaper alternatives (¶¶ 59, 73); (iv) already had taken steps specifically intended to address the increasing competition, including overhauling Align's Advantage Program in January 2018 to spur greater dentist participation and provide discounts for certain non-comprehensive products (¶¶ 67-75); and (v) based on the available data, knew or were deliberately reckless in not knowing that the 2018 Advantage Program was insufficient by itself to counteract the impact of competition on Align (¶¶ 61-66, 75).

1

**E.      2Q 2018 Conference Call**

2      155.     On July 25, 2018, just over three weeks after Align rolled out the undisclosed

3   3Q Promotion, Defendants held a conference call with analysts to discuss the Company's financial

4   results from the three months ended June 30, 2018 as well as the Company's expected revenues and

5   ASP for the third quarter of 2018 ("2Q 2018 Conference Call"). During this call, Defendant Morici

6   provided the following outlook for the third quarter of 2018: "[W]e expect the third quarter to shape

7   up as follows: . . . We expect Q3 gross margin to be in the range of 74% to 74.4%, reflecting higher

8   expenses as we regionalize our treatment planning and manufacturing operations, ***partially offset by***

9   ***higher ASPs***."

10      156.     During the question and answer portion of the 2Q 2018 Conference Call, Defendants

11   Hogan and Morici jointly responded to two questions from Jonathan Block, a Stifel, Nicolaus analyst,

12   related to competition and whether competition was factored into the Company's third quarter

13   guidance:

14      BLOCK: Two questions. Maybe the first one just on the guidance. Certainly, solid 3Q
        guidance but curious if you can talk about, at a high level, what that allows for, if
15      anything, from the incremental competition. In other words, you guys always seem to
        be a bit conservative on the guide. Are you even leaving a bit more wiggle room due
16      to the unknown uptick around suresmile and Clarity? And maybe just as a follow-on
        to that one, what, if anything, Joe, have you heard about these offerings over the past
17      2 months since the ortho show? And then I've got a follow-up.

18      MORICI: Jon, this is John. I'll start with the first part of your question. ***We guide like***
        ***we always guide, taking the best information that we have, no change in terms of***
19      ***how we've taken this guidance. So we factor in many different factors into our***
        ***forecast, and this is no different from a guidance standpoint.***
20

21      HOGAN: ***Jon, and from a competitive standpoint, there's nothing really different***
        ***than what we saw from an AAO standpoint***. . . . From what we see, it's – there's –
22      again, it's just in line with other offerings that we see out there and we'll get – I'll get,
        I think, a stronger beat on that in the future, but right now, ***I wouldn't say we've***
23      ***changed in any way our assessment of the competition that we saw at the AAO***.

24      157.     Later during the 2Q 2018 Conference Call, Hogan and Morici jointly responded to a

25   question from a Leerink Partners analyst, Richard S. Newitter, also related to competition:

26      NEWITTER: First one on just competition, Joe, is there anything – since some of the
        competitors launched back in May, that you're hearing in terms of how they're
27      approaching their and potentially your customer bases with respect to trialing or
        getting some initial kind of traction in the field? Or has it been relatively kind of quiet?
28      And then with respect to the guidance question and competition, is there anything at

all factored into your 2018 growth outlook, including the revised one? Any kind of impact from competition?

HOGAN: I'd say from a competitive standpoint, what we see in the marketplace is kind of what you expect. I'd say it's a cautious approach from a competition standpoint. I'd call – if you take a look at 3M, they more like slipstream into the marketplace behind their aligner – behind their wires and brackets business and try a few – to get a few uptakes. We'll be on the road this week in North America, just out talking to many customers, most of the MC staff. ***And the feedback that we get is they're being contacted and – but there's nothing really that's different from what was the output from the AAO in that piece and it's – so there is some interest and curiosity, I'd say, from a customer base. But there's not a momentum piece or anything that we're adjusting the business around right now.***

MORICI: And I would say, Rich, from – ***as we guide and as we forecast, we're always looking at what's happening in the market, products that are coming, what's happening with competition. So that's in our way that we look at our guidance and what we expect to see coming. So when we look at our revenue that we talked here for 2018 to low to mid-30s, that is inclusive of what we see from a competitive standpoint.***

158.     Following the 2Q 2018 Conference Call, analysts again reacted favorably and interpreted Defendants' statements as confirming that the Company was not seeing any impact from the increase in competition. With respect to competition, William Blair reported a "[s]tatus [q]uo [e]nvironment," stating that "[t]here has been no impact yet from looming competition, but we expect the number of active players will gradually increase." William Blair stated, however, that "Align views its provider locator program and rapidly increasing installed base of scanners as powerful tools to defend share." William Blair further noted:

There is no sign as yet that new entrants are impacting volumes or pricing, but this topic will remain a key concern now that all [] three of the traditional orthodontic leaders have clear aligner products in their portfolios. We view Align as the clear leader in aligners and believe it has many levers to not only defend share but also expand the market. . . . Today, we estimate clear aligners serve about 15% of the orthodontic market, with traditional wires and brackets serving 85%. We see no reason why clear aligners cannot penetrate 40%-50% of the market over the next several years. If correct, Align should be able to leverage its technology leadership to maintain strong unit growth despite expanding competition. With excellent volume growth and respectable margins, we believe Align remains clearly the best growth story in the broader dental space. We maintain our Outperform rating on Align despite the stock's lofty valuation.

159.     Piper Jaffray reported on July 25, 2018 that the third quarter guidance was "disappointing but we believe this is part of the typical conservative playbook management employs and we view the outlook for the business as extremely bright (even when they walk away from SDC

at the end of next year)." Similarly, Evercore noted in a July 25, 2018 report that "although 3Q guidance was possibly lighter than investor expectations . . . our long-term revenue model remains largely unchanged (25-30% growth in 2019 – 2020), as we remain bullish on ALGN's long term market opportunity and superior execution" and noted that "no signs that lower cost entrants are making a dent in the market overall." Deutsche Bank also noted in a July 25, 2018 report:

> ALGN put forth what we would consider very conservative guidance for F3Q (29% rev growth at the midpoint). This pattern of beat followed by conservative guide is very characteristic of how the company has operated in the past. We do not believe it indicates a fundamental slowdown in the business.

160.    Defendants' statements set forth in Paragraphs 156-157, *supra*, were materially false or misleading when made, or omitted material facts because, unbeknownst to investors, Defendants were seeing and taking affirmative steps to address the impact of competition on Align. For instance, in response to analysts' queries about competition, Defendants told investors that there is "nothing really different" from "what we saw from an AAO standpoint" and the "output from the AAO," and clearly stated that Align had not changed its "assessment of the competition [it] saw at the AAO," when, in reality, and unbeknownst to investors, Defendants: (i) met frequently regarding competition issues, including monthly EMC meetings (¶¶ 58-60, 106); (ii) were internally warning their employees about the consequences of the patent expirations and the fact that competition was coming prior to the start of the Class Period (e.g., "they're coming") (¶¶ 58-59); (iii) internally made clear that they planned to address their concerns regarding the expiration of the Company's Invisalign patents and increased clear aligner competition by running promotions and offering cheaper alternatives (¶¶ 59, 73, 102, 106); (iv) already had taken steps specifically intended to address the increasing competition, including overhauling Align's Advantage Program in January 2018 to spur greater dentist participation and provide discounts for certain non-comprehensive products (¶¶ 67-75); and (v) based on the available data, knew or were deliberately reckless in not knowing that the 2018 Advantage Program was insufficient by itself to counteract the impact of competition on Align (¶¶ 61-66, 75).

161.    Furthermore, on July 1, 2018, Defendants had secretly implemented the 3Q Promotion to gain a competitive edge with its customer-group that was most likely to be open to a competitive

offering—dentists. Indeed, in stark contrast to Defendants' statements regarding competition on July 25, 2018, Defendants understood that the 2018 Advantage Program was not sufficiently benefiting this key portion of the market, as evidenced by their decision to implement the 3Q Promotion in order to compete with new entrants catering to the lower end of the market. *See* ¶¶ 101-106, *supra*.

162.    Moreover, Defendants created the false impression that any competition would not impact the Align's Clear Aligner revenues and ASP by augmenting the Company's targets, misleadingly stating that these targets were "inclusive of what we see from a competitive standpoint" and that the Company had factored in competition when, unbeknownst to investors, Align knew it would be unable to meet the ASP target because the undisclosed 3Q Promotion, in combination with the new Advantage Program, was already causing a decline in the Company's Clear Aligner ASP. Defendants likewise told investors that any immediate concerns regarding the impact of competition on Align were unfounded and that there is "nothing" "that we're adjusting the business around right now," despite the fact that internally, Defendants: (i) warned employees that the expiration of its patents meant that competitors would get access to "our recipes" and allow competitors to sell aligners for less; (ii) already had taken steps to ensure that Align responded to the impact of competition following the October 2017 expiration of critical Align patents, including changing the pre-2018 Advantage Program to encourage greater participation by dentists and provide discounts on certain non-comprehensive products and implementing the undisclosed 3Q Promotion; and (iii) knew that the changes to the Advantage Program alone were insufficient to address the impact of competition on Align. *See* ¶¶ 58-75, 101-106, *supra*. Furthermore, Defendants knew or were deliberately reckless in not knowing that the measures the Company had implemented to address the impact of competition were causing a severe and undisclosed decline in the Company's ASP. *See* ¶¶ 61-66, 75, *supra*. Indeed, the 3Q Promotion, in combination with the 2018 Advantage Program, resulted in a significant decrease in the Company's Clear Aligner ASP, which was evident to the Individual Defendants, who: (i) received bi-weekly and monthly reports reflecting the Company's revenues and ASP (¶¶ 62, 66); (ii) discussed ASP at the Company's monthly EMC meetings (¶ 62); and (iii) had access to Sales Force, a program that Align used to track ASP (¶¶ 63-65).

163.    In the month following the 2Q 2018 Conference call and armed with nonpublic knowledge of the impact of competition on Align, the steps Align already had taken to address it (including taking steps to attract dentists and offering discounts on certain non-comprehensive products), and the decision to implement the 3Q Promotion after the changes to the Advantage Program failed to sufficiently counteract the impact of the increasing competition, Defendants Hogan and Morici offloaded significant amounts of Align stock. On August 14, 2018, Defendant Hogan sold 25,000 shares of Align common stock at $367.48 per share, resulting in total proceeds of $9,186,990. This sale represented just over 19% of Hogan's Align holdings. On August 23, 2018, Pascaud sold 10,500 shares—29% of his holdings—at $361 per share, for total proceeds of $3,790,500.

### F.      September 5, 2018 Robert W. Baird Global Healthcare Conference

164.    On September 5, 2018, two months after the Company first implemented its secret 3Q Promotion, Align presented at the Robert W. Baird Global Healthcare Conference. During the question and answer portion of the conference, Jeffrey D. Johnson, a Robert W. Baird analyst asked Defendant Morici to address the Company's patent expirations as well as competitive offerings from other clear aligner manufacturers:

> JOHNSON: All right. Maybe we'll ask a couple of questions here on competition. So obviously, earlier this year, you had a few of the larger companies come out with clear aligner systems. Now that some of the IP has come off late last year, first off, just a simple question, seeing any traction, anything that concerns you in the near term from these competitive launches?
>
> MORICI: ***Nothing that we haven't seen already***. I mean, there was some at the AAO. There was a dental ortho show where – in Washington in May. There was new companies in or other companies that had been in. ***But there's nothing that – of note that was disruptive or different than what we would've seen or would've done in the past, both from a product standpoint or a pricing standpoint***. The pricing was pretty similar to what we have seen. And we look at it from the standpoint that we've been facing competition with wires and brackets since the beginning and we're still facing that. And even when we talk about 10% market share, that means the vast majority of competition is still in the wires and brackets. There is additional clear aligners companies in the space, but we feel that we're properly positioned in terms of the products that we have, the brand that we have, the go-to-market strategies that we have, and being able to branch out and get more to push the consumers and turn those consumers into patients through our doctors.
>
> . . . .
>
> JOHNSON: And then one other question on competition. Dentsply, 3M, they're all kind of early on in their launches and we'll see kind of what their marketing messages ends up being and where that technology even goes. But ClearCorrect's been a

competitor for several years now. I was surprised, I mean, what did Straumann report, 50% year-over-year growth in North America, I think, this past quarter? Might've been off a small base, so with some deal-related dis-synergies or disruptions a year ago. But are you seeing anything specifically now that Straumann, you do have at least one big corporate partner with an established system, a much small market share. But anything with that particular business?

MORICI: *Nothing of note.* Like you say, we've been competing against them for a number of years, smaller company, really more on the GP side versus the ortho side. And they're typically on the lower stage, not as complicated of a product. But competing with them in the marketplace like we have in the past, whether it's in U.S. or other places, and we continue to find ways. Like I said, as a company, we can treat the most complicated cases, like you're talking with mandibular advancement and hopefully -- and future palate expansion all the way down to the more basic, straightforward cases, and it's up to us -- we created this market. It's up to us to continue to maximize and drive value in this market.

165.     Defendant Morici's statements set forth in Paragraph 164, *supra*, were materially false or misleading when made, or omitted material facts because, unbeknownst to investors, Defendants were seeing and taking affirmative steps to address the impact of competition on Align. For instance, in response to an analyst query about the impact of the patent expirations and new competitive launches, Defendant Morici responded that there was "[n]othing that we haven't seen already," "nothing . . . of note that was disruptive or different than what we would've seen or would've done in the past, both from a product standpoint or a pricing standpoint" and "[n]othing of note" when, in reality, and unbeknownst to investors, Defendants: (i) warned employees that the expiration of its patents meant that competitors would get access to "our recipes" and allow competitors to sell aligners for less; (ii) already had taken steps to ensure that Align responded to the impact of competition following the October 2017 expiration of critical Align patents, including changing the pre-2018 Advantage Program to encourage greater participation by dentists and provide discounts on certain non-comprehensive products and implementing the undisclosed 3Q Promotion; and (iii) based on the available data, knew or were deliberately reckless in not knowing that the 2018 Advantage Program was insufficient by itself to counteract the impact of competition on Align. *See* ¶¶ 58-75, *supra*.

166.     Furthermore, on July 1, 2018, Defendants had secretly implemented the 3Q Promotion to gain a competitive edge with its customer-group that was most likely to be open to a competitive offering—dentists. Indeed, in stark contrast to Defendant Morici's statement that there was "[n]othing

of note" regarding competition on September 5, 2018, Defendants understood that the 2018 Advantage Program was not sufficiently benefiting this key portion of the market, as evidenced by their decision to implement the 3Q Promotion in order to compete with new entrants catering to the lower end of the market. *See* ¶¶ 101-106, *supra*.

167.    Moreover, Defendants knew or were deliberately reckless in not knowing that the measures the Company had implemented to address the impact of competition, including the changes to the Advantage Program in combination with the 3Q Promotion, were causing a severe and undisclosed decline in the Company's ASP. *See* ¶¶ 61-66, 75, 116, *supra*. Indeed, the significant decrease in ASP that followed the implementation of the 3Q Promotion would have been apparent to the Individual Defendants nearly two months into the promotion, as these Defendants: (i) received bi-weekly and monthly reports reflecting the Company's revenues and ASP (¶¶ 62, 66); (ii) discussed ASP at the Company's monthly EMC meetings (¶ 62); (iii) and had access to Sales Force, a program that Align used to track ASP (¶¶ 63-65). In fact, despite Defendant Morici's statement that there was "nothing . . . of note" regarding competition, internally Defendants were trying to "figure out how to stop the bleeding" with respect to the ASP decline generated by the implementation of the 3Q Promotion. *See* ¶¶ 116, *supra*.

## VI.    LOSS CAUSATION

168.    As a result of Defendants' materially false and misleading statements, omissions of material facts, and fraudulent course of conduct, Align's publicly traded common stock traded at artificially inflated prices during the Class Period. Relying on the integrity of the market price for Align common stock and public information relating to Align, Plaintiff and other Class members purchased or otherwise acquired Align common stock at prices that incorporated and reflected Defendants' misrepresentations and omissions of material fact alleged herein. As a result of their purchases of Align common stock during the Class Period at artificially inflated prices and the removal of that inflation upon the disclosure set forth in Paragraphs 172-176, *infra*, Plaintiff and the Class suffered economic losses, i.e., damages under the federal securities laws.

169.    Defendants' false and misleading statements, material omissions, and deceptive course of conduct had their intended effect, directly and proximately causing Align common stock to

1   trade at artificially inflated prices during the Class Period, including closing as high as $392.98 per

2   share on September 25, 2018. Those misrepresentations and omissions of material fact that were not

3   immediately followed by an upward movement in the price of Align common stock served to

4   maintain the price of Align common stock at an artificially inflated level.

5       170.    Had Defendants been truthful about these matters during the Class Period, Plaintiff

6   and other Class members would not have purchased or otherwise acquired their Align common stock

7   at the artificially inflated prices at which they traded. It was entirely foreseeable to the Defendants

8   that misrepresenting and concealing material facts from the public would artificially inflate the price

9   of Align common stock. The economic losses, i.e., damages, suffered by Plaintiff and other members

10  of the Class were a direct, proximate, and foreseeable result of Defendants' materially false and

11  misleading statements and omissions of material fact, which artificially inflated the price of the

12  Company's common stock, and the subsequent significant decline in the value of the Company's

13  common stock when the relevant truth was revealed and/or the risks previously concealed by

14  Defendants' material misstatements and omissions materialized.

15      171.    Plaintiff and other Class members suffered actual economic loss and were damaged

16  when the material facts and/or foreseeable risks concealed or obscured by Defendants' misstatements

17  and omissions were revealed and/or materialized through the disclosure of new information

18  concerning Align on October 24, 2018. As alleged in this Section, the disclosure and/or

19  materialization of the foreseeable risks concealed by Defendants' fraud directly and proximately

20  caused foreseeable declines in the price of Align common stock by removing the artificial inflation

21  in the price of Align common stock that resulted from Defendants' fraud. The timing and magnitude

22  of the declines in the price of Align common stock, as detailed herein, negate any inference that the

23  loss suffered by Plaintiff and the Class was caused by changed market conditions or other

24  macroeconomic factors unrelated to Defendants' fraudulent conduct.

25      172.    Specifically, on October 24, 2018, Align stunned the market by announcing that

26  revenues for its Clear Aligner segment had declined 1.4% sequentially, from $433.2 million for

27  2Q 2018 to $427.1 million for the third quarter of 2018, and that "worldwide" ASPs for its Clear

28  Aligner products had declined approximately $85 quarter-over-quarter, from $1,315 for 2Q 2018 to

$1,230 for 2Q 2018. Notably, the sudden revenue decline was the first sequential decline since the fourth quarter of 2017, and the decline in ASPs followed several quarters of sequential increases, from $1,305 in the fourth quarter of 2017, to $1,310 in 1Q 2018, to $1,315 in 2Q 2018. The ASP decline also represented one of the largest declines in the Company's history as a public company.

173.    During the Company's October 24, 2018 earnings call, Defendants expressly connected the decline in Clear Aligner revenues and ASPs to "a combination of promotional programs, unfavorable foreign exchange and product mix shift"—i.e., factors related to Defendants' undisclosed attempt to address increasing competition during the Class Period. More specifically, Morici revealed that the sequential Clear Aligner revenue decline was "**driven** by lower ASPs as a result of higher-than-expected discounts and unfavorable foreign exchange, partially offset by increased volume." As Defendant Morici further explained:

> In Q3, we offered new product promotions designed to increase adoption of Invisalign treatment, and **we saw much higher-than-expected uptake on some of these promotions**. In addition, the beginning of the year, we created a more robust North America Advantage customer loyalty program, which has been very favorably received by our doctors. The new Advantage Program changed to a semiannual discount qualification period instead of a quarterly one, with additional tiers that provide doctors with more incentive to move up the tiers by increasing their Invisalign case volume. As a result, more doctors are moving up in tiers and **achieving higher overall discounts** than they were under the prior program.
>
> In Q3, we also saw a shift towards lower ASP non-comprehensive products. **Some of which is tied to promotions** and some is tied to continued progress, expanding our business with a GP dentist and DSOs. Specifically, **Q3 ASPs were down by approximately $85** and increased $24 of unfavorable foreign exchange. . . .

174.    During the same conference call, in response to a question from a Goldman Sachs analyst regarding the breakdown of the approximately $61 of the ASP decline that was not attributable to the unfavorable foreign exchange, Defendant Morici stated: "On the remaining piece that's left, about half of the drop in ASPs was due to mix, it was mix shift to the lower stage products, and about the other half or $30 or so was related to those promotions."

175.    Morici also explained that the "promotions" causing the ASP and revenue declines included the changes to the Advantage program adopted on January 1, 2018, and the implementation of the new, secret 3Q Promotion that was never disclosed to investors. Defendants also disclosed that the 3Q Promotion would immediately be discontinued. As Morici explained: "In Q3, we offered new

product promotions designed to increase adoption of Invisalign treatment, and we saw much higher-than-expected uptake on some of these promotions . . . [and those promotions] have been discontinued." Morici further stated, "those promotions that we had, those specific promotions that were driving down some of the ASPs in Q3 will not continue into Q4."

176.    In the wake of this announcement, the Company's share price declined from a close of $290.83 per share on October 24, 2018, to a close of $232.07 per share on October 25, 2018.

177.    In an October 24, 2018 report following Align's disclosures, Piper Jaffray lowered its price target from $440 to $300:

> Tons of Great Things Happening in Q3 but **Pricing Declines More than Overshadow Them**. . . . Despite all of that good news, (especially scanners, which are leading indicators of future case volumes), **the clear focus among investors** from the results were **soft global ASPs on aligners that were down roughly $85 sequentially** (or -6.5%).

Piper Jaffray also noted, "we have to focus on the pricing dynamics that impacted Q3 results and will hurt the fourth quarter (and '19)" and observed, "the results will stoke fears about competitive pressures on ALGN's business."

178.    In an October 25, 2018 report, Morgan Stanley lowered its price target from $320 to $300 following Align's disclosure of its third quarter 2018 results. Like Piper Jaffray, Morgan Stanley specifically referenced the impact of competition in analyzing the Company's unexpected results:

> **Unexpected pricing pressure emerges**. Our own work has suggested that there is a path to competitors having an impact on ALGN's growth, but we did not expect an impact near-term considering competitor commentary indicating an unwillingness to discount, particularly in the very early stages of launches by MMM (covered by Josh Pokrzywinski), XRAY, and DHR outside the US. The success of SmileDirectClub (SDC) with DTC clear aligners is another known threat, but the view that SDC's overlap with ALGN cases is nominal has left us thinking any impact on ALGN was also unlikely an '18 event. **Disclosure that ALGN saw accelerated pricing pressure in 3Q, which is expected to persist into 4Q, raises questions of whether these dynamics are already putting pressure on the franchise.** ALGN indicates that the pricing pressure is a result of mix shift to lower priced products launched by ALGN and unexpectedly rapid uptake of a new volume incentive program by higher volume customers. **The challenge for investors will be how to reconcile ALGN's view that there was no competitive dynamic at play, with ALGN's own history of executing on promotions and product launches without significant pricing disruptions.**

179.    In an October 25, 2018 report, Berenberg also lowered its price target—from $420 to $370—noting:

1
2
3

ALGN shares are likely to be under meaningful pressure, in our view, following a Q318 print that may raise investor concerns around the company's ability to maintain average selling price (ASP) in the face of increased competition. While we had always expected some ASP and GM compression in our model, we acknowledge that the magnitude of the quarterly ASP decline came earlier than we had forecast.

4
5
6
7

180.     Berenberg attributed the "weaker" ASPs to "more competitive pressure." In describing the "[k]ey risks" to its investment thesis, Berenberg stated: "Competition comes in harder and stronger than expected, and new entrants could also pressure ASPs more significantly than we have modeled, leading to downward pressure on operating margins."

8

## VII.     ADDITIONAL ALLEGATIONS OF SCIENTER

9
10
11
12
13
14
15
16
17
18
19
20

181.     As more fully alleged above, numerous facts give rise to a strong inference that, throughout the Class Period, Defendants knew or were deliberately reckless in not knowing that the statements identified in Section V above concerning competition in the clear aligner market and the impact of this competition on the Company were materially false and misleading when made and/or omitted material facts necessary to make those statements not misleading. In particular, Align and the Individual Defendants: (i) knew and/or were deliberately reckless in not knowing that the statements issued and disseminated in the name of the Company were false and misleading; (ii) knew that these statements were issued and disseminated to the investing public; and (iii) knowingly and substantially approved, participated or acquiesced in, and had control and ultimate authority over, the issuance or dissemination of such statements as primary violators of the federal securities laws. In addition to the specific facts enumerated above, the following facts also support a strong inference of scienter.

21
22
23
24
25
26
27
28

182.     ***The fraud concerned the core of Align's operations, the manufacture and sale of clear aligners***. The Clear Aligner segment was the Company's chief revenue generator, and the most important driver of Align's earnings. Indeed, during the Class Period, "Clear Aligner net revenues represent[ed] approximately 86% of worldwide net revenues." The Company's Clear Aligner revenues and ASP were closely watched by the market and continually emphasized by Defendants. For example, during Align's July 25, 2018 conference call, Defendant Morici noted that "[y]ear-over-year clear aligner revenue growth of 35% reflected strong Invisalign shipment growth across all customer channels and geographies and increased Invisalign ASPs." Indeed, throughout the Class

Period, Defendants regularly focused investors' attention on the Company's Clear Aligner revenues and ASP. The importance of the Clear Aligner segment to Align's business and bottom line raises a strong inference that the Individual Defendants knew, or were deliberately reckless in not knowing or disregarding, that their statements about the lack of impact from competition in the clear aligner market and the Company's Clear Aligner ASP were false and/or misleading or omitted material facts.

183. *The Individual Defendants had direct access to negative material nonpublic information regarding the impact of competition and the Company's Clear Aligner ASP.* Each of the Individual Defendants had access to detailed information regarding Align's competition, the impact of competition following the expiration of its key patents, the measures it put in place to combat competition (including the undisclosed 3Q Promotion), and real-time data regarding the revenues and ASPs and the impact of promotions on those metrics. As discussed above, multiple former employees stated that this information was transmitted and learned through meetings, reports, and other regular communications.

- During weekly EMC meetings, the attendees discussed the negative impact of competition, revenues, and ASP. *See* ¶¶ 60, 62.

- The Individual Defendants all attended the Company's quarterly All-Hands meetings where "all they talked about" was the expiration of Align's patents and the fact that the Company's competitors would "get access to [the Company's] recipes" and sell the aligners for less (which they did). *See* ¶ 59.

- Defendant Hogan expressly acknowledged the impact of looming competition during his remarks at the National Sales Meeting in January 2018. *See* ¶ 58. Hogan's message to the attendees about clear aligner competitors was "they're coming." *Id.*

- Defendant Morici attended meetings during which he discussed the threat of Align's competitors, including ClearCorrect, SDC, and 3M, and specifically linked the 3Q Promotion to the Company's concerns about competition. *See* ¶ 106.

- Align's focus on ASP increased in 2018 as its ASP began to decline and the Company started a large project in August or September 2018 specifically to "figure out how to stop the bleeding" regarding the declining ASP that resulted from the Company's promotions—i.e., the 2018 Advantage Program and the 3Q Promotion. *See* ¶ 116.

- Defendant Morici also attended meetings in connection with the Company's project to address declining ASP, during which the attendees discussed the ASP decline and various ways to try and stop the decline. *See id.*

- Align's executive team received bi-weekly reports that highlighted sales volume, revenue, and ASP, among other metrics. *See* ¶ 62.

- Align's executive team also received a monthly reporting package that reflected all of the financial figures for the prior month, including ASP. *See id.*

- The Individual Defendants had access to Sales Force, which reported ASP in almost real-time. *See ¶¶ 63-66.*

184. ***The Individual Defendants' suspicious insider trading reinforces a strong inference of scienter.*** During the Class Period, the Individual Defendants realized substantial benefits from their personal sales of Align stock at the same time that they and the Company mispresented and concealed material facts from investors regarding the impact that competition and the measures Defendants put in place to combat competition were having on the Company's Clear Aligner revenues and ASP. As set forth in the chart below, the Individual Defendants collectively sold more than 151,000 shares of Align stock during the Class Period, for total proceeds of nearly $50 million.

| Date | Seller | Number of Shares Sold | Approximate Price Per Share | Proceeds | Percentage of Shares Sold |
|------|--------|----------------------|----------------------------|----------|---------------------------|
| 5/7/18 | Wright | 27,492 | $263.67 | $7,248,953 | 66% |
| 5/30/18 | Morici | 2,405 | $331.35 | $796,907 | 82% |
| 6/1/18 | Hogan | 85,998 | $333.00 | $28,645,073 | 40% |
| 8/14/18 | Hogan | 25,000 | $367.48 | $9,186,990 | 19% |
| 8/23/18 | Pascaud | 10,500 | $361.00 | $3,790,500 | 29% |
| Totals | | 151,395 | | $49,668,424 | |

185. As this chart demonstrates, these sales were suspicious in amount. Defendant Wright's May 7, 2018 sale represented approximately 66% of his currently-held shares of Align common stock at that time. Defendant Hogan's June 1, 2018 sale represented nearly 40% of his currently-held shares of Align common stock at that time and his August 14, 2018 sale represented just over 19% of his currently-held shares of Align common stock at that time. In addition, in the three years leading up to these two sales, Hogan only sold 54,584 shares of Align stock for a total of $7,804,520 in proceeds. Thus, Hogan's total Class Period sales of $37,832,063 were nearly ***five times*** greater than his total sales over the prior three years. Defendant Morici's May 30, 2018 sale represented approximately

82% of Morici's currently-held shares of Align common stock at that time. Defendant Pascaud's August 23, 2018 sale represented more than 29% of Pascaud's currently-held shares of Align common stock at that time.

186.    The Individual Defendants' sales of Align stock were suspiciously timed to take advantage of the significant run up in the price of Align's stock. Indeed, at the time of Morici's May 30, 2018 sale and Hogan's June 1, 2018 sale, Align's stock price was at a high of over $330 per share. In addition, Hogan's largest sale on June 1, 2018 occurred just days before Align implemented its secret 3Q Promotion. Also, Hogan's and Morici's May and June 2018 sales occurred within months of the disclosure revealing the relevant truth regarding the impact of competition and the measures the Company put in place to address competition, which led to drastically lower ASP and revenue results, causing Align's stock price to plummet, as discussed above.

187.    ***Align's executive compensation structure supports scienter.*** Align's executive compensation was highly contingent on increases in the Company's stock price and financial performance. According to the Company's proxy statements, Align "emphasize[d] performance-based pay." For 2018, 91% of Defendant Hogan's "total target annual compensation was subject to annual performance goals or tied to the value of [Align's] common stock." However, after "[t]aking into account the special CEO equity award granted in June 2018, 97% of [Align's] CEO's [Defendant Hogan's] total-target annual 2018 compensation was subject to annual performance goals or tied to the value of [Align's] common stock." Moreover, "84% of [Defendants Morici's, Pascaud's, and Wright's] total-target annual compensation was subject to annual performance goals or tied to the value of [Align's] common stock." As set forth in Align's proxy statement issued on April 4, 2019: "Based on outstanding performance against aggressive 2018 objectives, [Defendants Morici, Pascaud, and Wright] received maximum annual incentive payments (bonuses) of 240% of their target award opportunity."

188.    Under Align's annual incentive plan compensation program, in addition to their base salaries, the Individual Defendants received substantial remuneration in the form of non-equity incentive plan compensation for 2018: Defendant Hogan earned $3,870,000; Defendant Morici earned $718,000; Defendant Pascaud earned $638,000; and Defendant Wright earned $686,000. The

non-equity incentive plan compensation was "based primarily on two metrics: revenue and operating income." In addition, Hogan was further incentivized to increase Align's stock price based on its performance versus the broader market. For every 1% that Align's stock price exceeded the return on the NASDAQ, Hogan would receive a 2% increase in stock-based compensation.

189.    As a result of the lucrative financial incentives offered by the Company, the Individual Defendants were highly motivated to artificially inflate the price of Align stock by making false and misleading statements that concealed material facts surrounding the impact of increasing competition and the measures Align was taking to address the competition that led to the third quarter decline in Align's Clear Aligner ASP and revenues.

190.    ***Puco's sudden resignation in connection with and shortly after the revelation of the adverse facts previously concealed by Defendants reinforces scienter.*** On November 1, 2018, only eight days after the Company's corrective disclosure, Align issued a press release announcing that Puco was resigning after twelve years with the Company. Notably, Puco approved both the secret 3Q Promotion and the January 2018 changes to the Advantage Program that led to the third quarter decline in Align's Clear Aligner ASP. *See* ¶ 102, *supra*.

191.    ***The temporal proximity between Defendant Morici's September 5, 2018 misrepresentation denying any change in competition and the Company's October 24, 2018 admissions supports scienter.*** During the Robert W. Baird Global Healthcare Conference on September 5, 2018, Defendant Morici engaged in the following exchange with an analyst:

> ANALYST: And then one other question on competition. . . . ClearCorrect's been a competitor for several years now. . . . *[A]re you seeing anything specifically now* that Straumann, you do have at least one big corporate partner with an established system, a much small market share. But anything with that particular business?
>
> MORICI: ***Nothing of note***. Like you say, we've been competing against them for a number of years, smaller company, really more on the GP side versus the ortho side. And they're typically on the lower stage, not as complicated of a product. But competing with them in the marketplace like we have in the past, whether it's in U.S. or other places, and we continue to find ways. Like I said, as a company, we can treat the most complicated cases, like you're talking with mandibular advancement and hopefully – and future palate expansion all the way down to the more basic, straightforward cases, and it's up to us to – we created this market. It's up to us to continue to maximize and drive value in this market.

192.    The proximity between Defendant Morici's misrepresentation that Align had not seen any changes in the clear aligner competition facing the Company and its disclosure of the significant decline in ASP due to the measures that the Company implemented specifically to deal with increased competition, only 49 days later, further supports an inference that Defendants were deliberately reckless in claiming there had been no changes in the competitive landscape.

193.    ***Defendant Hogan's and Defendant Morici's unequivocal denials that the Company was seeing any impact from competition demonstrate a strong inference of scienter.*** Following the implementation of the January 2018 changes to the Advantage Program, Defendants issued strident and unequivocal denials. For example, on April 25, 2018—four months after the Advantage Program changes went into effect—Defendant Hogan affirmatively and unequivocally denied that the Company was dealing with any changes in competition that prompted the modifications to the Advantage Program Align was offering to doctors. He stated: "***No, we haven't seen any change at all, John. I mean, we – I mean, the same cast of competitors are still out there that we had before***," and later added, "***So I mean, you can see with our kind of bullish forecast for the second half of the year that John just called that we're pretty much – have this in place in the sense of what we thought we would face, and we haven't really changed that analysis since we put the plan together last year***."

194.    Similarly, on July 25, 2018, just over three weeks after Align rolled out the undisclosed 3Q Promotion, Defendants held a conference call with analysts to discuss the Company's financial results from the three months ended June 30, 2018, as well as the Company's expected revenues and ASP for the third quarter of 2018. During this call, Defendant Morici provided the following outlook for the third quarter of 2018: "[W]e expect the third quarter to shape up as follows: . . . We expect Q3 gross margin to be in the range of 74% to 74.4%, reflecting higher expenses as we regionalize our treatment planning and manufacturing operations, ***partially offset by higher ASPs.***" During the question and answer portion of the 2Q 2018 Conference Call, Defendants Hogan and Morici jointly responded to two questions from Jonathan Block, a Stifel, Nicolaus analyst, related to competition and whether competition was factored into the Company's third quarter guidance, with Defendant Hogan stating: "***Jon, and from a competitive standpoint, there's nothing really different***

1    *than what we saw from an AAO standpoint* . . . . From what we see, it's – there's – again, it's just in

2    line with other offerings that we see out there and we'll get – I'll get, I think, a stronger beat on that

3    in the future, but right now, *I wouldn't say we've changed in any way our assessment of the*

4    *competition that we saw at the AAO.*"

5         195.   In making such unequivocal statements, Defendants Hogan and Morici knew, were

6    deliberately reckless in not knowing, and were responsible prior to making such statements for

7    inquiring into, the actual circumstances concerning the subject of their statements. Indeed, had

8    Defendants Hogan and Morici done any due diligence regarding competition prior to making these

9    statements, they would have known that: (i) the Company was experiencing pressure from new

10   competitors in the market as a result of the expiration of some of the Company's core patents

11   beginning in October 2017; and (ii) the changes to the promotions Align was offering in January 2018

12   and July 2018 were implemented in order to counteract the impact of competition in the lower end of

13   the market and were having a negative effect on the Company's ASP.

14        196.   *The Individual Defendants' high-level positions and control over the contents of the*

15   *Company's public statements during the Class Period support an inference of scienter.* The

16   Individual Defendants were directly involved in and participated in the both the management and

17   day-to-day operations of the Company at its highest levels. Indeed, each of the Individual Defendants

18   was a member of the Company's EMC throughout the Class Period. As Align's CEO and CFO,

19   respectively, Defendants Hogan and Morici were responsible for reviewing and approving all of

20   Align's filings with the SEC, which included reporting on the Company's Clear Aligner revenues

21   and ASP. Due to their high-level positions, each Individual Defendant was provided with, or had

22   access to, copies of the statements alleged herein to be false or misleading prior to, or shortly after,

23   their issuance, and had the ability and opportunity to prevent their issuance or cause them to be

24   corrected. As a result, the Individual Defendants were responsible for the accuracy of Align's

25   corporate statements, and each is therefore responsible and liable for the representations contained

26   therein or omitted therefrom.

27        197.   Moreover, because of their positions and access to material nonpublic information

28   concerning the Company, the Individual Defendants knew or were deliberately reckless in

disregarding that the adverse facts alleged herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made to investors, including the statements concerning competition in the clear aligner market and the Company's Clear Aligner revenues and ASP, were materially false and misleading. In addition, the statements made by Align and the Individual Defendants during the Class Period, including their denials that the Company was facing additional pressure from competitors, strongly and plausibly suggest each had access to the disputed information. Indeed, the vast majority of Defendants' material misrepresentations and omissions (*see* Section V, *supra*), explicitly or implicitly, pertain directly to competition in the clear aligner market and the Company's Clear Aligner revenues and ASP, and could not have been made with any reasonable basis in fact.

198.    Align knowingly and/or with deliberate recklessness made, controlled, or had ultimate authority over the materially false and/or misleading statements and omissions alleged herein based on the fact that Individual Defendants knew and/or were deliberately reckless in not knowing that the Company's statements were materially false and/or misleading, and/or omitted material facts at the times that such statements were made. Each of the Individual Defendants was among the most senior executives of the Company throughout the Class Period, was acting within the scope of their authority, and was a member of the Company's senior management, and their knowledge may be imputed to the Company.

## VIII.   CLASS ACTION ALLEGATIONS

199.    Plaintiff brings this action on its own behalf and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities who purchased the common stock of Align from April 25, 2018 through and including October 24, 2018, and were damaged thereby (the "Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate families of the Individual Defendants; (iii) the Company's subsidiaries and affiliates; (iv) any person who is or was an officer or director of the Company or any of the Company's subsidiaries or affiliates during the Class Period; (v) any entity in which any Defendant has a controlling interest; and (vi) the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

200.    The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, Align had more than 700 million shares of common stock outstanding and actively trading on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that the proposed Class numbers in the thousands and is geographically widely dispersed. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

201.    Plaintiff's claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' alleged conduct in violation of the Exchange Act as complained of herein.

202.    Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained counsel competent and experienced in class and securities litigation.

203.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. The questions of law and fact common to the Class include:

(i)     whether Defendants violated the federal securities laws by their acts and omissions as alleged herein;

(ii)    whether Defendants made statements to the investing public during the Class Period that contained material misrepresentations or omitted material facts;

(iii)   whether and to what extent the market price of Align's common stock was artificially inflated during the Class Period because of the material misstatements and omissions alleged herein;

(iv)    whether Align and the Individual Defendants acted with the requisite level of scienter;

(v)     whether the Individual Defendants were controlling persons of the Company;

(vi)    whether reliance may be presumed; and

(vii)   whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

204.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is

impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX.   THE FRAUD ON THE MARKET PRESUMPTION OF RELIANCE APPLIES

205.   At all relevant times, the market for Align's common stock was efficient for the following reasons, among others:

(i)     Align's common stock met the requirements for listing, and was listed and actively traded on the NASDAQ Global Select Market, a highly efficient and automated market;

(ii)    As a regulated issuer, Align filed periodic public reports with the SEC and the NASDAQ Global Select Market;

(iii)   Align regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(iv)    Align was followed by multiple securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace. Indeed, more than three hundred analyst reports on Align were published during the Class Period.

206.   As a result of the foregoing, the market for Align's common stock promptly digested current information regarding Align from all publicly available sources and reflected such information in the price of Align's common stock. Under these circumstances, all purchasers of Align's common stock during the Class Period suffered similar injury through their purchase of Align's stock at artificially inflated prices, and a presumption of reliance applies.

207.   Further, at all relevant times, Plaintiff and other members of the putative Class reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC filings. Plaintiff and the other members of the Class would not have purchased or otherwise acquired Align common stock at artificially inflated prices if Defendants had disclosed all material information as required. Thus, to the extent that Defendants concealed or improperly failed

to disclose material facts with regard to the Company and its business, Plaintiff and other members of the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## X.    THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

208.    The Private Securities Litigation Reform Act's statutory safe harbor and/or the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein.

209.    None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time each statement was made.

210.    To the extent that any materially false or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was a mixed statement of present and/or historical facts and future intent, and is not entitled to safe harbor protection with respect to the part of the statement that refers to the present and/or past.

211.    To the extent that any materially false or misleading statement alleged herein, or any portions thereof, may be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement or portion thereof. As alleged above in detail, given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false or misleading statements.

212.    To the extent that the statutory safe harbor may apply to any materially false or misleading statement alleged herein, or a portion thereof, Defendants are liable for any such false or misleading statement because at the time such statement was made, the speaker knew the statement was false or misleading, or the statement was authorized and approved by an executive officer of Align who knew that such statement was false or misleading.

1    XI.    CAUSES OF ACTION

2                                   COUNT ONE

3    **Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**
     **Against Defendants Align and the Individual Defendants**
4

5        213.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set

6    forth herein.

7        214.    This Count is asserted pursuant to Section 10(b) of the Exchange Act, and Rule 10b-5

8    promulgated thereunder, on behalf of Plaintiff and all other members of the Class, against Align and

9    the Individual Defendants.

10       215.    As alleged herein, throughout the Class Period, Align and the Individual Defendants,

11   individually and in concert, directly and indirectly, by the use of the means or instrumentalities of

12   interstate commerce, the mails, and/or the facilities of national securities exchanges, made materially

13   untrue statements of material fact and/or omitted to state material facts necessary to make their

14   statements not misleading and carried out a plan, scheme, and course of conduct, in violation of

15   Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Align and the Individual

16   Defendants intended to and did, as alleged herein: (i) deceive the investing public, including Plaintiff

17   and members of the Class; (ii) artificially inflate and maintain the prices of Align's common stock;

18   and (iii) cause Plaintiff and members of the Class to purchase the Company's common stock at

19   artificially inflated prices.

20       216.    The Individual Defendants were individually and collectively responsible for making

21   the materially false and misleading statements and omissions alleged herein and having engaged in a

22   plan, scheme, and course of conduct designed to deceive Plaintiff and members of the Class, by virtue

23   of having made public statements and prepared, approved, signed, and/or disseminated documents

24   that contained untrue statements of material fact and/or omitted facts necessary to make the

25   statements therein not misleading.

26       217.    As set forth above, Align and the Individual Defendants made the materially false and

27   misleading statements and omissions and engaged in the fraudulent activity described herein

28   knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit

and fraud upon Plaintiff and the other members of the Class who purchased the Company's common stock during the Class Period.

218.    In ignorance of the materially false and misleading nature of Align's and the Individual Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Align's common stock, Plaintiff and other members of the Class purchased the Company's common stock at artificially inflated prices during the Class Period. But for the fraud, Plaintiff and members of the Class would not have purchased the Company's common stock at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of Align's common stock declined precipitously, and Plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of the Company's common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

## COUNT TWO

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

219.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

220.    This Count is asserted pursuant to Section 20(a) of the Exchange Act, on behalf of Plaintiff and all other members of the Class, against the Individual Defendants.

221.    As alleged above, the Company violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making materially false and misleading statements and omissions in connection with the purchase or sale of Align's common stock and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period. This fraudulent conduct was undertaken with scienter, and Align is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with deliberate reckless disregard of the falsity of the Company's statements and the fraudulent nature of its scheme during the Class Period.

222.    As set forth above, the Individual Defendants were controlling persons of the Company during the Class Period, due to their senior executive positions with the Company and their

direct involvement in the Company's day-to-day operations, including their power to control or influence the policies and practices giving rise to the securities violations alleged herein, and exercised the same. As such, the Individual Defendants had regular access to nonpublic information about Align's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other corporate officers and employees, attendance at management meetings and meetings of the Company's Board and committees thereof, as well as reports and other information provided to them in connection therewith.

223. By virtue of the foregoing, the Individual Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content of its public statements with respect to its operations, corporate governance, and compliance with regulators.

224. The Individual Defendants were culpable participants in Align's fraud alleged herein, by acting knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Plaintiff and the other members of the Class who purchased the Company's common stock during the Class Period.

225. By reason of the foregoing, the Individual Defendants are liable to Plaintiff and the members of the Class as controlling persons of the Company in violation of Section 20(a) of the Exchange Act.

### COUNT THREE

**Violation of Section 10(b) and 20A of the Exchange Act and Rule 10b-5 Promulgated Thereunder for Insider Trading Against Defendants Hogan and Morici**

226. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

227. This Count is asserted pursuant to Sections 10(b) and 20A of the Exchange Act, and Rule 10b-5 promulgated thereunder, on behalf of Plaintiff and all other members of the Class who purchased shares of Align common stock contemporaneously with the sale of Align common stock

by Defendants Hogan and Morici while they were in possession of material, nonpublic information as alleged herein.

228.   Section 20A(a) of the Exchange Act provides:

> Any person who violates any provision of the [Exchange Act] or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased . . . securities of the same class.

229.   As set forth herein, Defendants Hogan and Morici violated Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder for the reasons stated in Counts One and Two above. Additionally, Defendants Hogan and Morici further violated Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder, by selling shares of Align common stock while in possession of material, nonpublic adverse information, as alleged above. Defendants Hogan and Morici were required to abstain from trading or disclose this nonpublic adverse information, but failed to do so, as more fully alleged herein.

230.   Contemporaneously with Defendant Morici's and Defendant Hogan's insider sales of Align common stock on May 30, 2018 and June 1, 2018, respectively, Plaintiff purchased shares of Align common stock on a national securities exchange.

231.   Other Class members also purchased shares of Align common stock contemporaneously with Defendant Hogan's and Defendant Morici's insider sales of Align common stock.

232.   Plaintiff and other members of the Class have been damaged as a result of the violations of the Exchange Act alleged herein.

233.   By reason of the violations of the Exchange Act alleged herein, Defendants Hogan and Morici are liable to Plaintiff and other members of the Class who purchased shares of Align common stock contemporaneously with Defendant Hogan's and Defendant Morici's sales of Align common stock during the Class Period.

234.   Plaintiff and the other members of the Class who purchased contemporaneously with Defendant Hogan's and Defendant Morici's insider sales of Align securities seek damages and/or other applicable remedies, including disgorgement by Defendants Hogan and Morici of profits gained

1    or losses avoided from Defendant Hogan's and Defendant Morici's transactions in Align common

2    stock contemporaneously with Plaintiff and other members of the Class.

3        235.   This action was brought within five years of the date of the last transaction that is the

4    subject of Defendant Hogan's and Defendant Morici's violations of Section 20A, and, with respect

5    to the underlying violations of Section 10(b) of the Exchange Act alleged in this Count and in Count

6    One above, was brought within five years after the date of the last transaction by each of Defendant

7    Hogan and Defendant Morici that violated section 20A of the Exchange Act.

8    **XII.    PRAYER FOR RELIEF**

9        WHEREFORE, Plaintiff respectfully prays for judgment as follows:

10       A.     Determining that this action is a proper class action maintained under Rules 23(a) and

11   (b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiff as class representative, and

12   appointing Kessler Topaz Meltzer & Check, LLP as class counsel pursuant to Rule 23(g);

13       B.     Declaring and determining that Defendants violated the Exchange Act by reason of

14   the acts and omissions alleged herein;

15       C.     Awarding Plaintiff and the Class compensatory damages against all Defendants,

16   jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

17       D.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this

18   action, including but not limited to, attorneys' fees and costs incurred by consulting and testifying

19   expert witnesses; and

20       E.     Granting such other and further relief as the Court deems just and proper.

21   **XIII.  DEMAND FOR JURY TRIAL**

22       Plaintiff hereby demands a trial by jury.

23

24

25

26

27

28

DATED: May 10, 2019                    Respectfully submitted,

                                       **KESSLER TOPAZ**
                                         **MELTZER & CHECK, LLP**

                                       */s/ Jennifer L. Joost*
                                       JENNIFER L. JOOST (Bar No. 296164)
                                       ELI GREENSTEIN (Bar No. 217945)
                                       STACEY M. KAPLAN (Bar No. 241989)
                                       JENNY L. PAQUETTE (Bar No. 321561)
                                       One Sansome Street, Suite 1850
                                       San Francisco, CA 94104
                                       Tel:    (415) 400-3000
                                       Fax:    (415) 400-3001
                                       jjoost@ktmc.com
                                       egreenstein@ktmc.com
                                       skaplan@ktmc.com
                                       jpaquette@ktmc.com

                                       -and-

                                       MARGARET E. MAZZEO (*Pro Hac Vice*)
                                       280 King of Prussia Road
                                       Radnor, PA 19087
                                       Tele:   (610) 667-7706
                                       Fax:    (610)667-7056
                                       mmazzeo@ktmc.com

                                       *Counsel for Lead Plaintiff SEB Investment*
                                       *Management AB and Lead Counsel for the Class*