**KESSLER TOPAZ**
  **MELTZER & CHECK, LLP**
JENNIFER L. JOOST (Bar No. 296164)
STACEY M. KAPLAN (Bar No. 241989)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel: (415) 400-3000
Fax: (415) 400-3001
jjoost@ktmc.com
skaplan@ktmc.com

[*Additional Counsel on Signature Page*]

*Counsel for Lead Plaintiff SEB Investment Management AB*
*and Lead Counsel for the Class*

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| SEB INVESTMENT MANAGEMENT AB, Individually and on Behalf of All Others Similarly Situated, | Case No. 5:18-cv-06720-LHK |
| Plaintiff, | CLASS ACTION |
| v. | **AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| ALIGN TECHNOLOGY, INC., JOSEPH M. HOGAN, and JOHN F. MORICI, | **DEMAND FOR JURY TRIAL** |
| Defendants. | Judge:        Hon. Lucy H. Koh<br>Courtroom:  8, 4th Floor |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION .......................................................................................... 1

II.  JURISDICTION AND VENUE ................................................................... 6

III.  PARTIES ....................................................................................................... 7

    A.  Plaintiff ................................................................................................ 7

    B.  Defendants ........................................................................................... 7

    C.  Relevant Non-Party Align Executives ................................................ 8

    D.  Former Employees .............................................................................. 9

IV.  FACTUAL ALLEGATIONS .................................................................... 10

    A.  Company Background and Business Model ...................................... 10

    B.  Pre-Class Period Events: The Market Focuses on the Impact of Expected Competition on Align's Key ASP Metric ....................................... 13

        1.  Analysts Focus on Whether New Competitive Entries Will Impact Align's Key ASP Metric .................................................................... 13

        2.  Defendants Closely Track Align's ASPs and the Impact of Competition ............ 16

        3.  Before a Key Industry Event at Which New Competition Is Expected, Analysts Believe the Threat Is Limited to Low-End, Non-Comprehensive Cases ............................................................ 18

        4.  Competitors Launch New Comprehensive Products at the AAO Annual Meeting ................................................................... 19

    C.  Class Period: Defendants Reassure the Market About New Competitive Entries While Concealing that They Are Secretly Implementing an Aggressive Discounting Program for Comprehensive Products to Counter Competition ................. 20

        1.  At Align's Investor Day, Defendants Paint Align's Core Comprehensive Business as Impervious to Competition While Top Executives Unload Company Stock .......................................... 20

        2.  Defendants Secretly Implement Sharp Discounts to Align's Comprehensive Products ................................................................... 21

        3.  Defendants Promise Higher ASPs in the Third Quarter While Concealing the 3Q18 Discounting Promotion and Misleadingly Claiming that Align Has Made No Adjustments in Response to Competition .................................... 23

    D.  The Relevant Truth Is Revealed ....................................................... 26

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

V.      DEFENDANTS' MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS ............................................................................................................29

        A.      May 23, 2018 Investor Day .........................................................................29

        B.      June 12, 2018 Goldman Sachs Global Healthcare Conference .........................31

        C.      July 25, 2018 2Q18 Earnings Call ...............................................................31

        D.      September 5, 2018 Robert W. Baird Global Healthcare Conference ................35

VI.     LOSS CAUSATION..................................................................................................36

        A.      The Relevant Truth Concealed by Defendants' Misleading Statements and Omissions Is Revealed on October 24, 2018 ...................................................37

        B.      Relevant Post-Class Period Developments......................................................42

VII.    SUMMARY ALLEGATIONS OF SCIENTER ...........................................................43

VIII.   CLASS ACTION ALLEGATIONS ...........................................................................50

IX.     THE FRAUD ON THE MARKET AND *AFFLILIATED UTE* PRESUMPTIONS OF RELIANCE APPLY ...............................................................................................52

X.      THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE ....................................................................................................53

XI.     CAUSES OF ACTION .............................................................................................54

XII.    PRAYER FOR RELIEF ............................................................................................58

XIII.   DEMAND FOR JURY TRIAL ..................................................................................58

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Lead Plaintiff SEB Investment Management AB ("Plaintiff" or "SEB"), by and through its undersigned counsel, brings this action individually and on behalf of all other persons and entities who purchased or otherwise acquired the common stock of Align Technology, Inc. ("Align" or the "Company") between May 23, 2018, and October 24, 2018, both dates inclusive (the "Class Period"), and who were damaged thereby.

Plaintiff alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based upon the investigation conducted by and through its attorneys, which included, among other things, interviews with numerous individuals, including former employees of Align, a review of Align's public documents, conference calls concerning Align, Align's filings with the United States Securities and Exchange Commission ("SEC"), wire and press releases published by Align, analyst reports and advisories about the Company, media reports concerning Align, and information obtainable on the Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    __INTRODUCTION__

1.      For decades, the only solution for persons looking to correct malocclusion—that is, misaligned teeth—was traditional bracket and wire braces. While effective, braces could be uncomfortable and were viewed as aesthetically undesirable by some patients. In the late 1990s, Align developed an alternative: custom-made, removable, clear plastic aligners that could straighten a patient's teeth less conspicuously than braces. The product took off, as patients and their doctors flocked to the new technology.

2.      Although Align also developed and marketed intraoral scanners and related software for use in doctors' offices to image patients' teeth, it was the aligners, sold in sets called "cases," that sustained the Company, making up nearly 90% of its net sales in recent years. The cases fell into two broad categories: comprehensive, designed to treat more severe malocclusion, and non-comprehensive, which cost less, involved fewer sets of aligners, and were intended for less serious instances of malocclusion. Comprehensive cases comprised the lion's share of Align's sales, accounting for 70% to

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

75% during the relevant period. Most of these sales went to orthodontists and general practitioner dentists, whose prescriptions were required before patients could be fitted for the aligners.

3.      For nearly two decades after it first brought its flagship Invisalign clear aligner product line to market, Align faced little competition in the market for comprehensive cases. The handful of other companies competing in the clear aligner space during this period offered non-comprehensive cases, which constituted only a quarter of the total market for clear aligner products addressing malocclusion. As Piper Jaffray summarized in a September 6, 2017 report, Align's rival companies "compete[d] at a lower price point with limited tooth movement capabilities."

4.      Align maintained this dominance because of the patents it held on its technology and manufacturing processes, many of which related to the computer-aided design and manufacturing technology that allowed the Company to develop and manufacture high-quality clear aligners in large quantities. Align's hold on critical technology and, therefore, the comprehensive case market allowed the Company to charge higher prices, which served as an indicator of the lack of competition. The Company's ability to sell its aligners for higher prices without fear of being undercut by rival companies was a welcome feature to Align investors and analysts covering the Company, driving a sustained run-up in Align's stock price.

5.      Beginning in late 2017, however, the patents that had until then prevented new entrants into the market for comprehensive cases began to expire. With rival companies set to gain access to the technology that had protected Align's market share since its inception, investors awoke to the possibility that the Company's virtual monopoly could come to an end. Analysts focused in particular on Align's pricing, viewing the Company's Average Selling Price ("ASP") as a proxy for the competitive threat: declining prices could reflect that increasing competition in the clear aligner market was forcing Align to lower its prices to compete. Deutsche Bank observed in the spring of 2018 that "the sustainability of [Align's] ASP trends will come into question as the competitive landscape becomes more of a focus." Similarly, Berenberg Capital Markets observed that a "key risk" to its positive investment thesis for Align was that "new entrants could also pressure ASPs more significantly than we have modeled."

6.      Given its importance to analysts, Align's management closely monitored the Company's ASP metric. Former employees report that the Company maintained near-real-time data on ASPs through

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

its internal sales system and that CEO Joseph Hogan, CFO John Morici, and other top executives received updates both biweekly and at the end of each month. ASPs were also included as topics for discussion in Align's monthly Executive Management Committee ("EMC") meetings. Align's executives were equally absorbed by the Company's emerging competition as its patents expired. Former employees have confirmed that this threat was a regular topic of conversation at EMC meetings attended by Hogan, Morici, and other top managers, as well as at quarterly "All-Hands" meetings during which Hogan and the rest of the leadership team focused intently on the subject.

7.     A critical test of the competitive threat to Align was set to occur in May 2018 at the Annual Meeting of the American Association of Orthodontists ("AAO"), when new entrants were expected to announce their products. Heading into the meeting, analysts speculated that pricing pressure would occur only in the low end of the market, with Align maintaining its strength in the comprehensive case market from which it drew most of its revenues. During the AAO, however, competitors launched comprehensive products at price-points under Align's, prompting analysts to take notice. Leerink Partners reported that "clear aligner competition headlines are coming," noting in a follow-up analysis that "rising competition naturally raises questions about potential future pricing pressure." Morgan Stanley wrote, "[T]here could be risk to ALGN's moat amongst more comprehensive cases."

8.     Roughly two weeks later, on May 23, 2018—the first day of the Class Period—Align's top managers faced skeptical analysts at the Company's annual Investor Day. The executives sought to assuage the analysts' concerns. In response to a question about the competitive threat posed by new rivals, Hogan assured those in attendance that competition would be at the "low end" of the market, concerning cases of "15 aligners or less" (i.e., less expensive, non-comprehensive products); in other words, any competitive threat was limited to a small subset of the Company's business. At a healthcare conference on June 12, 2018, Morici presented the same theme, stating that "there's nothing that disrupts us from what we would've expected."

9.     The analysts took these reassurances at face value, with Berenberg Capital Markets reporting, "U.S. competitive launches are not likely to undercut [Align's] ASPs significantly." Credit Suisse stated that it had "walked away [from the Investor Day] incrementally encouraged on [Align's]

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

competitive position," particularly given that Align had "emphasized that competitors clearly need to invest further in their solutions to make more meaningful inroads."

10.     In truth, Align's top managers were deeply concerned about what they had seen at the AAO and were readying a secret promotional campaign that would cut prices on its all-important comprehensive cases to sway doctors to stay with the Company's products over those of its rival companies. Unbeknownst to the investing public, the campaign (the "3Q18 Discounting Promotion") would go into effect on July 1, 2018, the first day of Align's third quarter, and would provide a $200 discount to qualifying sales **on top of** the Company's existing customer loyalty incentives.

11.     As one former employee recounted, CFO Morici was "very, very aware of Align's competition" and ***explicitly linked the 3Q18 Discounting Promotion to Align's concerns about competition***. Tellingly, the promotion applied **only** to Align's comprehensive cases—a reflection of Defendants' and others' recognition that competition in this space posed a serious threat to the Company. Indeed, the same former employee, a member of Align's Financial Planning and Analysis group at the time, recalls seeing a whiteboard at the Company's headquarters on which the new rivals were identified by name, along with an analysis of how much **lost** market share in the comprehensive case market Align could recapture through the $200-per-unit discount.

12.     Once the 3Q18 Discounting Promotion secretly went into effect, the impact on Align's ASPs was immediate. A former employee revealed that, even **before** the 3Q18 Discounting Promotion began, Align's ASPs had been declining. After the promotion was put into place, however, the decline accelerated—and management knew it. Indeed, Morici was so concerned about the deterioration in this key metric that he directed his Vice Presidents ("VPs") in the Finance Department to have analyses of the trend conducted in July—that is, less than a month after the discounts went into effect. These analyses showing declining ASPs were personally delivered to Morici.

13.     Nevertheless, even after he had learned that ASPs were trending ***negative*** as a result of the new discounts, Morici promised ***higher*** ASPs in the third quarter during Align's 2Q18 earnings call on July 25, 2018. On the same call, Hogan responded to a question about post-AAO competition by saying, "I wouldn't say we've changed in any way our assessment of the competition that we saw at the AAO." He later reiterated his denial that Align was responding to the competition, stating, "***[T]here's not a***

*momentum piece or anything that we're adjusting the business around right now*."[1] Moreover, while assuring the market that they were making no adjustments to counter competition, Hogan and Morici concealed the aggressive new 3Q18 Discounting Promotion that Align had implemented directly in response to the new competition. A former employee familiar with the promotion confirmed that the lead time for such initiatives was at least several weeks before the effective date and that it was understood at the time the 3Q18 Discounting Promotion went into effect that it would lower ASPs.

14.     Analysts again were reassured by Defendants' public statements. Berenberg Capital Markets wrote that Align's "price is insulated given a clear competitive advantage," giving the firm "more confidence that a near term pricing cliff is unlikely for [Align]." William Blair maintained an "outperform" rating on the Company's stock because Align's "[m]anagement commentary on new clear aligner entrants was unchanged. There is no sign as yet that new entrants are impacting volumes or pricing."

15.     Six weeks later, Morici, again addressing an analyst's question about competition, once more denied that Align was responding to competition in the comprehensive market, stating, "there's nothing that – of note that was disruptive or different than what we would've seen or would've done in the past, both from a product standpoint or a pricing standpoint." While denying any pricing changes or disruption, Morici concealed that the Company was running the 3Q18 Discounting Promotion, which was continuing to drive down Align's ASPs. Meanwhile, internally, Morici and others were meeting regularly during this period to try to "*figure out how to stop the bleeding*" in the Company's ASPs.

16.     During the Company's October 24, 2018 3Q18 earnings conference call, Defendants finally revealed the relevant truth about the aggressive discounts that they had put in place to stem competition in the comprehensive market. The Company disclosed that ASPs for comprehensive products had dropped a full $100 over the prior quarter, from $1,410 to $1,310. Total ASPs for all clear aligner products fell $85. The Company later confirmed that ***all*** of the ASP drop that was unrelated to foreign-currency fluctuations was due to its promotional discounts. Align also disclosed during the 3Q18

---

[1] Unless otherwise noted, all emphasis is added.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

earnings call that it expected ASPs to remain "flat" throughout all of 2019, reflecting a "new normal" for the Company amid burgeoning competition.

17.     The news stunned the market. Berenberg Capital Markets wrote that Align's stock price would be challenged by "investor concerns around the company's ability to maintain average selling price (ASP) in the face of increased competition." William Blair observed, "investors will interpret the lower ASP as directly or indirectly a function of increased competition and compress the stock's valuation as a result."

18.     In keeping with these predictions, Align's share price plummeted nearly $59, from a close of $290.83 on October 24, 2018, to a close of $232.07 the next day. Following this steep decline, William Blair concluded, "The 6% reduction in average selling price (ASP) in the third quarter, coupled with caution about the fourth quarter, was the primary catalyst for the stock's 20% correction following earnings. . . . The ASP erosion . . . will surely increase anxiety about the impact of competition on pricing."

19.     The decline in Align's share price following the revelation that the concealed discounts had significantly driven the material ASP decline wiped out billions in market capitalization. Through this action, Plaintiff seeks to hold Defendants Align, Hogan, and Morici accountable for deceiving investors about the 3Q18 Discounting Promotion, its effect on prices of the Company's flagship products, and, ultimately, Align's important ASP metric.

## II.     <u>JURISDICTION AND VENUE</u>

20.     The claims asserted herein arise under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1(a), respectively, and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

21.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and under 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

22.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because Defendant Align's headquarters are located within this District, the Company

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

conducts substantial business in this District, and many of the acts and practices complained of herein occurred in substantial part in this District.

23.     Assignment to the San Jose Division of this District is proper under Northern District of California Civil L.R. 3-2(c) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within Santa Clara County, California, and Defendant Align's principal executive offices are located in Santa Clara County, California. Pursuant to Northern District of California Civil L.R. 3-2(e), all civil actions arising in Santa Clara County shall be assigned to the San Jose Division.

24.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.   PARTIES

### A.    Plaintiff

25.     Lead Plaintiff SEB Investment Management AB is one of the largest asset managers in Northern Europe. Headquartered in Stockholm, Sweden (corporate identity number 556197-3719), SEB offers a broad range of funds and tailored portfolios for institutional investors, as well as for retail and private banking clients. SEB purchased Align common stock during the Class Period, as described in SEB's certification pursuant to the Private Securities Litigation Reform Act of 1995, attached hereto as Exhibit A, at artificially inflated prices and suffered substantial damages as a result of the misconduct alleged herein.

### B.    Defendants

26.     Defendant Align is a global medical device company engaged in the design, manufacture, and marketing of Invisalign® clear aligners and iTero® intraoral scanners and services for orthodontics, restorative, and aesthetic dentistry. Align is incorporated in Delaware, and the Company's principal executive offices are located at 2820 Orchard Parkway, San Jose, California 95134. Align's common stock trades on the NASDAQ under the ticker symbol "ALGN."

27.     Defendant Joseph M. Hogan ("Hogan") served at all relevant times as the Company's President and Chief Executive Officer ("CEO"). Hogan additionally has served as a member of Align's

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

Board of Directors since 2015. In his role as President and CEO, Hogan spoke on behalf of Align at various conferences and meetings during the Class Period. As alleged herein, Hogan made materially false and misleading statements during the Company's May 23, 2018 Investor Day and July 25, 2018 2Q18 earnings call.

28.     Defendant John F. Morici ("Morici") served at all relevant times as the Company's Senior Vice President ("SVP") of Global Finance and Chief Financial Officer ("CFO"). In this role, Morici was responsible for managing the Company's global finance and financial strategy during the Class Period. As alleged herein, Morici made materially false and misleading statements during the June 12, 2018 Goldman Sachs Global Healthcare Conference, the Company's July 25, 2018 2Q18 earnings call, and the September 5, 2018 Robert W. Baird Healthcare Conference.

29.     Hogan and Morici are referred to herein as the "Individual Defendants." Align and the Individual Defendants are collectively referred to herein as the "Defendants."

**C.     Relevant Non-Party Align Executives**

30.     Raphael S. Pascaud ("Pascaud") served at all relevant times as the Company's Chief Marketing, Portfolio and Business Development Officer ("CMO"). In this role, Pascaud reported directly to Hogan and was responsible for global growth strategy, customer experience, brand equity, professional marketing and consumer demand, portfolio innovation, and business development during the Class Period. On October 24, 2018, Align announced that Pascaud would be stepping down from his position as CMO and transitioning to the position of Senior Vice President, Business Development and Strategy, in February 2019.

31.     Christopher C. Puco ("Puco") was Align's SVP and Managing Director, Americas during the Class Period. Before his promotion to SVP, Puco served as the Vice President of North America from December 2012 to December 2017. During the Class Period, Puco reported directly to Hogan. On November 1, 2018, Align unexpectedly announced that Puco was resigning from his position as SVP.

32.     Emory M. Wright ("Wright") served at all relevant times as the Company's SVP of Global Operations. In this role, Wright reported directly to Hogan and was responsible for Align's global manufacturing and operation activities during the Class Period. Wright joined Align in 2000, and was

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

promoted to Vice President of Operations in December 2007. He was promoted to SVP in February 2018.

D.  **Former Employees**[2]

33.     FE 1 was a Regional Sales manager for Align from several years prior to the Class Period through May 2018, supervising between five and ten Territory Managers. FE 1 reported to the Director of Sales for the Southwest area, Joe Ghiz, who reported to the West Area Vice President of Sales, Kevin Connolly, who in turn reported to Puco. FE 1 had access to Align's Sales Force reporting system and used this system to send weekly reports to Ghiz, who reported to Connolly. FE 1 added that Sales Force data included information regarding ASPs. FE 1 attended quarterly business review meetings, which Puco occasionally attended. During these meetings, the attendees discussed ASP and other Sales Force targets.

34.     FE 3 was a mid-level manager at Align from several years prior to 2018 through early in the second quarter of 2018, responsible for purchasing direct materials and supporting marketing. FE 3 reported to the Director of Supply Chain, Cory Robertson, who reported to Wright, who in turn reported to Defendant Hogan. FE 3 attended Align's quarterly All-Hands meetings where Defendant Hogan addressed patent expirations and competition. FE 3 also attended meetings with the Vice President of Operations that followed each quarterly All-Hands meeting.

35.     FE 4 was Senior Support Assistant at Align during the entirety of the Class Period. In this role, FE 4 supported a sales and operations executive who reported directly to Defendant Hogan. FE 4 was closely involved with and privy to internal discussions among top Align executives about competition and pricing and interacted regularly with Defendant Hogan. FE 4 also had access to the agendas prepared for the monthly meetings of the EMC, attended by Hogan and all of his direct reports, including Pascaud and Wright.

36.     FE 5 was a member of Align's corporate Financial Planning and Analysis group at the Company's corporate headquarters beginning early in the third quarter of 2018, through the end of the Class Period. FE 5 reported indirectly to Defendant Morici through other managers. In this role, FE 5

_____

[2] Former Employees ("FEs") will be identified herein by number (e.g., "FE 1"). Regardless of gender, all FEs will be described in the masculine to protect their identities.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

worked directly with Defendant Morici, and attended meetings during which Defendant Morici spoke about the competitive pressures facing Align and its impact on ASPs.

37.     FE 7 was an Invisalign Territory Manager for a Midwest area during the entirety of the Class Period and reported to a Regional Manager. In this role, FE 7 sold Invisalign products to dentists and orthodontists and dealt directly with Align's Invisalign promotions. FE 7 attended Align's annual National Sales Conference at the beginning of 2018, at which Company executives, including Defendant Hogan, participated in general sessions.

## IV.    FACTUAL ALLEGATIONS

### A.    Company Background and Business Model

38.     Founded in 1997, Align was the pioneer of invisible orthodontic technology, providing an alternative to the traditional bracket and wire braces used to treat the majority of patients looking to correct malocclusion. The Invisalign system uses doctor-prescribed, custom-manufactured, clear plastic removable aligners to straighten or realign a patient's teeth. After introducing its first Invisalign system in 1999, the Company rapidly expanded. By 2001, Align had manufactured one million clear aligners and had trained over ten thousand doctors to use its products.

39.     Align is divided into two segments: (1) Clear Aligner and (2) Scanners and Services. The Clear Aligner segment is comprised of the Company's clear aligner products, while the Scanners and Services segment is comprised of the Company's intraoral scanning devices and related software and services. Align's Clear Aligner Segment is its primary source of revenues; according to the Company's 2018 Form 10-K filed on February 28, 2019, net revenues from the Clear Aligner segment constituted 86% of Align's worldwide net sales the year before.

40.     Align's primary customers are dentists and orthodontists. As Align stated in its 2017 Form 10-K filed on February 28, 2018: "We sell the vast majority of our products directly to our customers: orthodontists and general practitioner dentists [ ], as well as to restorative and aesthetic dentists, including prosthodontists, periodontists, and oral surgeons." Invisalign is offered exclusively through in-office treatment by an Invisalign-trained orthodontist or general dentist. In order to provide Invisalign treatment to their patients, orthodontists and dentists must complete an Invisalign training course.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

41.     To begin Invisalign treatment, a patient first visits an Invisalign-trained dental professional who prepares and sends to Align a data package that includes either a physical impression of the patient's relevant dental arches or an intraoral digital scan. The digital scans are created using Align's iTero scanner or a third-party scanner. Using proprietary software, Align then generates a three-dimensional treatment plan simulation that is provided to the treating dental professional for review, modification, and approval. After approval by the treating dental professional, Align uses the three-dimensional treatment plan to construct molds that depict the future position of the patient's teeth, replicating the position of the patient's teeth at each stage of the course of treatment. Aligners are fabricated by pressure-forming polymeric sheets over each of the molds and are then shipped directly to the treating dental professional, who dispenses them to the patient at regular intervals during follow-up appointments. The patient wears each set of aligners for a period of time prescribed by the treatment plan—usually one week—before moving to the next set, advancing tooth movement at each stage.

42.     During the Class Period, Align sold its aligners in "cases" that included a series of aligners intended for one patient. Align offered two types of aligner cases: comprehensive cases and non-comprehensive cases. The comprehensive cases could treat more severe cases of malocclusion and typically offered unlimited sets of clear aligners to reach a doctor's treatment goals. The comprehensive products included the added perk of additional aligners for one to five years after initial shipment, at no additional charge. Invisalign Full, Invisalign Teen, and Invisalign Assist were Align's comprehensive products during the Class Period.

43.     In contrast, the non-comprehensive cases provided simplified treatments geared towards less severe cases of malocclusion. The Company offered the following non-comprehensive products before and during the Class Period: Invisalign Express 5, Invisalign Express 10, Invisalign Lite, Invisalign i7, and Invisalign Go. These products included fewer sets of aligners than their comprehensive counterparts. For example, Invisalign Express 5 involved up to five sets of aligners, while Invisalign Lite involved up to 14 sets of aligners. Align described these products as providing "[l]ower-cost solutions" for "less complex orthodontic cases, non-comprehensive treatment relapse cases, or straightening prior to restorative or cosmetic treatments such as veneers."

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

44.     Comprehensive cases were Align's core business and the lynchpin of the Company's financial success, a fact of which Defendants and analysts alike were acutely aware. The Company stated in its 3Q18 Form 10-Q: "We expect that *net revenues from the sale of the Invisalign System, primarily our comprehensive products, will continue to account for the vast majority of our total net revenues for the foreseeable future*." Analysts were thus intently focused on Align's net revenues from comprehensive products. For example, Leerink Partners noted in a July 26, 2018 report that Align's "Percentage of Revenue – Product Mix" for "Invisalign Full Products" was *73.2%* and *71.9%*, for 1Q18 and 2Q18, respectively. This trend persisted through the Class Period. Credit Suisse noted in a November 20, 2018 report that "comprehensive cases still represent 75% of [Align's] overall mix."

45.     To drive sales of such products, Align operated a customer loyalty program called the Invisalign Advantage Program (the "Advantage Program"), which offered Align's orthodontist and dentist customers a variety of incentives to purchase Invisalign products. Effective January 1, 2018, the Company instituted changes to its Advantage Program, replacing the prior rebates with a tiered discounting system based on the number of Invisalign cases each doctor sold. The top tier earned discounts of 38%. Align also extended the period during which doctors could count sales to qualify for each tier to six months from three. The changes to the 2018 Advantage Program made it easier for doctors to earn discounts, which in turn placed downward pressure on the Company's ASPs.

46.     Align disclosed to the market both the changes to the Advantage Program and the downward pressure that it was having on the Company's ASPs. For example, Northcoast Research reported that "[i]n January 2018, ALGN implemented major changes to its Invisalign advantage program." Moreover, in its first quarter 2018 and second quarter 2018 Form 10-Qs filed with the SEC on May 3, 2018, and August 2, 2018, respectively, Align disclosed ASP declines for its clear aligner products that resulted, in part, from "higher promotional discounts." Thus, leading into the Class Period, investors were aware both of the Advantage Program discounts and that these discounts were placing downward pressure on the Company's ASPs. Investors were not, however, aware of additional promotional programs that could place added pressure on that highly watched metric.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

**B.     Pre-Class Period Events: The Market Focuses on the Impact of Expected Competition on Align's Key ASP Metric**

      **1.     Analysts Focus on Whether New Competitive Entries Will Impact Align's Key ASP Metric**

47.     In the years leading up to 2018, Align had just a handful of competitors (e.g., ClearCorrect, Ormco, Dentsply Sirona, and SmileDirectClub ("SDC")), all of whom offered less expensive products that were only suitable for treating mild to moderate cases of malocclusion. Although more costly, Align's Invisalign remained a superior product insofar as it could be used to treat more severe cases of malocclusion. As William Blair explained in an August 18, 2017 report discussing ClearCorrect, one of the Company's first competitors:

> [ClearCorrect] is a reasonable option for simple-to-moderate adult cases being treated by general dentists. This is the most price sensitive portion of the market. We do not believe the product has been configured to serve more complex cases to appeal to orthodontists and the teen consumer, which account for about 75% of the total ortho market.

48.     Align's competitors were disadvantaged in large part because Align had successfully obtained hundreds of patents to protect its technology and manufacturing processes, including its computer-aided design ("CAD") and computer-aided manufacturing ("CAM") technology, which allowed Align to efficiently develop, manufacture, and sell large volumes of high-quality clear aligners. As Piper Jaffray stated in an August 17, 2017 report, "we [] believe Align's 10-year head start in manufacturing, patient data, customer relationships, software, and overall trade secrets will allow them to remain the dominant clear aligner player for years to come." William Blair similarly observed in a September 1, 2017 report: "Align has nearly 700 issued patents for Invisalign, so we do not expect [ ] competitors to be able to match the product's functionality."

49.     As a result, prior to 2018, Align's competitors were forced to resort to far less efficient means of designing and manufacturing clear aligners. Moreover, because of Align's superior products, it was able to charge higher prices than its competitors. As Piper Jaffray summed it up in a September 6, 2017 report, Align's primary competitors "currently compete at a lower price point with limited tooth movement capabilities."

50.     Beginning in the fall of 2017, Align's arsenal of patents—one of its key competitive advantages over other clear aligner manufacturers—began to expire. Forty of the Company's early

patents, including those that protected the process that Align used to digitally plan and manufacture aligners, started to lapse in October 2017. The market knew that the expiration of these early patents took away Align's critical monopoly over certain of its CAD and CAM technology, thus allowing Align's competitors to design and manufacture cases using generic technology and ultimately offer clear aligners at a lower price than Align. An April 25, 2017 article in *Forbes* observed that, following the initial wave of patent expirations, an average of twenty-three of Align's patents would expire each year through at least 2028. The following chart compiled by Piper Jaffray identified some of the relevant patents and their expiration dates, confirming that many of the expiring patents protected Align's computer design technology:

**ALGN Key Patents and Estimated Expiration Dates**

| Patent # | Patent Title | Patent Issue Date | Patent Expiration Date (estimate) |
|---|---|---|---|
| 5,975,893 | METHOD AND SYSTEM FOR INCREMENTALLY MOVING TEETH | Nov-99 | Oct-17 |
| 6,217,325 | METHOD AND SYSTEM FOR INCREMENTALLY MOVING TEETH | Apr-01 | Oct-17 |
| 6,309,215 | ATTACHMENT DEVICES AND METHODS FOR A DENTAL APPLIANCE | Oct-01 | Oct-17 |
| 6,398,548 | METHOD AND SYSTEM FOR INCREMENTALLY MOVING TEETH | Jun-02 | Oct-17 |
| 6,554,611 | METHOD AND SYSTEM FOR INCREMENTALLY MOVING TEETH | Apr-03 | Oct-17 |
| 6,722,880 | METHOD AND SYSTEM FOR INCREMENTALLY MOVING TEETH | Apr-04 | Oct-17 |
| 6,625,666 | METHOD AND SYSTEM FOR INCREMENTALLY MOVING TEETH | Sep-03 | Feb-18 |
| 6,629,840 | METHOD AND SYSTEM FOR INCREMENTALLY MOVING TEETH | Sep-03 | Feb-18 |
| 7,134,874 | COMPUTER AUTOMATED DEVELOPMENT OF AN ORTHODONTIC TREATMENT PLAN AND APPLIANCE | Nov-06 | Jun-18 |
| 6,471,511 | DEFINING TOOTH-MOVING APPLIANCES COMPUTATIONALLY | Oct-02 | Oct-18 |
| 8,070,487 | SYSTEM AND METHOD FOR POSITIONING TEETH | Dec-11 | Dec-18 |
| 7,125,248 | ATTACHMENT DEVICES AND METHODS FOR A DENTAL APPLIANCE | Oct-04 | Jan-19 |
| 6,210,612 | CREATING A POSITIVE MOLD OF A PATIENT'S DENTITION FOR USE IN FORMING AN ORTHODONTIC | Apr-01 | May-19 |
| 6,685,469 | SYSTEM FOR DETERMINING FINAL POSITION OF TEETH | Feb-04 | May-19 |
| 6,299,440 | SYSTEM AND METHOD FOR PRODUCING TOOTH MOVEMENT | Oct-01 | Jan-20 |
| 6,705,863 | ATTACHMENT DEVICES AND METHODS FOR A DENTAL APPLIANCE | Mar-04 | Apr-21 |
| 7,578,674 | METHODS FOR CORRECTING TOOTH MOVEMENTS MIDCOURSE IN TREATMENT | Aug-09 | Oct-21 |

Source: Company Reports

51. Align's ASP for its clear aligner products has always been of critical importance to analysts and investors assessing the health of Align's business and, more specifically, its competitive edge. The expiration of Align's initial set of patents led analysts to focus intently on the impact that competitors would have on Align's business and, specifically, whether it would have to lower its prices (and thus, ASPs) in order to compete. For example, William Blair stated in its September 25, 2017 report, "[i]n anticipation of the initial patent expirations . . . we are taking a closer look at the current and future competitive landscape in the clear aligner market, and what it could mean for the business model and the stock." The William Blair report confirmed "the expiration of the early patents will allow competitors to introduce products that can compete on less complex cases with a higher level of precision

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

offered by CAD CAM fabrication," further explaining that "*[t]hese new entrants could affect pricing* and share."

52.     In an April 20, 2018 report, Berenberg Capital Markets noted with respect to the expected influx of competitors that one of the "key risks" to its investment thesis for Align was that "*new entrants could also pressure ASPs* more significantly than we have modeled." In an April 25, 2018 report, analyst Deutsche Bank wrote that "*the sustainability of [Align's] ASP trends will come into question as the competitive landscape becomes more of a focus*." William Blair similarly reported on April 26, 2018, that "*[t]he key question with Align remains the timing of competitive entry to the clear aligner space and what impact that will have on growth and pricing*." On May 6, 2018, Piper Jaffray reported that competitive launches "*will certainly raise concerns about lost market share and pricing erosion domestically for Align*."

53.     Likewise, during the Class Period, analysts frequently focused on Align's pricing to gauge whether competitors were making inroads on its first-mover advantage sufficient to force the Company to cut prices. For example, ahead of the Company's second quarter earnings conference call, analyst Evercore wrote that one of its "Conference Call Focus[es]" would be "*[c]olor on recent competitive launches and any impact on pricing* or volumes." Berenberg Capital Markets similarly reported on July 26, 2018 that, "*we think the H1 ASP uptick validated our near term (i.e. 1-2 year) thinking that price is insulated* given a clear competitive advantage (ability to treat more types of malocclusions)."

54.     Of equal significance to analysts were the reasons for changes in the Company's ASPs from quarter to quarter, which could signal desirable growth in sales of less complex, non-comprehensive products with lower standard list prices (so-called "product mix shift") or, more ominously, that growing competition from other clear aligner manufacturers had necessitated price cuts for comprehensive products. Price cuts in response to competition in Align's flagship comprehensive cases, where Align had long reigned supreme, could augur trouble, whereas a product mix shift toward non-comprehensive cases could reflect *positive* developments of Align gaining market share in that space and expanding the Company's addressable market. Analysts homed in on this distinction. For example, in the "Key Points" section of a November 8, 2016 report by William Blair, analysts observed that Align's "average selling

price was $16 below our target," but, "[i]mportantly, the lower ASP resulted from a mix shift rather than incremental discounting." The report gave Align a bullish "outperform" outlook rating.

55.     Analysts' positive view of the trade-off of lower ASPs from product mix shift in exchange for higher volumes continued through and after the Class Period. In an October 25, 2018 report, Northcoast Research wrote that, "[w]ith regard to product mix, the percent of ALGN's worldwide non-comprehensive Invisalign cases (which carried a $940 ASP this quarter versus a $1,310 ASP for comprehensive cases) increased from 20.8% in 3Q17 to 21.5% in 3Q18 as the company's efforts to expand the market continued to attract more patients with less severe malocclusions. We expect this trend to continue and view it as an overall positive development for the company." Similarly, a November 28, 2018 William Blair report stated, "We believe sacrificing some ASP (mix shift toward [dental support organizations], [general practitioners] doing additional cases) for higher volume growth and greater operating margin dollars will ultimately boost penetration of Invisalign and the company's bottom-line performance."

### 2.     Defendants Closely Track Align's ASPs and the Impact of Competition

56.     Unsurprisingly, the market's keen focus on both the trajectory and factors driving ASP movements rendered it a metric of great concern to Align and its top executives. Indeed, multiple former employees confirmed that Defendants not only had access to, but actively tracked ASP data. FE 5 stated that the data regarding the Company's ASPs was updated every few hours and that daily and weekly reports that included revenues and ASPs were circulated to top management by email. FE 5 explained that after the accounting close at the end of each month, a set of reports that reflected all of the financial figures for the month, including ASP, was prepared. This package of reports was then delivered to the executive team—including both Defendants Hogan and Morici—via email.

57.     Similarly, FE 4 stated that Puco, as SVP, Managing Director, and Defendant Hogan's direct report, received reports approximately twice a week highlighting then-current ASPs. According to FE 4, Puco closely watched these reports. FE 4 also confirmed that *Defendants Hogan and Morici received these reports detailing ASPs on a biweekly and monthly basis*, along with Pascaud and Wright. FE 4 further stated that revenues and ASPs were included as topics on the agendas for Align's monthly EMC meetings.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

58.     Separately, FE 4 explained, Align had an internal reporting system called "Sales Force," which the Company used to track and report various sales information—including ASPs. Sales Force could be accessed through a tablet interface called Compass. Defendants Hogan and Morici each had access to this data.

59.     According to FE 1, Sales Force was Align's outlet for sales analytics. FE 1 stated that Sales Force was updated twice daily. He further explained that the program could be used to generate reports detailing current ASPs and monthly, quarterly, or yearly trends. Additionally, ASP figures could be broken out by product. FE 1 also confirmed that Align's top executives had access to Sales Force and reports generated by the program.

60.     Former employees have confirmed that Align's top executives were focused on the threat of competition as the Company's patents began to expire. FE 1 explained that in or around early 2017, Align became more focused on the impact of competition entering the market and on the Align sales team's ability to handle this competition.

61.     FE 4 stated that competition was also a regular topic of conversation at Align's EMC meetings. As FE 4 explained, the Company had monthly EMC meetings attended by Hogan and all of his direct reports, including Morici, Pascaud, and Wright. FE 4 stated that between six and eight of these monthly meetings were held in San Jose, while the remaining meetings were held in different locations, depending on the travel schedules of the EMC members. FE 4 further stated that some of the written agendas circulated in advance of each EMC meeting explicitly included Align's growing competition as a subject of discussion. FE 4 reported that competition always seemed to be a topic of conversation during these meetings. In addition, FE 4 stated that before each EMC meeting, SVP Puco met with his sales directors to discuss competition.

62.     FE 3 similarly stated that Align's top executives were worried about patents expiring and competitors entering the market and selling products at a lower price. According to FE 3, at quarterly All-Hands meetings in San Jose, with Hogan and the leadership team (which usually included Pascaud and Morici) in attendance, "all they talked about" was the expiration of Align's patents and the fact that Align's competitors would "get access to [the Company's] recipes" and sell the aligners for less. Following these gatherings, FE 3 attended mandatory meetings with SVP of Global Operations Wright,

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

who reinforced the CEO's message from the All-Hands meeting. During these meetings, Wright made clear that *Align intended to address its concerns about its expiring patents and increased competition by running promotions and offering cheaper alternatives*.

### 3. Before a Key Industry Event at Which New Competition Is Expected, Analysts Believe the Threat Is Limited to Low-End, Non-Comprehensive Cases

63. A critical event in Align's assessment of the growing competitive threat was calendared for May 4-8, 2018, when the 2018 AAO was to be held in Washington, D.C. The AAO is the oldest and largest dental specialty organization, with nearly 19,000 orthodontist members throughout the world. Its Annual Session is held every spring and provides an opportunity for members of the orthodontic industry to showcase their present and future products. The 2018 AAO afforded Align's competitors, no longer thwarted by the Company's patent wall, the perfect venue in which to showcase new challenges to the Company's dominance. As such, the market expected an influx of new entrants.

64. Heading into the AAO, however, analysts believed that pricing pressure from competition, if any, would be limited to lower-end, non-comprehensive products, rather than the higher-priced comprehensive products that made up the bulk of Align's revenues. For example, on April 26, 2018, William Blair reported that "[t]here has been no impact yet from looming competition, but we expect the number of active players will gradually increase . . . . *We assume pressure will build at the lower end of the market where there are already a number of lower cost alternatives, and where customers have been shown to be price sensitive*. At the other end of the spectrum, we assume Align will continue to invest aggressively to stay far ahead of the competition for more complex cases." That same day, Morgan Stanley reported, "*Our estimates contemplate competition ramping at the low-end of the market over the next few years*, which ALGN will likely counter via new products such as Invisalign Lite and Go for GPs."

65. Also on April 26, 2018, analysts at Stephens wrote, "[t]o be clear, we reiterate our view that expected new market entrants will NOT be on par with ALGN's Invisalign offering. However, *we do see the potential for heightened competition at the low-end of the marketplace*." In a same-day analyst report, Berenberg Capital Markets reported, "We have factored in downward pricing into our forecasts, and believe that *price pressure will likely affect low-end products that represent a smaller portion of*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

*ALGN's product mix*." The Berenberg reported noted, however, that "if competitive entrants can offer a lower priced solution that is perceived to be as good as the full Invisalign platform, this could provide greater ASP pressure and potentially place our EPS forecasts at risk."

### 4. Competitors Launch New Comprehensive Products at the AAO Annual Meeting

66.     Several high-profile entrants to the comprehensive case market emerged at the 2018 AAO. On May 4, 2018, the first day of the week-long event, Henry Schein announced its SLX Clear Aligners, with a cost to doctors of $1,450 for a full case. Also during the AAO, 3M launched its Clarity Aligners; Northcoast Research noted in a May 10, 2018 report that "[a]n unlimited number of 3M Clarity aligners will cost the doctor $1,584 versus a list price of $1,829 for ALGN's comprehensive package." Meanwhile, Dentsply Sirona introduced its SureSmile Clear Aligner, which would sell for $1,695 for an unlimited number of aligners and refinements.

67.     Some analysts immediately recognized the potential risks to Align's comprehensive case market share. Commenting on the Henry Schein announcement, Leerink Partners stated in a May 4, 2018 report that "*clear aligner competition headlines are coming*." Morgan Stanley observed in a May 7, 2018 report that some of the new competitors had the potential to erode Align's long-standing dominance in comprehensive cases, noting "[b]oth [Dentsply Sirona] and 3M marketing materials suggested use of attachments in their aligners (polymer adhesions to teeth which allow for aligner traction/grasping to speed tooth movement), which we long believed ALGN held patents on through the mid-2020s and was a source of their competitive advantage at the high-end of the market." Morgan Stanley concluded, "*This suggests there could be risk to ALGN's moat amongst more comprehensive cases*. For the high end of the market, competitors appear likely to assert their hybrid wire/bracket/aligner systems are the superior approach."

68.     Yet the consequences to the Company of the new entrants were far from clear. Reflecting the uncertainty that the market had regarding Align's ability to handle such competitors, the May 4, 2018 Leerink Partners report cautioned that "[i]t is still too early to know what any definitive impact from competition will have on the near-term clear aligner market dynamics." The firm speculated, "Perhaps at the margin it will impact Align at the 'lower end of the mkt'—we contemplate price pressure in our

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

model already." In a follow-up report on May 7, 2018, Leerink Partners stated that "ALGN could be volatile in the near-to-intermediate term as ***rising competition naturally raises questions about potential future pricing pressure***, share shifts, competitive trialing impact, etc. . . . ***We will need to do more work over the coming qtrs. to truly understand how increasing competition in the clear aligner segment may or may not impact ALGN's growth prospects***." In a more optimistic report issued on May 11, 2018, William O'Neil & Company reported: "ALGN has a first-mover advantage with proven products ***specifically at the higher end of the clear aligner market, where new competitive offerings likely won't impact ALGN in the near term***."

### C.      Class Period: Defendants Reassure the Market About New Competitive Entries While Concealing that They Are Secretly Implementing an Aggressive Discounting Program for Comprehensive Products to Counter Competition

#### 1.      At Align's Investor Day, Defendants Paint Align's Core Comprehensive Business as Impervious to Competition While Top Executives Unload Company Stock

69.     Despite the fact that multiple competitors had announced lower-priced comprehensive products at the AAO, Defendants misled investors to believe that Align only faced serious competition in the low-end, non-comprehensive sector, and that Align would not respond with price reductions.

70.     For instance, during Align's May 23, 2018 "Investor Day," Jeffrey D. Johnson from Robert W. Baird & Co. asked Defendant Hogan about the potential competitive threat posed by one of the alternative clear aligner business models. In response, Hogan represented that because competitors were at such a technological disadvantage, they could only seriously compete with Align on the low end of the market: "I think there's going to be a low end to this market that we've talked about before in these kinds of sessions, and that's 15 aligners or less. And this is where companies that don't have the capabilities Align have [sic], they're going to have to play in that segment. So it's going to – there's going to be a scrum in that marketplace to a certain extent."

71.     Analysts were buoyed by Defendants' representations regarding Align's competition, assuming that the Company could hold the line on pricing. Based on Defendants' statements, Credit Suisse analysts stated in a May 24, 2018 report that they had "walked away [from Align's Investor Day] incrementally encouraged on [Align's] competitive positioning, despite an evolving landscape" and noted that Defendants' statements "prove[d] just how far behind competitors are on the innovation and

learning curve in terms of clear aligner products" and that Align "emphasized that competitors clearly need to invest further in their solutions to make more meaningful inroads."

72.     Commenting on Align's increase to its growth predictions, William Blair noted, "***it provides a reassuring signal that management expects competition to expand the market rather than erode volumes and pricing***." Similarly, Berenberg Capital Markets reported that, "[o]ur pricing estimates remain unchanged (1-2% long term erosion) given our view that ***U.S. competitive launches are not likely to undercut ALGN's ASPs significantly***."

73.     Over the course of the next month, Defendants continued to conceal from investors that the Company was planning to respond to new competitors by offering price discounts on Align's comprehensive products that would create additional downward pressure on Align's much-watched ASP metric. For instance, at the June 12, 2018 Goldman Sachs Healthcare Conference, Defendant Morici, addressing Align's competitors, claimed that "there's nothing that disrupts us from what we would've expected, and we're going to continue to execute as we have."

74.     Notwithstanding previous representations that there were no changes in execution, Align secretly implemented a steep discounting program in July 2018 specifically to address competition in the comprehensive case market. *See* Section IV.C.2, *infra*. Meanwhile, on June 1, 2018, with Align's share price artificially inflated by their statements and omissions, Defendant Hogan offloaded more than $28 million worth of Align common stock. *See* Section VII, *infra*.

## 2.     Defendants Secretly Implement Sharp Discounts to Align's Comprehensive Products

75.     While they were representing to the market that Align's comprehensive product line was insulated from competition, leaving analysts with the impression that new entries would not erode pricing for those products, internally Defendants were secretly designing a promotion for the third quarter of 2018 that offered sizable discounts solely for the Company's comprehensive products (the 3Q18 Discounting Promotion). Internally, Defendants called the 3Q18 Discounting Promotion the Company's "summer sizzler" campaign. FE 5 confirmed that the general lead time for such promotions was at least a few weeks and certainly more than two weeks. The 3Q Discounting Promotion officially went into effect on July 1, 2018.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

76.     According to FE 7, the 3Q18 Discounting Promotion applied **only to Align's full comprehensive cases** (i.e., the comprehensive Invisalign Full and Invisalign Teen cases, as well as Invisalign Assist cases). As FE 7 explained, under the terms of the program, doctors received a $200 discount for every qualifying Invisalign case that they sold above the number that they had sold in the previous period. For example, if a doctor sold ten qualifying cases in the previous period, she would receive a $200 discount for the eleventh case and every additional case that she sold during the third quarter of 2018.

77.     FE 7 also explained that this $200 discount on Align's comprehensive products was applied **on top** of the discounts doctors received through the Advantage Program. For example, a top-tier doctor who received a high percentage discount through the Advantage Program could obtain an additional $200 discount on top of the discount afforded her under the Advantage Program. The 3Q18 Discounting Promotion offered such steep discounts that FE 7 reported that Align's customers moved patients they had targeted for treatment beginning in the fourth quarter into the third quarter just to take advantage of the promotion.

78.     The 3Q18 Discounting Promotion was approved—and its purpose and effects understood—at the highest levels of the Company. FE 4 stated that SVP and Managing Director Puco approved all promotions before they were implemented and would have had to have approved the 3Q18 Discounting Promotion. Puco reported directly to Defendant Hogan. Meanwhile, FE 5 stated that he was involved in conversations with Align's Finance Department during which Defendant Morici discussed his preoccupation with competition, stating that Morici was "very, very aware of Align's competition." During his discussion of Align's competitors, **Defendant Morici explicitly linked the 3Q18 Discounting Promotion to the Company's concerns about competition**.

79.     According to FE 5, Align offered the 3Q18 Discounting Promotion to increase product volume and secure a competitive edge. FE 5 explained that while Align's comprehensive clear aligners were unique when they were introduced, competitors had begun taking away Align's market share by July 2018, which Align was looking to win back. FE 5 recalled a whiteboard on which 3M and other competitors were identified and an analysis presented of what percentage of the comprehensive clear aligner market Align could get back with the $200-per-unit discount provided by the 3Q18 Discounting

Promotion. FE 5 also stated that it was understood that the discount would increase sales volume but would have a negative effect on ASPs.

### 3. Defendants Promise Higher ASPs in the Third Quarter While Concealing the 3Q18 Discounting Promotion and Misleadingly Claiming that Align Has Made No Adjustments in Response to Competition

80.     On July 25, 2018, nearly a month after they launched the 3Q18 Discounting Promotion, Defendants held the Company's 2Q18 earnings conference call. During the call, Defendants promised investors **higher** ASPs during the third quarter, while at the same time misleadingly concealing that they had just put in place steep discounts that applied to 75% of the Company's clear aligner product line—which were already resulting in steep declines in Align's ASPs. Specifically, during Align's 2Q18 earnings call, Defendant Morici stated:

> We expect Q3 revenues to be in the range of $493 million to $503 million, an increase of approximately 28% to 31% year-over-year. We expect Q3 gross margin to be in the range of 74% to 74.4%, reflecting higher expenses as we regionalize our treatment planning and manufacturing operations, partially *offset by higher ASPs*.

81.     Moreover, although they had already taken drastic steps to combat competition in the comprehensive aligner space, Defendants continued to misrepresent that they were not making any changes in response to competition. For example, in response to a question from an analyst at Stifel, Nicolaus & Company concerning "what, if anything, Joe, have you heard about these offerings [from competitors] over the past 2 months since the [AAO]," Hogan stated, "[F]rom a competitive standpoint, there's nothing really different than what we saw from an AAO standpoint. . . . *I wouldn't say we've changed in any way our assessment of the competition that we saw at the AAO*."

82.     Later, an analyst from Leerink Partners asked:

> First one on just competition, Joe, is there anything—since some of the competitors launched back in May [at the AAO], that you're hearing in terms of how they're approaching their and potentially your customer bases with respect to trialing or getting some initial kind of traction in the field? Or has it been relatively kind of quiet? And then with respect to the guidance question and competition, is there anything at all factored into your 2018 growth outlook, including the revised one? Any kind of impact from competition?

83.     In response, Hogan replied that "the feedback that we get is that [our customers] are being contacted and – but there's nothing really that's different from what was the output from the AAO in that

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

piece." Hogan concluded, "*[T]here's not a momentum piece or anything that we're adjusting the business around right now*."

84.    Hogan's statements created the misleading impression that Align was unconcerned with the competitive challenge to the Company's high-end comprehensive products, as they had stated after the AAO. Moreover, Hogan's statements created the misleading impression that Align had made no significant changes in response to competitors' offerings, while concealing the fact that the Company had implemented steep discounts to its entire comprehensive product line.

85.    Following Defendants' false and misleading statements during the 2Q18 earnings call, Evercore reported that "we remain bullish on ALGN's long term market opportunity and superior execution," noting that it observed "no signs that lower cost entrants are making a dent in the market overall." Berenberg Capital Markets wrote that the Company's second quarter results, "validated our near term (i.e. 1-2 year) thinking that price *is insulated given a clear competitive advantage* (ability to treat more types of malocclusions). . . . As a result, we come away with more confidence that *a near term pricing cliff is unlikely for ALGN*." William Blair was similarly reassured by Defendants' statements regarding competition, stating in a July 25, 2018 report: "*Management commentary on new clear aligner entrants was unchanged. There is no sign as yet that new entrants are impacting volumes or pricing*. . . . We maintain our Outperform rating on Align despite the stock's lofty valuation."

86.    The undisclosed facts were far different. At the time Defendants issued the guidance calling for *higher* ASPs while telling the market that there had been no change, Defendants and other top executives knew that the undisclosed 3Q18 Discounting Promotion was driving an accelerating decline in the Company's ASPs.

87.    Indeed, FE 5 stated that the decline in Align ASPs had begun *before* the start of the third quarter, and that *the decline in ASPs accelerated following implementation of the 3Q18 Discounting Promotion* on July 1, 2018, the first day of the third quarter. FE 5 further stated that, given the declining ASPs, Morici requested from his Finance Department VPs that analyses be performed on revenues and ASPs. FE 5 stated that these analyses were performed in July and personally delivered to Defendant Morici. FE 5 stated that *ASPs were declining throughout July, including before the July 25, 2018 2Q18*

*earnings call*. FE 7 also confirmed that *the 3Q18 Discounting Promotion resulted in a significant decrease in Align's ASPs*.

88.    The market, however, was none the wiser. On August 14, 2018, with Align's common stock price artificially inflated by Defendants' misleading statements and omissions, Defendant Hogan sold an additional 25,000 shares of Align common stock at approximately $367.48 per share, for proceeds of over $9 million. *See* Section VII, *infra*.

89.    Defendants continued their narrative that competition in Align's flagship products was not forcing the Company to respond with price cuts. On August 30, 2018, after meeting with Defendant Morici, analysts from William Blair similarly reported that "while we continue to view competition as the key risk for the stock, we believe this is more of a three- to five-year issue. We also see plenty of room for the new entrants to expand the market, *rather than triggering a pricing battle*." The William Blair report continued, "Competitive entry was a key topic of discussion during the meeting, but *management repeated its view that, to date, it has not seen any new product that challenges Invisalign from a clinical perspective, or that offers aggressive pricing*."

90.    On September 5, 2018, at the Robert W. Baird Global Healthcare Conference, Defendant Morici continue to misrepresent that the Company had not made any pricing changes in response to competition. More specifically, an analyst from Robert W. Baird asked Defendant Morici:

> Maybe we'll ask a couple of questions here on competition. So obviously, earlier this year, you had a few of the larger companies come out with clear aligner systems. Now that some of the IP has come off late last year, first off, just a simple question, seeing any traction, anything that concerns you in the near term from these competitive launches?

91.    In response, Defendant Morici stated:

> Nothing that we haven't seen already. I mean, there was some at the AAO. There was a dental ortho show where -- in Washington in May. There was new companies in or other companies that had been in. But *there's nothing that -- of note that was disruptive or different than what we would've seen or would've done in the past, both from a product standpoint or a pricing standpoint*.

92.    Morici's statement again created the misleading impression that Align had not made any changes in response to competition, including on pricing, when in reality the Company had implemented an aggressive new discounting program for its core comprehensive clear aligner products two months earlier that it knew was driving *down* ASPs.

93.     FE 5 explained that, by the middle of the third quarter of 2018, he was involved in a large project encompassing multiple rounds of analysis specifically focusing on the declining ASPs. This project followed and was separate from the analyses reflecting declining ASPs that Morici had personally commissioned in July 2018. *See* ¶ 87 *supra*. The ASP analyses conducted during the mid-3Q18 project were provided to the entire Align executive team, including Hogan. The project also involved regular meetings during which attendees discussed different ways to try to stop the ASP decline. FE5 specifically recalled regular meetings with Morici during which the finance team discussed product pricing and tried to "***figure out how to stop the bleeding***."

### D.     **The Relevant Truth Is Revealed**

94.     The relevant truth concealed by Defendants' false and misleading statements and omissions was revealed to investors on October 24, 2018, when Align disclosed that, as a result of steep discounts to its comprehensive products, the Company had suffered a marked decline in ASP for the third quarter. Specifically, worldwide Invisalign ASP dropped from $1,315 in 2Q18 to $1,230 in 3Q18, a decline of $85, while the ASP of Invisalign comprehensive products—the exclusive subjects of the 3Q18 Discounting Promotion—dropped ***a full $100***, from $1,410 in 2Q18 to $1,310 in 3Q18.

95.     During Align's 3Q18 earnings call on October 24, 2018, Defendant Morici disclosed:

> ***Q3 Invisalign ASPs were down sequentially and year-over-year due to a combination of promotional programs,*** unfavorable foreign exchange ["FX"] and product mix, partially offset by price increases across all regions. ***In Q3, we offered new product promotions*** designed to increase adoption of Invisalign treatment, and we saw much higher-than-expected uptake on some of these promotions.

96.     Defendant Morici further stated that of the $85 drop in worldwide Invisalign ASPs, $24 owed to unfavorable foreign exchange rates, while the remaining $61 per unit was split evenly between product mix shift and promotional discounts. As noted below, however, one week later, Align corrected this claim, revealing that ***all*** of the non-FX-related drop was due to promotional discounts.

97.     During the question-and-answer portion of the 3Q18 earnings call, Defendant Hogan flatly admitted that the 3Q18 Discounting Promotion was responsible for lower ASPs, stating that "those promotions that we had, ***those specific promotions that were driving down some of the ASPs in Q3*** will not continue into Q4."

98.    On the same call, analyst Jonathan Block of Stifel, Nicolaus & Company asked Hogan for more information about the 3Q18 Discounting Promotion, which had, until then, been undisclosed. Block focused in particular on whether the discounts applied to Align's comprehensive cases:

> I think it's important, obviously, with the focus on the promotion. So can you be a little bit more clear that the promotions that you ran in the quarter, *you hear the word promotions at the same time that 2 or 3 comprehensive clear aligners were introduced in the market for the first time ever. And that's going to freak a lot of people out, right?* So the promotions you mentioned, were those specific to express type cases? Were the more specific to comprehensive? Any clarity you could give would be great.

99.    In response, Hogan acknowledged that the discounts were applied to Align's comprehensive cases, that Defendants had not previously disclosed the 3Q18 Discounting Promotion, and that the 3Q18 Discounting Promotion was responsible for driving down ASP:

> *[T]hese were comprehensive cases*. . . . [W]e're just trying some things in the sense of incentivizing the marketplace and it just happened to engage the upper tier of our Advantage Program, rather than the lower tier that we had hoped. And these go on all the time, kind of *under the radar screen*, Jon. And *we don't talk about them, this one in the sense of how it performed obviously, affecting ASP*.

100.    During the 3Q18 earnings conference call, Defendants also disclosed that they did not expect the Company's ASPs to recover, but instead expected ASP to remain "flat" at the same level throughout all of 2019. In other words, the lower ASPs that Defendants disclosed on October 25, 2018, were not merely a blip, but instead represented the "new normal" for the Company in the face of increased competition.

101.    Defendant Hogan also announced during this conference call that Pascaud would be stepping down as CMO, reducing his responsibilities and transitioning to a part-time position once the Company hired a replacement CMO.

102.    In the wake of these disclosures, Align's stock price plummeted nearly $59 per share, from a close of $290.83 on October 24, 2018, to a close of $232.07 on October 25, 2018.

103.    Although the Company denied it, the market understood that the Company's 3Q18 ASP decline was related to increased competition. For example, Berenberg Capital Markets wrote that "ALGN shares are likely to be under meaningful pressure, in our view, following a Q318 print that may raise investor concerns around the company's ability to maintain average selling price (ASP) in the face

of increased competition." Morgan Stanley reported, "Disclosure that ALGN saw accelerated pricing pressure in 3Q, which is expected to persist into 4Q, raises questions of whether these [competitive] dynamics are already putting pressure on the franchise." William Blair similarly wrote that "we believe investors will interpret the lower ASP as directly or indirectly a function of increased competition and compress the stock's valuation as a result."

104.    Moreover, analysts reported that the stock price decline on October 25, 2018, was substantially caused by the Company's disclosure of lower ASPs. For example, in a November 19, 2018 report, William Blair wrote, "The 6% reduction in average selling price (ASP) in the third quarter, coupled with caution about the fourth quarter, was the primary catalyst for the stock's 20% correction following earnings. . . . The ASP erosion and corresponding erosion in gross margin over the past year will surely increase anxiety about the impact of competition on pricing."

105.    Just a week later, on November 1, 2018, Align abruptly announced that Puco—who had been responsible for approving Align's promotions—was resigning from his position as SVP and Managing Director of the Americas as of March 1, 2019, after twelve years with the Company.

106.    Also on November 1, 2018, Align filed its 3Q18 Form 10-Q. The filing made clear that *all* of the non-FX-related decline in Invisalign ASP in 3Q18 had been due to Align's 3Q18 discounting and that the ASP drop would have been *larger* had it not been for the positive effect of the product mix shift:

> For the three months ended September 30, 2018, Americas net revenues increased by $31.7 million as compared to the same period in 2017, primarily due to case volume growth across all channels and products, which increased net revenues by $45.8 million. This increase was offset in part by lower average selling prices ("ASP"), which reduced net revenues by $14.1 million. ***The ASP decline was primarily a result of higher promotional discounts***, which reduced revenues by $21.2 million. Additionally, unfavorable foreign exchange rates and increased additional aligner deferrals collectively reduced net revenues by $3.7 million. ***These factors were partially offset*** by higher prices on the new products introduced in July 2018 and a ***favorable product mix shift*** driven by decreased SDC revenues which carry a lower ASP, which collectively increased net revenues by $10.2 million.

107.    Since 3Q18, Align's comprehensive clear aligner ASPs have never recovered, remaining $75 to $100 below their pre-3Q18 norm.

## V.   DEFENDANTS' MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS

108.   During the Class Period, Defendants repeatedly downplayed competition in the comprehensive clear aligner space and assured the market that the Company was not making changes to respond to growing competitive threats—even as they secretly planned and implemented an undisclosed, aggressive discounting program to the Company's core comprehensive product line that immediately drove down the Company's ASPs.[3]

### A.   May 23, 2018 Investor Day

109.   On May 23, 2018, Align held a conference call with analysts as part of its Investor Day. During the question and answer portion of the event, Defendant Hogan represented that competition would "have to play" in the lower, non-comprehensive end of the market, leaving investors with the impression that Align's core comprehensive business was insulated because its competition did not "have the capabilities Align ha[d]":

> JOHNSON: Maybe one other secular kind of item. We're starting to hear some others talk about disaggregating kind of the treatment planning and the aligner, manufacturing them or maybe if the dentist wants to design the case in office and then pay for aligner, and they could send it even to a couple different labs, whatever lab they want to send it to, things like that. Same question. I mean, is that a viable model? Is that model that at all concerns you or that you would see as a real competitive threat anytime down the road?
>
> HOGAN: *Jeff, I think there's going to be a low end to this market* that we've talked about before in these kinds of sessions, and that's *15 aligners or less*. And this is where companies that don't have the capabilities Align have [sic], *they're going to have to play in that segment*. So it's going to – there's going to be a scrum in that marketplace to a certain extent.

110.   The following day, on May 24, 2018, William Blair reported Defendants' Investor Day statements "provide[d] a reassuring signal that management expects competition to expand the market rather than erode volumes and pricing." On May 25, 2018, Berenberg Capital Markets reported, "*Our pricing estimates remain unchanged (1-2% long term erosion) given our view that U.S. competitive*

---

[3] In accordance with the Court's "Guidelines for Securities Class Action Cases" issued September 23, 2019, attached hereto as Exhibit B is a summary chart of the false and/or misleading statements and omissions alleged below; the speaker, date, and medium of each statement or omission; the reasons why each statement or omission was false and/or misleading when made; and the facts giving rise to a strong inference of scienter as to each statement or omission.

*launches are not likely to undercut ALGN's ASPs significantly*." Credit Suisse likewise "walked away [from Align's Investor Day] incrementally encouraged on [Align's] competitive positioning, despite an evolving landscape" and reported on Align's response to competing product launches:

> [It] proves just how far behind competitors are on the innovation and learning curve in terms of clear aligner products. Management noted competing products are using technology that ALGN had used ~10 years prior, with new competitors lacking a more comprehensive clear aligner solution. We view ALGN's (21-year) first-mover advantage as a differentiator, and importantly, ***it doesn't view new competitor offerings as surprising/meaningful from a technology or (importantly) pricing standpoint***.

> As a reminder, this year at the annual American Association of Orthodontists (AAO) Conference in Washington, DC (May 4-8), three companies launched new clear aligner offerings with digital software components (see note for more information), including Henry Schein (HSIC, Outperform), Dentsply Sirona (XRAY, Outperform), and 3M (MMM, Unrated). ALGN had expected these launches, and of note, it was surprised Danaher (DHR, Outperform) was conspicuously absent (in new clear aligner offerings), although we anticipate there are initiatives at DHR in the works (see note from recent DHR management meetings on 4/27). Importantly, it emphasized that competitors clearly need to invest further in their solutions to make more meaningful inroads.

111.    Defendant Hogan's response that the real competitive threat facing Align was in the "low end to this market" involving "15 aligners or less"—i.e., non-comprehensive cases—and that its competitors were "going to have to play in that segment" was materially false or misleading when made because it misled investors to believe that only a small portion of Align's business (non-comprehensive cases) was vulnerable to competition when, in fact, Align faced a significant competitive threat in the high-end, comprehensive case market following the 2018 AAO. ¶¶ 69, 73-74. Indeed, it was in response to the competitive threat to its comprehensive cases that Align implemented the 3Q18 Discounting Promotion. ¶¶ 74, 78-79. As FE 7 explained, these discounts applied ***only*** to Align's full comprehensive cases. ¶ 76. Meanwhile, FE 5 confirmed that Defendant Morici explicitly linked the undisclosed 3Q18 Discounting Promotion to the Company's concerns about competition. ¶ 78. The $200-per-unit discount was expressly designed to win back market share lost to competitors in the comprehensive clear aligner market. ¶ 79. Implementing the aggressive, undisclosed 3Q18 Discounting Promotion solely on comprehensive cases and in response to competition reflected Defendants' recognition that Align faced a "real competitive threat" in the high-end, comprehensive case market. Hogan's statement was also materially false or misleading when made because it omitted any mention of the 3Q18 Discounting

Promotion that began only about a month later and, as discussed above, applied only to comprehensive cases and was implemented in direct response to competition in the comprehensive case market.

### B.   June 12, 2018 Goldman Sachs Global Healthcare Conference

112.    On June 12, 2018, Align presented at the Goldman Sachs Global Healthcare Conference. During the question and answer portion of Align's presentation, Defendant Morici engaged in the following exchange with Robert Patrick Jones, an analyst from Goldman Sachs, on the topic of competition:

> JONES: Obviously, the opportunity in front of you is vast, it is obviously not lost on others. So *competition is always something that we get from investors*. It seems like it's a bit heightened now relative to the time that we've followed the story at least. So I was wondering if maybe you could just take a couple of minutes and describe how you see the competitive landscape. How has it evolved? *Is there anything new on the market or coming to the market that you think is a more formidable competitor than maybe what you've seen in the past?*

> MORICI: I think what we see – we've faced competition for a number of years, and especially outside the U.S. and what we saw the best analogy that you would look back or the time period you'd look back is perhaps at AAO. And during AAO, we saw different entrants into the market but they were coming in at a technology in a product that was something that we were producing 5 or 10 years ago. And at price points that were not so different than where we're currently priced at. . . . [W]hat we do see is that *there's nothing that disrupts us from what we would've expected*, *and we're going to continue to execute as we have* to be able to grow in this market.

113.    Defendant Morici's statements that "there's nothing that disrupts us from what we would've expected" and "we're going to continue to execute as we have" were materially false or misleading when made because, in truth, Defendants were deeply concerned about new competition in the comprehensive case market. For example, FE 5 stated that Morici was preoccupied by the growing competitive threat and explicitly linked the 3Q18 Discounting Promotion to the Company's concerns about competition. ¶ 78. Indeed, the $200-per-unit discount was designed to recapture market share recently lost to competitors in the comprehensive case market. ¶ 79. The competition thus was clearly "disruptive," as it impelled Align to develop and implement an undisclosed discount program that would necessarily have a negative effect on the much-watched ASP metric. ¶¶ 75-79.

### C.   July 25, 2018 2Q18 Earnings Call

114.    On July 25, 2018, over three weeks *after* Align had rolled out the undisclosed 3Q18 Discounting Promotion, Defendants held Align's 2Q18 earnings call to discuss the Company's financial

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

results from the three months ended June 30, 2018, and its expected performance for 3Q18. During this call, Defendant Morici provided the following outlook for the third quarter of 2018: "[W]e expect the third quarter to shape up as follows: . . . We expect Q3 gross margin to be in the range of 74% to 74.4%, reflecting higher expenses as we regionalize our treatment planning and manufacturing operations, partially *offset by higher ASPs*." Defendant Morici did not disclose that Align had recently implemented steep discounts that were already driving down its ASPs.

115.    During the question-and-answer portion of the July 25, 2018 call, Jonathan Block, an analyst at Stifel, Nicolaus & Company, asked Defendant Hogan "what, if anything, Joe, have you heard about these offerings [from competitors] over the past 2 months since the [AAO]?" In response, Hogan stated, "[F]rom a competitive standpoint, there's nothing really different than what we saw from an AAO standpoint. . . . *I wouldn't say we've changed in any way our assessment of the competition that we saw at the AAO*." Defendant Hogan said nothing about the 3Q18 Discounting Promotion.

116.    Later during the same call, Richard S. Newitter, an analyst from Leerink Partners asked Defendant Hogan:

> First one on just competition, Joe, is there anything—since some of the competitors launched back in May [at the AAO], that you're hearing in terms of how they're approaching their and potentially your customer bases with respect to trialing or getting some initial kind of traction in the field? Or has it been relatively kind of quiet? And then with respect to the guidance question and competition, is there anything at all factored into your 2018 growth outlook, including the revised one? *Any kind of impact from competition*?

117.    Hogan again denied that Align was responding to competition. Hogan said, "[T]he feedback that we get is [that our customers are] being contacted and – but there's nothing really that's different from what was the output from the AAO in that piece," concluding, "*there's not a momentum piece or anything that we're adjusting the business around right now*." Defendant Hogan again did not disclose Align's ongoing 3Q18 Discounting Promotion, which had specifically been put in place to win back lost market share from competitors in the comprehensive aligner space.

118.    Following the 2Q18 earnings call, analysts reacted favorably to Defendants' remarks and interpreted Defendants' statements as confirming that Align was not being forced to cut prices or make other significant adjustments in the face of growing competition. William Blair reported a "*[s]tatus [q]uo [c]ompetitive [e]nvironment*" with respect to competition, stating that "[t]here has been no impact yet

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

from looming competition, but we expect the number of active players will gradually increase." William Blair further noted:

> ***There is no sign as yet that new entrants are impacting volumes or pricing***, but this topic will remain a key concern now that all [] three of the traditional orthodontic leaders have clear aligner products in their portfolios. We view Align as the clear leader in aligners and believe it has many levers to not only defend share but also expand the market. . . . With excellent volume growth and respectable margins, we believe Align remains clearly the best growth story in the broader dental space. We maintain our Outperform rating on Align despite the stock's lofty valuation.

119.   Piper Jaffray reported on July 25, 2018, that "we view the outlook for the business as extremely bright (even when they walk away from SDC at the end of next year)." Similarly, Evercore noted in a July 25, 2018 report that "we remain bullish on ALGN's long term market opportunity and superior execution" and noted that "***no signs that lower cost entrants are making a dent*** in the market overall."

120.   In truth, Morici's statement that ASPs would be higher in the third quarter and Hogan's statements that Align had made no adjustments since the AAO to respond to competition were materially false or misleading when made, as the Company had already implemented an undisclosed aggressive discounting promotion for its comprehensive products, which was already driving down the Company's ASPs.

121.   In particular, Defendant Morici's statement that Align would enjoy "higher ASPs" in the third quarter of 2018 (¶ 114) was materially misleading when made because he failed to disclose the highly material fact that Defendants had just implemented a steep discount program that applied to 75% of Align's clear aligner products, and which was already driving down Align's 3Q18 ASPs ***even before the 2Q18 earnings call***. ¶¶ 80, 86-87. Specifically, the program provided a $200-per-unit discount on every comprehensive case purchased above the doctors' purchases during the prior period. ¶ 76. Coupled with the 2018 Advantage Program, doctors could receive hundreds of dollars off each unit, placing significant downward pressure on Align's ASPs. ¶¶ 77, 79, 87. As expected, the 3Q18 Discounting Promotion resulted in an immediate decline to the Company's ASPs. ¶¶ 80-87. FE 5 stated that the decline in Align ASPs had begun ***before*** the start of the third quarter, which began on July 1, 2018, and that ***the decline in ASPs accelerated following implementation of the 3Q18 Discounting Promotion***. ¶ 87. FE 5 further stated that, given the declining ASPs, Morici requested from his Finance Department

VPs that analyses be performed on revenues and ASPs. *Id.* FE 5 stated that these analyses were performed in July and personally delivered to Defendant Morici. *Id.* FE 5 stated that ***ASPs were declining throughout July, including before the July 25, 2018 2Q18 earnings call***. *Id.* FE 7 similarly confirmed that the 3Q18 Discounting Promotion had resulted in a significant decrease in Align's ASPs. *Id.* This fact was ultimately acknowledged in Align's October 24, 2018 earnings call, when Defendant Morici revealed that ASPs had declined approximately $85 in 3Q18, due in large part to the undisclosed promotion. ¶¶ 95-96. The Company's Form 10-Q for 3Q18 filed on November 1, 2018, confirmed that ***all*** of the non-FX-related decline was a result of Align's 3Q18 promotional programs. ¶ 106. In the alternative, Morici's statement that Align's 3Q18 ASPs would be "higher" was false for these same reasons.

122. Defendant Hogan's claim that Align had not "changed in any way [its] assessment of the competition that [it] saw at the AAO" (¶ 115) was also materially false or misleading when made because, following the AAO, Defendants secretly designed and implemented the 3Q18 Discounting Promotion, which began on July 1, 2018—nearly a month earlier. ¶¶ 73-79. The 3Q18 Discounting Promotion provided aggressive, undisclosed discounts to customers in addition to those already earned under the revamped, disclosed 2018 Advantage Program. ¶ 77. FE 5 recounted that Defendant Morici was "very, very aware of Align's competition" during this period and explicitly linked the 3Q18 Discounting Promotion to Align's concerns about competition. ¶ 78. FE 5 further stated that the discount was expressly implemented to regain market share lost to competition in the comprehensive clear aligner market, as reflected at the May 2018 AAO. ¶ 79. Hogan's statement that Align had not "changed in any way [its] assessment of the competition that [it] saw at the AAO" was also materially false or misleading when made because it omitted any mention of the undisclosed 3Q18 Discounting Promotion.

123. Similarly, Defendant Hogan's statement that there was "not . . . anything that we're adjusting the business around right now" (¶ 117) was materially false or misleading when made because Align had made a critical adjustment following the emergence of competitors in the comprehensive case market at the AAO, which were priced lower than Align's comprehensive cases. ¶¶ 66, 69, 73-79. Specifically, Defendants secretly designed and implemented the 3Q18 Discounting Promotion, which began on July 1, 2018, and provided aggressive, $200-per-unit discounts to customers on top of those

already earned under the revamped 2018 Advantage Program. ¶ 77. The 3Q18 Discounting Promotion was expressly designed to regain market share lost to competitors in the comprehensive case market. ¶ 79. Thus, contrary to Hogan's statement, Align was indeed adjusting its business around competition, offering large discounts in order to win back business lost to competition and further stem the competitive threat in the comprehensive clear aligner market. Hogan's statement that there was "not . . . anything that we're adjusting the business around right now" was also materially false or misleading because it omitted any mention of the undisclosed 3Q18 Discounting Promotion and the fact that it was already driving down Align's ASPs.

D.   **September 5, 2018 Robert W. Baird Global Healthcare Conference**

124.   On September 5, 2018, at the Robert W. Baird Global Healthcare Conference, Jeffrey Johnson, an analyst at Robert W. Baird, asked Defendant Morici:

> Maybe we'll ask a couple of questions here on competition. So obviously, earlier this year, you had a few of the larger companies come out with clear aligner systems. Now that some of the IP has come off late last year, first off, just a simple question, seeing any traction, anything that concerns you in the near term from these competitive launches?

125.   In response, Defendant Morici stated, "*[T]here's nothing that – of note that was disruptive or different than what we would've seen or would've done in the past, both from a product standpoint or a pricing standpoint*." This statement was materially false or misleading when made because, in truth, Defendants had secretly developed and implemented the 3Q18 Discounting Promotion in direct response to competition—particularly the new products that competitors had announced at the May 2018 AAO, which were priced lower than Align's comparable products. ¶¶ 66, 69, 73-79. Defendants secretly designed and implemented the 3Q18 Discounting Promotion, which began on July 1, 2018, and provided aggressive, $200-per-unit discounts to customers *in addition to* those already earned under the revamped 2018 Advantage Program. ¶ 77. Combined with the 2018 Advantage Program, customers received up to several hundred dollars off each unit, placing heavy downward pressure on Align's ASPs. ¶¶ 77, 79, 87. FE 5 recalled that *Defendant Morici was "very, very aware of Align's competition" during this period, holding conversations with Align's Finance Department about competitors and explicitly linking the 3Q18 Discounting Promotion to concerns about competition*. ¶ 78. FE 5 stated that the discount was specifically implemented to regain market share in the

comprehensive clear aligner space that competitors had recently begun to cannibalize. ¶ 79. Moreover, as Morici knew at the time, the undisclosed 3Q18 Discounting Promotion was already having a significantly disruptive effect on ASPs, Align's key pricing metric. ¶¶ 86-87, 92-93. Specifically, even in July 2018, the 3Q18 program was accelerating the decline in Align's ASPs, prompting management to conduct multiple rounds of analysis of the declining ASPs and ultimately focusing management's attention on trying to "figure out how to stop the bleeding." ¶¶ 86-87, 93. In addition, Morici's statement that "there's nothing that – of note that was disruptive or different than what we would've seen or would've done in the past, both from a product standpoint or a pricing standpoint" was materially false or misleading when made because it omitted any mention of the 3Q18 Discounting Promotion, which was a direct response to the growing competition in the market for comprehensive clear aligner cases and was already driving down Align's ASPs.

## VI.   LOSS CAUSATION

126.    As a result of Defendants' materially false or misleading statements, omissions of material facts, and fraudulent course of conduct, Align's publicly traded common stock traded at artificially inflated prices during the Class Period. Relying on the integrity of the market price for Align common stock and public information relating to Align, Plaintiff and other Class members purchased or otherwise acquired Align common stock at prices that incorporated and reflected Defendants' misrepresentations and omissions of material fact alleged herein. As a result of their purchases of Align common stock during the Class Period at artificially inflated prices and the removal of that inflation upon the disclosure set forth in ¶¶ 130-44, *infra*, Plaintiff and the Class suffered economic losses (i.e., damages) under the federal securities laws.

127.    Defendants' false and misleading statements, material omissions, and deceptive course of conduct had their intended effect, directly and proximately causing Align common stock to trade at artificially inflated prices during the Class Period, closing as high as $392.98 per share on September 25, 2018. Those misrepresentations and omissions of material fact that were not immediately followed by an upward movement in the price of Align common stock served to maintain the price of Align common stock at an artificially inflated level.

128.     Had Defendants been truthful about Align's need to discount its comprehensive products in order to compete during the Class Period, Plaintiff and other Class members would not have purchased or otherwise acquired their Align common stock at the artificially inflated prices at which they traded. It was entirely foreseeable to Defendants that misrepresenting and concealing material facts from the public would artificially inflate the price of Align common stock. The economic losses (i.e., damages suffered by Plaintiff and other members of the Class) were a direct, proximate, and foreseeable result of Defendants' materially false and misleading statements and omissions of material fact, which artificially inflated the price of the Company's common stock, and the subsequent significant decline in the value of the Company's common stock when the relevant truth was revealed and/or the risks previously concealed by Defendants' material misstatements and omissions materialized.

129.     Plaintiff and other Class members suffered actual economic loss and were damaged when the material facts and/or foreseeable risks concealed or obscured by Defendants' misstatements and omissions were revealed and/or materialized through the disclosure of new information concerning Align on October 24, 2018. As alleged in this Section, the disclosure and/or materialization of the foreseeable risks concealed by Defendants' fraud directly and proximately caused foreseeable declines in the price of Align common stock by removing the artificial inflation in the price of Align common stock that resulted from Defendants' fraud. The timing and magnitude of the declines in the price of Align common stock, as detailed herein, negate any inference that the loss suffered by Plaintiff and the Class was caused by changed market conditions or other macroeconomic factors unrelated to Defendants' fraudulent conduct.

A.     **The Relevant Truth Concealed by Defendants' Misleading Statements and Omissions Is Revealed on October 24, 2018**

130.     On October 24, 2018, Align stunned the market by announcing on the Company's 3Q18 earnings call that ASPs for its Clear Aligner products had declined approximately by $85 quarter-over-quarter, from $1,315 for 2Q18 to $1,230 for 3Q18. The ASP decline represented one of the largest declines in Align's history as a public company. Moreover, the decline in ASPs followed several quarters of sequential increases, from $1,305 in 4Q17, to $1,310 in 1Q 2018, to $1,315 in 2Q18. The ASP decline in Align's comprehensive products was even steeper, dropping from $1,410 in 2Q18 to $1,310 in 3Q18.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

131.     The analysts on Align's October 24, 2018 3Q18 earnings call zeroed in on the sudden, unexpected decline in ASPs. Indeed, *of the fourteen analysts who posed questions to Defendants, twelve asked about pricing or the effect of Align's recent discounting promotion*. The analysts' focus on ASPs and Align's undisclosed discounting practices confirmed that Align's lower ASP for its clear aligner products was of paramount importance to the market and that the market had not been aware of the existence and effect of the 3Q18 Discounting Promotion prior to Defendants' disclosure that day.

132.     During the 3Q18 earnings call, Defendant Morici expressly connected the decline in ASPs to the 3Q18 Discounting Promotion:

> *Q3 Invisalign ASPs were down sequentially and year-over-year due to a combination of promotional programs*, unfavorable foreign exchange and product mix, partially offset by price increases across all regions. *In Q3, we offered new product promotions* designed to increase adoption of Invisalign treatment, and we saw much higher-than-expected uptake on some of these promotions.

133.     Defendant Morici further explained that the Company's secret implementation of the 3Q18 Discounting Promotion on top of the Advantage Program was a significant cause of the ASP decline:

> In addition, the beginning of the year, we created a more robust North America Advantage customer loyalty program, which has been very favorably received by our doctors. The new Advantage Program changed to a semiannual discount qualification period instead of a quarterly one, with additional tiers that provide doctors with more incentive to move up the tiers by increasing their Invisalign case volume. As a result, more doctors are moving up in tiers and achieving higher overall discounts than they were under the prior program.

Also during the call, Hogan acknowledged "those specific promotions that were driving down some of the ASPs in Q3."

134.     During the same conference call, in response to a question from Goldman Sachs analyst Robert Patrick Jones regarding the breakdown of the approximately $61 of the ASP decline that was not attributable to the unfavorable foreign exchange, Defendant Morici stated: "On the remaining piece that's left, about half of the drop in ASPs was due to mix, it was mix shift to the lower stage products, and about the other half or $30 or so was related to those promotions." However, as Align conceded in its 3Q18 Form 10-Q filed one week later, *all* of the non-FX-related decline in ASPs was due to discounting

promotions, and the ASP decline would actually have been larger if not for the *positive* impact from product mix shift. In other words, the vast majority of the Company's 3Q18 ASP decline was caused by the implementation of the 3Q18 Discounting Promotion, which Defendants concealed from the market during the Class Period.

135.   Defendants also revealed during the 3Q18 earnings conference call that the 3Q18 Discounting Promotion applied to "comprehensive cases." For example, during the call, Jonathan Block, an analyst at Stifel, Nicolaus & Company, Incorporated, asked, "***So can you be a little bit more clear that the promotions that you ran in the quarter, you hear the word promotions at the same time that 2 or 3 comprehensive clear aligners were introduced in the market for the first time ever. And that's going to freak a lot of people out, right***? So the promotions that you mentioned, were those specific to express type cases? Were they more specific to comprehensive?" In response, Defendant Hogan disclosed that "Yes. Jon, to answer your question backwards is, ***these were comprehensive cases***."

136.   That the $200-per-unit discount applied specifically to comprehensive cases explained why the ASP decline in those products was significantly greater than the decline in Align's ASPs for non-comprehensive products. More specifically, Align disclosed that ASPs for its comprehensive products had declined to $1,310, a $100 decrease from the previous quarter ($1,410) and a $95 decrease from the previous year ($1,405). Align's ASP for its non-comprehensive products, on the other hand, were $940, a $25 decrease from the previous quarter ($965) and a $10 from the previous year ($950).

137.   During the 3Q18 earnings conference call, Defendants also disclosed that they did not expect the Company's ASPs to recover, but instead expected Align's clear aligner ASP to remain "flat" at the same level throughout all of 2019. For example, the following exchange took place between Morici and Jeffrey D. Johnson of Robert W. Baird & Co. during the 3Q18 earnings conference call:

> JOHNSON: Yes. Fair enough. And then again, there hasn't been enough ASP questions here tonight but I just want to understand, John, your comments. You get some of the promotional activities right sized in the fourth quarter, currency probably is a little bit bigger of an impact going forward. ***So fourth quarter, you would expect ASP to be down sequentially a bit versus 3Q, is that right***? And then we kind of see a recovery throughout 2019 or at least a little bit trending up in 2019 as some of those currency headwinds in the back half come off and maybe some of the promotional activity headwinds do as well?

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

MORICI: Jeff. What we would see is *you're right*. On the FX, you see it come down a little bit from an ASP standpoint into the -- in the fourth quarter. But *then from the fourth quarter, we expect it to be about flat*, just given the mix and other things that we've talked about in terms of what we see in the business.

JOHNSON: Okay. *And just to clarify that. So whatever our fourth quarter ASP, whatever that ends up, that you would expect holding flat then moving throughout 2019 sequentially?*

MORICI: *Yes, that's how we would look at it.*

In other words, the lower ASPs that Defendants disclosed on October 25, 2018 were not merely a blip, but instead represented the "new normal" for the Company in the face of increased competition.

138.    In the wake of this announcement, the Company's share price declined by $58.76—or over 20%— in a single trading day, from a close of $290.83 per share on October 24, 2018, to a close of $232.07 per share on October 25, 2018.

139.    This substantial stock price decline was driven by Align's disappointing ASP decline. Indeed, following the 3Q18 earnings call, but prior to the opening of trading on the following day, analysts issued reports predicting that Align's shares would decline meaningfully as a result of the ASP decline. For example, on October 24, 2018, Piper Jaffray reported, "*much higher than expected pricing pressure in the quarter led to weak Q4 guidance, which will push shares meaningfully lower tomorrow*." Piper Jaffray also lowered its price target from $440 to $300, explaining in a section entitled "Tons of Great Things Happening in Q3 but *Pricing Declines More than Overshadow Them*" that "[d]espite all of that good news, (especially scanners, which are leading indicators of future case volumes), *the clear focus among investors from the results were soft global ASPs on aligners that were down roughly $85 sequentially* (or -6.5%)." Piper Jaffray also noted, "[W]e have to focus on the pricing dynamics that impacted Q3 results and will hurt the fourth quarter (and '19)" and observed, "the results will stoke fears about competitive pressures on ALGN's business." In a same-day report, Credit Suisse wrote that Align's "*shares may decline further on a surprising dip in ASP*, contributing to a weaker 4Q outlook."

140.    Likewise, on October 25, 2018, Stephens reported that "while lower pricing is likely conducive to driving higher case volume growth it is also likely to result in a reduction to the Street's perception of peak earnings power and, as a result, the relative premium assigned to the Company's

shares." That same day, William Blair wrote that any positive results were "overshadowed by a notable decrease in Invisalign average selling price (ASP), which is expected to carry into the fourth quarter and next year" and that "*we believe investors will interpret the lower ASP as directly or indirectly a function of increased competition and compress the stock's valuation as a result*."

141.  Similarly, on November 19, 2018, William Blair confirmed that Align's stock price decline had been driven by the disclosure of disappointing ASP results and guidance, writing, "*[t]he 6% reduction in average selling price (ASP) in the third quarter, coupled with caution about the fourth quarter, was the primary catalyst for the stock's 20% correction following earnings*."

142.  Moreover, although the Company denied it, the market understood that the Company's 3Q18 ASP decline was related to competition. For example, in its October 24, 2018 report, Credit Suisse wrote that the ASP decline "will inevitably raise concerns over competitive dynamics with new players in the wings" and that "a greater than anticipated decline in ASP will be a focus area for investors tomorrow, particular [sic] amidst intensified competitive dynamics." That same day, Piper Jaffray wrote that "[s]urely, the results will stoke fears about competitive pressures on ALGN's business."

143.  Similarly, in an October 25, 2018 report, Morgan Stanley lowered its Align share price target from $320 to $300 following the Company's disclosure of its 3Q18 results. Like numerous other analysts, Morgan Stanley specifically referenced the impact of competition on Align's prices in analyzing the Company's unexpected results:

> **Unexpected pricing pressure emerges**. Our own work has suggested that there is a path to competitors having an impact on ALGN's growth . . . . *Disclosure that ALGN saw accelerated pricing pressure in 3Q, which is expected to persist into 4Q, raises questions of whether these dynamics are already putting pressure on the franchise.* ALGN indicates that the pricing pressure is a result of mix shift to lower priced products launched by ALGN and unexpectedly rapid uptake of a new volume incentive program by higher volume customers. *The challenge for investors will be how to reconcile ALGN's view that there was no competitive dynamic at play, with ALGN's own history of executing on promotions and product launches without significant pricing disruptions*.

144.  In its October 25, 2018 report, Berenberg Capital Markets also lowered its price target—from $420 to $370—noting:

> ALGN shares are likely to be under meaningful pressure, in our view, following a Q318 print that may *raise investor concerns around the company's ability to maintain average selling price (ASP) in the face of increased competition*. While we had always expected some ASP and GM compression in our model, we acknowledge that the magnitude of the quarterly ASP decline came earlier than we had forecast.

Berenberg attributed the "weaker" ASPs to "more competitive pressure."

**B.    Relevant Post-Class Period Developments**

145.    On November 1, 2018, Align filed its 3Q18 Form 10-Q. The filing made clear that all of the non-FX-related decline in Invisalign's 3Q18 clear aligner ASP had been caused by Align's discounting programs, and that the drop would have been *larger* had it not been for the positive effect of the product mix shift:

> For the three months ended September 30, 2018, Americas net revenues increased by $31.7 million as compared to the same period in 2017, primarily due to case volume growth across all channels and products, which increased net revenues by $45.8 million. This increase was offset in part by lower average selling prices ("ASP"), which reduced net revenues by $14.1 million. *The ASP decline was primarily a result of higher promotional discounts*, *which reduced revenues by $21.2 million*. Additionally, unfavorable foreign exchange rates and increased additional aligner deferrals collectively reduced net revenues by $3.7 million. These factors were partially offset by higher prices on the new products introduced in July 2018 and a *favorable product mix shift* driven by decreased SDC revenues which carry a lower ASP, *which collectively increased net revenues by $10.2 million* . . . .

> For the three months ended September 30, 2018, International net revenues increased by $48.7 million as compared to the same period in 2017, primarily driven by case volume growth across all channels and products which increased net revenues by $56.3 million. This increase was offset in part by lower ASP, which reduced net revenues by $7.6 million. This reduction in ASP was primarily due to increased additional aligner deferrals, which reduced net revenues by $6.0 million, in addition to unfavorable exchange rates and *higher promotional discounts*, which collectively reduced net revenues by $5.4 million. These factors were partially offset by higher prices from the new products introduced in July 2018 which increased net revenues by $5.9 million.

146.    Since 3Q18, Align's comprehensive clear aligner ASPs have never recovered, making it increasingly clear that the comprehensive ASP decline that Defendants first disclosed on October 24, 2018 was the Company's "new normal" after the launch of multiple competitors who caused downward pressure on the Company's pricing. The following chart, plotting data from Align's 2Q19 earnings call presentation slide deck, clearly illustrates this trend, with pre-3Q18 ASPs fluctuating around $1,390 to $1,400 and post-3Q18 comprehensive ASPs fluctuating around $1,310 to $1,320:

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS



VII.   **SUMMARY ALLEGATIONS OF SCIENTER**

147.   As more fully alleged above, numerous facts give rise to a strong inference that, throughout the Class Period, Defendants knew or were deliberately reckless in not knowing that the statements identified in Section V above concerning Align's response to competition in the clear aligner market were materially false and/or misleading when made and/or omitted material facts necessary to make those statements not misleading. Likewise, Defendants knew that their claim that Align would report higher ASPs in 3Q18 was false and/or misleading when made given their material nonpublic knowledge at the time that ASPs were in fact already declining as a result of the undisclosed 3Q18 Discounting Promotion. In particular, Align and the Individual Defendants: (i) knew and/or were deliberately reckless in not knowing that the statements issued and disseminated in the name of the Company were false and/or misleading and/or omitted material facts necessary to render those statements not false and/or misleading; (ii) knew that these statements were issued and disseminated to the investing public; and (iii) knowingly and substantially approved, participated or acquiesced in, and had control and ultimate authority over, the issuance or dissemination of such statements as primary violators of the federal securities laws. In addition to the specific facts enumerated above, the following facts also support a strong inference of scienter.

148.   ***The fraud concerned the core of Align's operations, the manufacture and sale of clear aligners***. The Clear Aligner segment was the Company's chief revenue generator and the most important driver of Align's earnings. Indeed, during the Class Period, Clear Aligner net revenues represented approximately 86% of worldwide net revenues. The Company's Clear Aligner revenues and ASPs were

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

closely watched by the market and continually emphasized by Defendants. For example, during Align's July 25, 2018 earnings call, Defendant Morici noted that "[y]ear-over-year clear aligner revenue growth of 35% reflected strong Invisalign shipment growth across all customer channels and geographies and increased Invisalign ASPs." The importance of the Clear Aligner segment to Align's business and its key ASP metric raises a strong inference that the Defendants knew, or were deliberately reckless in not knowing or disregarding, that their statements about the Align's lack of response to competition in the clear aligner market and the Company's ASPs were false or misleading and/or omitted material facts.

149. Specifically, the importance of that segment and its key ASP metric raises a strong inference that the Defendants knew that Align had undertaken the 3Q18 Discounting Promotion in response to competition in comprehensive cases announced at the AAO and that those discounts were causing downward pressure on the Company's ASPs. Moreover, the importance of the clear aligner segment and its key ASP metric raises the strong inference that Defendants knew on July 25, 2018, when they promised investors higher ASPs in 3Q18, that (1) ASPs were in fact declining as a result of the 3Q18 Discounting Promotion that they had secretly implemented three-and-a-half weeks before, and (2) Defendants' failure to disclose the 3Q18 Discounting Promotion rendered that statement materially misleading.

150. ***The Individual Defendants had direct access to negative material nonpublic information regarding the impact of the Company's discounting promotions on Clear Aligner ASP.*** Each of the Individual Defendants had access to detailed information regarding Align's competition, the threat of competition following the expiration of its key patents, the measures it put in place to combat competition (including the undisclosed 3Q18 Discounting Promotion), and real-time data regarding ASPs and the impact of Align's discounting promotions on that key metric. As discussed above, multiple former employees stated that this information was transmitted and learned through meetings, reports, and other regular communications. For example:

- During monthly EMC meetings, the attendees discussed Align's growing competition and ASPs. ¶¶ 57, 61.

- Defendants Hogan and Morici attended the Company's quarterly All-Hands meetings where "all they talked about" was the expiration of Align's patents and the fact that the Company's competitors would "get access to [the Company's] recipes" and sell the aligners for less (which they did). ¶ 62.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

- Defendant Morici attended meetings during which he discussed his preoccupation with competition and specifically linked the 3Q Promotion to the Company's concerns about competition. ¶ 78. Meanwhile, Puco, who reported directly to Hogan, approved all promotions and would have had to have approved the 3Q18 Discounting Promotion. *Id*.

- While the decline in Align's ASPs had begun prior to the third quarter of 2018, it accelerated following Defendants' implementation of the undisclosed 3Q18 Discounting Promotion on July 1, 2018. ¶¶ 86-87. The decline in ASPs was apparent in July 2018, even before Align's July 25, 2018 earnings call, and was reflected in the ASP data that was updated every few hours and regularly disseminated to Hogan, Morici, and other top executives. ¶¶ 56-57, 87. Moreover, Defendant Morici directed his Finance Department VPs to have analyses performed on ASPs in July 2018, which were personally delivered to Morici. ¶ 87. Morici and others were meeting on the subject regularly during 3Q18, focusing their attention on trying to "figure out how to stop the bleeding" in the Company's ASPs. ¶ 93.

- The 3Q18 Discounting Promotion was specifically implemented to regain comprehensive case market share that had been recently lost to competitors, and employees at the Company's headquarters analyzed the percentage of lost market share that could be reclaimed through the $200-per-unit discount. ¶ 79. The lead time for such promotions was at least a few weeks and certainly more than two weeks. ¶ 75.

- Align's executive team received biweekly reports that highlighted ASPs, among other metrics. ¶ 57.

- Align's executive team also received a monthly reporting package that reflected all of the financial figures for the prior month, including ASPs. ¶¶ 56-57.

- The Individual Defendants had access to Sales Force, which reported ASPs in almost real-time. ¶¶ 58-59.

151. ***Defendants Hogan's and Morici's unequivocal denials that the Company was responding to competition following the AAO demonstrate a strong inference of scienter***. Following the May 2018 AAO at which new, lower-priced entrants to the comprehensive clear aligner case market mounted a public challenge to Align's previously unchallenged dominance, Defendants issued strident and unequivocal denials that Align was responding to the competition, including by implementing new pricing incentives.

152. For example, on July 25, 2018, nearly a month after Align had secretly rolled out the undisclosed 3Q18 Discounting Promotion, Defendants held a conference call with analysts to discuss the Company's financial results from the three months ended June 30, 2018, as well as the Company's expected revenues and ASPs for the third quarter of 2018. During this call, Defendant Hogan was asked

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

by Jonathan Block, an analyst at Stifel, Nicolaus & Company, "what, if anything, Joe, have you heard about these offerings [from competitors] over the past 2 months since the [AAO]?" Hogan replied, "*I wouldn't say we've changed in any way our assessment of the competition that we saw at the AAO*." During the same call, Richard Newitter, an analyst from Leerink Partners, asked Hogan whether Align was seeing "[a]ny kind of impact from competition." Hogan flatly denied that the Company was responding to the growing competitive threat, claiming, "*[T]here's not a momentum piece or anything that we're adjusting the business around right now*."

153.   At the Robert W. Baird Global Healthcare conference six weeks later—*more than two months into the 3Q18 Discounting Promotion*—Defendant Morici was asked by an analyst whether Align saw "anything that concerns you in the near term from these competitive launches." Morici responded, "*[T]here's nothing that . . . was disruptive or different than what we would've seen or would've done in the past, both from a product standpoint or a pricing standpoint*."

154.   In making such unequivocal statements, Defendants Hogan and Morici knew, or were deliberately reckless in not knowing and were responsible prior to making such statements for inquiring into, the actual circumstances concerning the subject of their statements. Had Defendants Hogan and Morici done any due diligence prior to making these statements, they would have known that, even as they were telling investors before and during the Class Period that Align saw no threat from the competition announced at the AAO and was taking no steps in response, Align was developing and implementing the undisclosed 3Q18 Discounting Promotion that, added to the revamped 2018 Advantage Program, was significantly and negatively affecting the Company's highly watched ASP metric. FE 5 recalled that Defendant Morici *explicitly linked the 3Q18 Discounting Promotion to Align's concerns about competition*.

155.   *The temporal proximity between Defendant Morici's September 5, 2018 misrepresentation denying any concerns about or response to new competition and the Company's October 24, 2018 admissions supports scienter*. As noted above, during the Robert W. Baird Global Healthcare Conference on September 5, 2018, Defendant Morici engaged in the following exchange with an analyst:

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

ANALYST: Maybe we'll ask a couple of questions here on competition. So obviously, earlier this year, you had a few of the larger companies come out with clear aligner systems. Now that some of the IP has come off late last year, first off, just a simple question, seeing any traction, ***anything that concerns you in the near term from these competitive launches***?

MORICI: "[T]here's ***nothing that – of note that was disruptive or different than what we would've seen or would've done in the past, both from a product standpoint or a pricing standpoint***."

156.    The proximity between Defendant Morici's misrepresentation that Align had done nothing different or disruptive to response to competition from a pricing standpoint, and the revelation only 49 days later that the Company had secretly developed and implemented an aggressive new discounting program that was put in place in direct response to new competition, producing the marked decline in Align's ASPs, further supports an inference that Defendants were, at best, deliberately reckless in claiming that Align had done nothing different or disruptive to response to competition from a pricing standpoint. To the contrary, as FE 5 confirmed, Defendant Morici was "very, very aware of Align's competition" during this period, holding conversations with Align's Finance Department about competitors and explicitly linking the 3Q18 Discounting Promotion to concerns about competition. ¶ 78.

157.    Indeed, Morici knew of significant pricing disruptions at the time that he made this statement. The accelerated decline in ASPs from the 3Q18 Discounting Promotion was apparent even before Align's July 25, 2018 earnings call and was reflected in the ASP data that was updated every few hours and regularly disseminated to Morici and other top executives. ¶¶ 56-57, 86-87. Moreover, Defendant Morici directed his Finance Department VPs to have analyses performed on ASPs in July, which were personally delivered to Morici. ¶ 87. Periodic meetings with Defendant Morici, among others, were held as part of the Finance Department's analysis of ASP. ¶ 93. During these meetings, the attendees, including Morici, discussed ASPs and different ways to try and stop the ASP decline. *Id*. As FE 5 explained, Align had implemented the promotion in response to the competitive threat, but the resulting decline in ASP then prompted management to try to "figure out how to stop the bleeding." ¶¶ 79, 93.

158.    ***Defendant Hogan's suspicious insider trading reinforces a strong inference of scienter***. During the Class Period, Defendant Hogan realized substantial benefits from his personal sales of Align

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

stock at the same time that Defendants misrepresented and concealed material facts from investors regarding the threat from the competition on display at the May 2018 AAO and the fact that they were implementing steep discounts to the Company's comprehensive products in response.

159.    On June 1, 2015, Defendant Hogan was hired as CEO of Align. In recognition of his role, Hogan was granted an initial lot of 111,000 MSUs that would not vest until June 1, 2018. The grant gave Hogan an incentive of earning additional stock based on Align's share price performance compared to the NASDAQ Composite Index: if Align outperformed the NASDAQ over the next three years, the MSUs would convert to shares at a rate of two to one (a 2% increase in units for each percentage point of over-performance), up to a maximum percentage of 150%. That incentive structure in mind, Hogan then oversaw an unprecedented run in the value of Align's stock. Eighteen months after Hogan became CEO, Align's common stock closed at $96.96 per share on January 3, 2017. As a result, Defendant Hogan received the maximum payout of 150% of his June 2015 target award—166,500 shares of Align stock— in June 2018.

160.    Just as Hogan's options became eligible for exercise, Defendants' misleading statements led to an unprecedented increase in Align's stock price. Indeed, by the end of Align's Investor Day on May 23, 2018, when Defendants assured investors that the Company's core comprehensive business was insulated from competition, Align common stock closed at $308.20 per share. Just days later, armed with nonpublic knowledge that Align faced a significant competitive threat in the high-end, comprehensive case market following the 2018 AAO and was planning to implement discounts in response, Defendant Hogan sold huge blocks of Align stock.

161.    On June 1, 2018, the same day that his MSU award vested, Defendant Hogan sold 85,998 shares—*nearly 40%* of his holdings—at $333.09 per share, for proceeds of more than $28,645,073. On August 14, 2018, Defendant Hogan sold 25,000 shares of Align common stock at approximately $367.48 per share, resulting in total proceeds of $9,186,990. This sale represented over 19% of Hogan's then-held Align stock and followed his post-AAO sale of 40% on June 1, 2018.

162.    These sales were suspicious in amount and timing. Both followed the May 2018 AAO, during which the coming threat of competition to Align's continued dominance in the comprehensive clear aligner market came more clearly into focus, and Defendants' statements reassured the market that

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

Align would not see pricing pressure its core comprehensive product market. In addition, in the three years leading up to these two sales, Hogan only sold 54,584 shares of Align stock for a total of $7,804,520 in proceeds. Thus, Hogan's total post-AAO sales of $37,832,063 were nearly ***five times*** greater than his total sales over the prior three years.

163.    Defendant Hogan's sales of Align stock were suspiciously timed to take advantage of the significant run-up in the price of Align's stock, before the truth about the effects of Align's aggressive new discounting program was revealed. Indeed, at the time of Hogan's June 1, 2018 sale, Align's stock was trading at its then-all-time high, over $65 higher per share than it had traded at any point in the ten years preceding 2018. Hogan's largest sale, on June 1, 2018, occurred just a month before Align implemented its secret 3Q18 Discounting Promotion. Moreover, Hogan's August sales occurred ***after*** Align implemented its undisclosed and aggressive discounting program, and after those discounts had already led to steep declines in the Company's key ASP metric. Moreover, Hogan's sales occurred just several months prior to the disclosure revealing the 3Q18 Discounting Promotion and its deleterious effect on ASPs, which caused Align's stock price to plummet to $232.07 per share—over $100 per share lower than the price at which Hogan sold in June, and over $135 per share lower than the price at which Hogan sold in August.

164.    ***Align's executive compensation structure supports scienter***. Align's executive compensation was highly contingent on increases in the Company's stock price and financial performance. According to the Company's proxy statements, Align "emphasize[d] performance-based pay." For 2018, 91% of Defendant Hogan's "total target annual compensation was subject to annual performance goals or tied to the value of [Align's] common stock." However, after "[t]aking into account the special CEO equity award granted in June 2018, 97% of [Align's] CEO's [Defendant Hogan's] total-target annual 2018 compensation was subject to annual performance goals or tied to the value of [Align's] common stock." Moreover, "84% of [Defendant Morici's] total-target annual compensation was subject to annual performance goals or tied to the value of [Align's] common stock." As set forth in Align's proxy statement issued on April 4, 2019, "[b]ased on outstanding performance against aggressive 2018 objectives, [Defendant Morici] received maximum annual incentive payments (bonuses) of 240% of [his] target award opportunity."

165.    Under Align's annual incentive plan compensation program, in addition to their base salaries, the Individual Defendants received substantial remuneration in the form of non-equity incentive plan compensation for 2018: Defendant Hogan earned $3,870,000, while Defendant Morici earned $718,000. The non-equity incentive plan compensation was based primarily on two metrics, revenue and operating income. In addition, Hogan was further incentivized to increase Align's stock price based on its performance versus the broader market: for every 1% that Align's stock price exceeded the return on the NASDAQ, Hogan would receive a 2% increase in stock-based compensation.

166.    As a result of the lucrative financial incentives offered by the Company, the Individual Defendants were highly motivated to artificially inflate the price of Align stock by making false and misleading statements that concealed material facts surrounding the discounting that Align was implementing to keep its comprehensive clear aligner cases competitive.

167.    ***SVP Puco's abrupt resignation in connection with and shortly after the revelation of the adverse facts previously concealed by Defendants reinforces scienter***. On November 1, 2018, only eight days after the Company's corrective disclosure, Align issued a press release announcing that Puco, SVP and Managing Director for the Americas, was resigning after twelve years with the Company. Notably, Puco approved the secret 3Q18 Discounting Promotion that caused the third quarter decline in Align's Clear Aligner ASPs.

## VIII.    <u>CLASS ACTION ALLEGATIONS</u>

168.    Plaintiff brings this action on its own behalf and as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities who purchased the common stock of Align from May 23, 2018, through October 24, 2018, both dates inclusive, and were damaged thereby (the "Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate families of the Individual Defendants; (iii) the Company's subsidiaries and affiliates; (iv) any person who is or was an officer or director of the Company or any of the Company's subsidiaries or affiliates during the Class Period; (v) any entity in which any Defendant has a controlling interest; and (vi) the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

169.     The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, Align had around 80 million shares of common stock outstanding and actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that the proposed Class numbers in the thousands and is geographically widely dispersed. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

170.     Plaintiff's claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' alleged conduct in violation of the Exchange Act as complained of herein.

171.     Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained counsel competent and experienced in class and securities litigation.

172.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. The questions of law and fact common to the Class include:

    i.    whether Defendants violated the federal securities laws by their acts and omissions as alleged herein;

    ii.    whether Defendants made statements to the investing public during the Class Period that contained material misrepresentations or omitted material facts;

    iii.    whether and to what extent the market price of Align's common stock was artificially inflated during the Class Period because of the material misstatements and omissions alleged herein;

    iv.    whether Align and the Individual Defendants acted with the requisite level of scienter;

    v.    whether the Individual Defendants were controlling persons of the Company;

    vi.    whether reliance may be presumed; and

    vii.    whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

173.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the

Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX.   THE FRAUD ON THE MARKET AND *AFFLILIATED UTE* PRESUMPTIONS OF RELIANCE APPLY

174.   At all relevant times, the market for Align's common stock was efficient for the following reasons, among others:

i.   Align's common stock met the requirements for listing on, and was listed and actively traded on, the NASDAQ Global Select Market, a highly efficient and automated market;

ii.   As a regulated issuer, Align filed periodic public reports with the SEC and the NASDAQ Global Select Market;

iii.   Align regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

iv.   Align was followed by multiple securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace. Indeed, at least 145 analyst reports on Align were published during the Class Period.

175.   As a result of the foregoing, the market for Align's common stock promptly digested current information regarding Align from all publicly available sources and reflected such information in the price of Align's common stock. Under these circumstances, all purchasers or acquirers of Align's common stock during the Class Period suffered similar injury through their purchase or acquisition of Align's stock at artificially inflated prices, and a presumption of reliance applies.

176.   Further, at all relevant times, Plaintiff and other members of the putative Class reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC filings. Plaintiff and the other members of the Class would not have purchased or otherwise acquired Align common stock at artificially inflated prices if Defendants had disclosed all material information as required. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Plaintiff and other members of the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## X.    THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

177.    The Private Securities Litigation Reform Act's statutory safe harbor and/or the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein.

178.    Most, if not all, of the statements complained of herein were not forward-looking statements. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time each statement was made.

179.    To the extent that any materially false or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was a mixed statement of present and/or historical facts and future intent, and is not entitled to safe harbor protection with respect to the part of the statement that refers to the present and/or past. Alternatively, such statement is not entitled to safe harbor protection because Plaintiff alleges that it was misleading as a result of Defendants' omission of material information of historical fact necessary to make the statement not misleading when made.

180.    To the extent that any materially false or misleading statement alleged herein, or any portions thereof, may be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement or portion thereof. As alleged above in detail, given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false or misleading statements.

181.    To the extent that the statutory safe harbor may apply to any materially false or misleading statement alleged herein, or a portion thereof, Defendants are liable for any such false or misleading statement because at the time such statement was made the speaker knew the statement was false or misleading and/or had no reasonable basis or the statement was authorized and approved by an executive officer of Align who knew that such statement was false or misleading and/or had no reasonable basis.

1    XI.    **CAUSES OF ACTION**

2                                    **COUNT ONE**

3    **Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
4    Against Defendant Align and the Individual Defendants**

5         182.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth
6    herein.

7         183.    This Count is asserted pursuant to Section 10(b) of the Exchange Act, and Rule 10b-5
8    promulgated thereunder, on behalf of Plaintiff and all other members of the Class, against Align and the
9    Individual Defendants.

10        184.    As alleged herein, throughout the Class Period, Align and the Individual Defendants,
11   individually and in concert, directly and indirectly, by the use of the means or instrumentalities of
12   interstate commerce, the mails, and/or the facilities of national securities exchanges, made materially
13   untrue statements of material fact and/or omitted to state material facts necessary to make their
14   statements not misleading and carried out a plan, scheme, and course of conduct in violation of Section
15   10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Align and the Individual Defendants
16   intended to and did, as alleged herein: (i) deceive the investing public, including Plaintiff and members
17   of the Class; (ii) artificially inflate and maintain the price of Align's common stock; and (iii) cause
18   Plaintiff and members of the Class to purchase or otherwise acquire the Company's common stock at
19   artificially inflated prices.

20        185.    The Individual Defendants were individually and collectively responsible for making the
21   materially false or misleading statements and omissions alleged herein and having engaged in a plan,
22   scheme, and course of conduct designed to deceive Plaintiff and members of the Class, by virtue of
23   having made public statements and prepared, approved, signed, and/or disseminated documents that
24   contained untrue statements of material fact and/or omitted facts necessary to make the statements
25   therein not misleading.

26        186.    As set forth above, Align and the Individual Defendants made the materially false or
27   misleading statements and omissions and engaged in the fraudulent activity described herein knowingly
28   and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon

Plaintiff and the other members of the Class who purchased or otherwise acquired the Company's common stock during the Class Period.

187.    In ignorance of the materially false and misleading nature of Align's and the Individual Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Align's common stock, Plaintiff and other members of the Class purchased or otherwise acquired the Company's common stock at artificially inflated prices during the Class Period. But for the fraud, Plaintiff and members of the Class would not have purchased or otherwise acquired the Company's common stock at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of Align's common stock declined precipitously, and Plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases or acquisitions of the Company's common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

## COUNT TWO

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

188.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

189.    This Count is asserted pursuant to Section 20(a) of the Exchange Act, on behalf of Plaintiff and all other members of the Class, against the Individual Defendants.

190.    As alleged above, the Company violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making materially false or misleading statements and omissions of material fact in connection with the purchase or sale of Align's common stock and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period. This fraudulent conduct was undertaken with scienter, and Align is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with deliberate reckless disregard of the falsity of the Company's statements and the fraudulent nature of its scheme during the Class Period.

191.    As set forth above, the Individual Defendants were controlling persons of the Company during the Class Period due to their senior executive positions with the Company and their direct

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

involvement in the Company's day-to-day operations, including their power to control or influence the policies and practices giving rise to the securities violations alleged herein, and exercised the same. As such, the Individual Defendants had regular access to nonpublic information about Align's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other corporate officers and employees, attendance at management meetings and meetings of the Company's Board and committees thereof, as well as reports and other information provided to them in connection therewith.

192.    By virtue of the foregoing, the Individual Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content of its public statements with respect to its operations.

193.    The Individual Defendants were culpable participants in Align's fraud alleged herein, by acting knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Plaintiff and the other members of the Class who purchased or otherwise acquired the Company's common stock during the Class Period.

194.    By reason of the foregoing, the Individual Defendants are liable to Plaintiff and the members of the Class as controlling persons of the Company in violation of Section 20(a) of the Exchange Act.

## <u>COUNT THREE</u>

### <u>Violation of Section 10(b) and 20A of the Exchange Act and Rule 10b-5 Promulgated Thereunder for Insider Trading Against Defendant Hogan</u>

195.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

196.    This Count is asserted pursuant to Sections 10(b) and 20A of the Exchange Act, and Rule 10b-5 promulgated thereunder, on behalf of Plaintiff and all other members of the Class who purchased shares of Align common stock contemporaneously with the sale of Align common stock by Defendant Hogan while he was in possession of material, nonpublic information as alleged herein.

197.    Section 20A(a) of the Exchange Act provides:

Any person who violates any provision of the [Exchange Act] or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased . . . securities of the same class.

198.    As set forth herein, Defendant Hogan violated Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder for the reasons stated in Counts One and Two above. Additionally, Defendant Hogan further violated Section 10(b), and Rule 10b-5 promulgated thereunder, by selling shares of Align common stock while in possession of material, nonpublic adverse information concerning the 3Q18 Discounting Promotion and its negative impact on the Company's ASPs, as alleged above. Defendant Hogan was required to abstain from trading or disclose this material nonpublic adverse information, but failed to do so, as more fully alleged herein.

199.    Contemporaneously with Defendant Hogan's insider sales of Align common stock on August 14, 2018, Plaintiff purchased shares of Align common stock on a national securities exchange.

200.    Other Class members also purchased shares of Align common stock contemporaneously with Defendant Hogan's insider sales of Align common stock.

201.    Plaintiff and other members of the Class have been damaged as a result of the violations of the Exchange Act alleged herein.

202.    By reason of the violations of the Exchange Act alleged herein, Defendant Hogan is liable to Plaintiff and other members of the Class who purchased shares of Align common stock contemporaneously with Defendant Hogan's sales of Align common stock during the Class Period.

203.    Plaintiff and the other members of the Class who purchased contemporaneously with Defendant Hogan's insider sales of Align securities seek damages and/or other applicable remedies, including disgorgement by Defendant Hogan of profits gained or losses avoided from Defendant Hogan's sales of Align common stock that were contemporaneous with Plaintiff's and other Class members' purchases of Align common stock.

204.    This action was brought within five years of the date of the last transaction that is the subject of Defendant Hogan's violation of Section 20A, and, with respect to the underlying violations of Section 10(b) of the Exchange Act alleged in this Count and in Count One above, was brought within

1   five years after the date of the last transaction by Defendant Hogan that violated section 20A of the

2   Exchange Act.

3   **XII.    PRAYER FOR RELIEF**

4           WHEREFORE, Plaintiff respectfully prays for judgment as follows:

5           A.      Determining that this action is a proper class action maintained under Rules 23(a) and

6   (b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiff as class representative, and appointing

7   Kessler Topaz Meltzer & Check, LLP as class counsel pursuant to Rule 23(g);

8           B.      Declaring and determining that Defendants violated the Exchange Act by reason of the

9   acts and omissions alleged herein;

10          C.      Awarding Plaintiff and the Class compensatory damages against all Defendants, jointly

11  and severally, in an amount to be proven at trial together with prejudgment interest thereon;

12          D.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this

13  action, including but not limited to, attorneys' fees and costs incurred by consulting and testifying expert

14  witnesses; and

15          E.      Granting such other and further relief as the Court deems just and proper.

16  **XIII.   DEMAND FOR JURY TRIAL**

17              Plaintiff hereby demands a trial by jury.

18

19  DATED: November 29, 2019                      **KESSLER TOPAZ**
                                                    **MELTZER & CHECK, LLP**
20
                                                  */s/ Jennifer L. Joost*
21                                                Jennifer L. Joost (Bar No. 296164)
                                                  Stacey M. Kaplan (Bar No. 241989)
22                                                Nicole T. Schwartzberg (Bar No. 326212)
                                                  One Sansome Street, Suite 1850
23                                                San Francisco, CA 94104
                                                  Telephone: (415) 400-3000
24                                                Facsimile: (415) 400-3001
                                                  jjoost@ktmc.com
25                                                skaplan@ktmc.com
                                                  nschwartzberg@ktmc.com
26
                                                  - and -
27
                                                  **KESSLER TOPAZ**
28                                                  **MELTZER & CHECK, LLP**
                                                  Margaret E. Mazzeo (*Pro Hac Vice*)

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

Eric K. Gerard (*Pro Hac Vice Pending*)
Evan R. Hoey (*Pro Hac Vice*)
Mark Franek (*Pro Hac Vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
mmazzeo@ktmc.com
egerard@ktmc.com
ehoey@ktmc.com
mfranek@ktmc.com

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

# EXHIBIT A

## CERTIFICATION

SEB Investment Management AB ("SEB Investment Management" or "Lead Plaintiff"), on behalf of the Funds listed in the attached Schedule A, declares, as to the claims asserted under the federal securities laws, that:

1. Lead Plaintiff did not purchase the securities that are the subject of this action at the direction of Lead Plaintiff's counsel or in order to participate in any private action.

2. Lead Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

3. Lead Plaintiff's Class Period purchase and sale transactions in the Align Technology, Inc. securities that are the subject of this action are attached in Schedule A.

4. SEB Investment Management has full power and authority to bring suit to recover for investment losses on behalf of its Funds.

5. Lead Plaintiff has fully reviewed the Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws and authorizes its filing.

6. I, Caroline Rifall, Head of Legal, am authorized to make legal decisions on behalf of SEB Investment Management.

7. Lead Plaintiff intends to actively monitor and vigorously pursue this action for the benefit of the class.

8. Lead Plaintiff will endeavor to provide fair and adequate representation and work directly with the efforts of class counsel to ensure that the largest recovery for the class consistent with good faith and meritorious judgment is obtained.

9. Lead Plaintiff is currently serving as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification in *SEB*

*Investment Management AB v. Endo International, plc*, No. 2:17-cv-3711 (E.D. Pa.), *SEB Investment Management AB v. Symantec Corp.*, No. 3:18-cv-2902 (N.D. Cal.), and *SEB Investment Management AB v. Align Technology, Inc.*, No. 5:18-cv-6720 (N.D. Cal.).

10.    Lead Plaintiff has not otherwise sought to serve as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification.

11.    Lead Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Lead Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed this 28th day of November 2019.

For and on behalf of
SEB Investment Management AB

By: _____
Caroline Rifall, *Head of Legal*

## SCHEDULE A

### SEB Strategy Fund - SEB Strategy Balanced

| Security | Buy/Sell | Date | Quantity | Price |
|---|---|---|---|---|
| Common Stock | BUY | 5/31/2018 | 200 | $331.95 |
| Common Stock | BUY | 10/4/2018 | 1 | $357.89 |
| Common Stock | BUY | 10/23/2018 | 289 | $311.69 |

### SEB Strategy Fund - SEB Strategy Defensive

| Security | Buy/Sell | Date | Quantity | Price |
|---|---|---|---|---|
| Common Stock | BUY | 10/3/2018 | 96 | $375.26 |
| Common Stock | BUY | 10/23/2018 | 165 | $311.69 |

### SEB Strategy Fund - SEB Strategy Growth

| Security | Buy/Sell | Date | Quantity | Price |
|---|---|---|---|---|
| Common Stock | BUY | 5/31/2018 | 200 | $331.95 |
| Common Stock | BUY | 10/4/2018 | 27 | $357.89 |
| Common Stock | BUY | 10/23/2018 | 124 | $311.69 |

### SEB Strategy Fund - SEB Strategy Opportunity

| Security | Buy/Sell | Date | Quantity | Price |
|---|---|---|---|---|
| Common Stock | BUY | 5/31/2018 | 200 | $331.95 |
| Common Stock | BUY | 10/4/2018 | 27 | $357.89 |
| Common Stock | BUY | 10/23/2018 | 187 | $311.69 |

### SEB Fund 3 - SEB U.S. Index Fund

| Security | Buy/Sell | Date | Quantity | Price |
|---|---|---|---|---|
| Common Stock | BUY | 7/24/2018 | 300 | $372.59 |

### SEB Fund 3 - SEB Medical Fund

| Security | Buy/Sell | Date | Quantity | Price |
|---|---|---|---|---|
| Common Stock | BUY | 5/29/2018 | 787 | $322.97 |
| Common Stock | BUY | 5/30/2018 | 413 | $329.85 |
| Common Stock | BUY | 6/26/2018 | 400 | $352.53 |
| Common Stock | BUY | 8/29/2018 | 849 | $386.50 |
| Common Stock | BUY | 8/30/2018 | 251 | $386.57 |

| Common Stock | BUY | 10/1/2018 | 1,800 | $394.79 |
| Common Stock | BUY | 10/15/2018 | 100 | $318.68 |

## SEB Läkemedelsfond

| Security | Buy/Sell | Date | Quantity | Price |
|---|---|---|---|---|
| Common Stock | BUY | 5/29/2018 | 19,736 | $322.97 |
| Common Stock | BUY | 5/30/2018 | 10,364 | $329.85 |
| Common Stock | BUY | 6/26/2018 | 8,500 | $352.53 |
| Common Stock | BUY | 8/20/2018 | 15,800 | $354.08 |
| Common Stock | BUY | 8/29/2018 | 12,041 | $386.50 |
| Common Stock | BUY | 8/30/2018 | 3,559 | $386.57 |
| Common Stock | BUY | 9/25/2018 | 12,600 | $394.34 |
| Common Stock | BUY | 10/1/2018 | 28,300 | $394.79 |
| Common Stock | BUY | 10/15/2018 | 3,200 | $318.68 |

# EXHIBIT B

*SEB INVESTMENT MANAGEMENT AB v. ALIGN TECHNOLOGY, INC., JOSEPH M. HOGAN, and JOHN F. MORICI*
Case No. 5:18-cv-06720-LHK

## DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS OR OMISSIONS

| | Speaker, Date and Medium | False and/or Misleading Statements or Omissions | Reasons Why Statements Were False and/or Misleading When Made | Facts Giving Rise to Strong Inference of Scienter |
|---|---|---|---|---|
| #1 | Defendant Joseph M. Hogan ("Hogan"), Defendant Align Technology, Inc. ("Align")<br><br>May 23, 2018 Investor Day<br><br>In-Person Meeting | "*I think there's going to be a low end to this market* that we've talked about before in these kinds of sessions, and that's *15 aligners or less*. And this is where companies that don't have the capabilities Align have [sic], *they're going to have to play in that segment*." ¶ 109.[1] | Hogan's response that the "real competitive threat" facing Align was in the "low end to this market" involving "15 aligners or less"—i.e., non-comprehensive cases—and that its competitors were "going to have to play in that segment" was misleading because it misled investors to believe that only a small portion of Align's business (non-comprehensive cases) was vulnerable to competition when, in fact, Align faced a significant competitive threat in the high-end, comprehensive case market following the 2018 AAO. ¶¶ 69, 73-74. Indeed, Align implemented the 3Q18 Discounting Promotion specifically in response to the competitive threat to its comprehensive cases. ¶¶ 74, 78-79. These discounts applied *only* to Align's full comprehensive cases. ¶ 76. The $200-per-unit discount was expressly designed to win back market share lost to competitors in the comprehensive clear aligner market. ¶ 79. Implementing the | Hogan's statements concerned the competitive threat to Align's core operations, the manufacture and sale of clear aligners, which represented 86% of Align's worldwide revenues during the Class Period. ¶ 39. Moreover, the Company's comprehensive clear aligners made up the vast majority of its clear aligner sales. ¶ 44. As the Company's CEO, there is no question that Hogan was aware of the competitive threat to Align's comprehensive clear aligner business and the steep discounting program that the Company put in place to deal with those threats. Nevertheless, Hogan downplayed the competitive threat to Align's comprehensive business and omitted any reference to the 3Q18 Discounting Promotion, which applied only to comprehensive clear cases, the source of 70% to 75% of Align's revenues. ¶¶ 44, 76, 79.<br><br>Hogan had direct access to negative material nonpublic information concerning the threat of competition to Align's comprehensive case business. During monthly EMC meetings attended by Hogan, the attendees discussed Align's |

---

[1] All paragraph citations contained herein correspond to the numbered paragraphs of the Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws (Dkt. 120) in the above-captioned matter.

*SEB INVESTMENT MANAGEMENT AB v. ALIGN TECHNOLOGY, INC., JOSEPH M. HOGAN, and JOHN F. MORICI*
**Case No. 5:18-cv-06720-LHK**

### DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS OR OMISSIONS

| | Speaker, Date and Medium | False and/or Misleading Statements or Omissions | Reasons Why Statements Were False and/or Misleading When Made | Facts Giving Rise to Strong Inference of Scienter |
|---|---|---|---|---|
| | | | aggressive, undisclosed 3Q18 Discounting Promotion solely on comprehensive cases and in response to competition reflected Defendants' recognition that Align faced a "real competitive threat" in the high-end, comprehensive case market. Hogan's statement was also misleading because it omitted any mention of the 3Q18 Discounting Promotion that began only about a month later and, as discussed above, applied only to comprehensive cases and was implemented in direct response to competition in the comprehensive case market. | growing competition and ASPs. ¶¶ 56, 57, 61. Hogan attended the Company's quarterly All-Hands meetings at which "all [the attendees] talked about" was the expiration of Align's patents and the fact that the Company's competitors would "get access to [the Company's] recipes" and sell the aligners for less (which they did). ¶ 62.<br><br>The 3Q18 Discounting Promotion, which was fully operational on July 1, 2018, was specifically implemented to regain comprehensive case market share that had been recently lost to competitors. ¶ 79. Hogan's direct report, SVP Puco, approved the promotion, and Hogan later admitted that the promotion was not disclosed to the market. ¶¶ 78, 99. Puco resigned on November 1, 2018, only eight days after Hogan disclosed the 3Q18 Discounting Promotion to the market. ¶ 167.<br><br>The timing, magnitude, and circumstances of Hogan's insider trading sales were highly suspicious. On June 1, 2018, just days after he made this false or misleading statement at Align's Investor Day, Hogan sold 85,998 shares—nearly 40% of his holdings—at $333.09 per share—its then-all-time high—for proceeds of more than $28,645,073. ¶ 161. The sale came approximately |

*SEB INVESTMENT MANAGEMENT AB v. ALIGN TECHNOLOGY, INC., JOSEPH M. HOGAN, and JOHN F. MORICI*
Case No. 5:18-cv-06720-LHK

**DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS OR OMISSIONS**

| | Speaker, Date and Medium | False and/or Misleading Statements or Omissions | Reasons Why Statements Were False and/or Misleading When Made | Facts Giving Rise to Strong Inference of Scienter |
|---|---|---|---|---|
| | | | | three weeks after the May 2018 AAO, when the threat of competition to Align's dominance in the comprehensive case market came into focus. ¶¶ 66-67. Then, on August 14, 2018, with Align's stock price still inflated, Hogan sold 25,000 shares of Align common stock at approximately $367.48 per share, resulting in total proceeds of $9,186,990. ¶ 161. This sale represented over 19% of Hogan's then-held Align stock. In contrast, during the three years leading up to these two sales, Hogan only sold 54,584 shares of Align stock for a total of $7,804,520 in proceeds. ¶ 162.<br><br>Hogan's executive compensation structure motivated Hogan to artificially inflate the price of Align stock. For 2018, 91% of Defendant Hogan's total target annual compensation was subject to annual performance goals or tied to the value of Align's common stock (97% after taking the special CEO equity award granted in June 2018 into account). ¶¶ 164-66. |
| #2 | Defendant John F. Morici ("Morici"), Align | In response to an analyst's question, "Is there anything new on the market or coming to the market | Morici's statement that "there's nothing that disrupts us from what we would've expected" was false or misleading because Defendants were in fact deeply concerned about new competition in the | Morici's statements concerned the competitive threat to Align's core operations, the manufacture and sale of clear aligners, which represented 86% of Align's worldwide revenues during the Class Period. ¶ 39. Moreover, the Company's |

*SEB INVESTMENT MANAGEMENT AB v. ALIGN TECHNOLOGY, INC., JOSEPH M. HOGAN, and JOHN F. MORICI*
**Case No. 5:18-cv-06720-LHK**

### DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS OR OMISSIONS

| | Speaker, Date and Medium | False and/or Misleading Statements or Omissions | Reasons Why Statements Were False and/or Misleading When Made | Facts Giving Rise to Strong Inference of Scienter |
|---|---|---|---|---|
| | June 12, 2018 Goldman Sachs Healthcare Conference<br><br>In-Person Conference | that you think is a more formidable competitor than maybe what you've seen in the past?", Morici stated, "[W]hat we do see is that ***there's nothing that disrupts us from what we would've expected***, and we're going to continue to execute as we have to be able to grow in this market." ¶ 112. | comprehensive case market at the time. For example, competition impelled Align to implement a discount program—the 3Q18 Discounting Promotion—that applied steep pricing reductions only to Align's flagship comprehensive case products and would necessarily have a negative effect on ASPs, a critically watched metric. ¶¶ 73-76, 78, 79. Internally, Morici explicitly linked the 3Q18 Discounting Promotion to the Company's concerns about competition. ¶ 78. Moreover, the $200-per-unit discount was designed to recapture market share recently lost to competitors in the comprehensive case market. ¶ 79. Morici's statement was also misleading because it omitted any mention of the 3Q18 Discounting Promotion, which, as discussed above, was implemented in direct response to competition in the comprehensive case market. ¶¶ 73-76, 78, 79. | comprehensive clear aligners made up the vast majority of its clear aligner sales. ¶ 44. As the Company's CFO, there is no question that Morici was aware of the competitive threat to Align's comprehensive clear aligner business and the steep discounting program that the Company put in place to deal with those threats. Nevertheless, Morici downplayed the competitive threat to Align's comprehensive business and omitted any reference to the 3Q18 Discounting Promotion, which applied only to comprehensive clear cases, the source of 70% to 75% of Align's revenues. ¶¶ 44, 76, 79.<br><br>Morici had direct access to negative material nonpublic information concerning the threat of competition to Align's comprehensive case business. During monthly EMC meetings attended by Morici, the attendees discussed Align's growing competition and ASPs. ¶¶ 56, 57, 61. Morici attended the Company's quarterly All-Hands meetings at which "all [the attendees] talked about" was the expiration of Align's patents and the fact that the Company's competitors would "get access to [the Company's] recipes" and sell the aligners for less (which they did). ¶ 62. |

*SEB INVESTMENT MANAGEMENT AB v. ALIGN TECHNOLOGY, INC., JOSEPH M. HOGAN, and JOHN F. MORICI*
**Case No. 5:18-cv-06720-LHK**

## DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS OR OMISSIONS

| | Speaker, Date and Medium | False and/or Misleading Statements or Omissions | Reasons Why Statements Were False and/or Misleading When Made | Facts Giving Rise to Strong Inference of Scienter |
|---|---|---|---|---|
| | | | | The 3Q18 Discounting Promotion, which was fully operational eighteen days after Morici made this statement, was specifically implemented to regain comprehensive case market share that had been recently lost to competitors. ¶ 79. Morici attended meetings during which he discussed the threat of Align's competitors and specifically linked the 3Q Promotion to the Company's concerns about competition. ¶ 78. Such promotions require a lead time of at least a few weeks and certainly more than two weeks. ¶ 75. <br><br> Morici's unequivocal denial in response to the analyst's question, "Is there anything new on the market or coming to the market that you think is a more formidable competitor than maybe what you've seen in the past?", further supports a strong inference of scienter. <br><br> Morici's executive compensation structure motivated Morici to artificially inflate the price of Align stock. Indeed, 84% of his total target annual compensation was subject to annual performance goals or tied to the value of Align's common stock. Morici received maximum annual incentive payments (bonuses) of 240% of his target award opportunity. ¶¶ 164-66. |

*SEB INVESTMENT MANAGEMENT AB v. ALIGN TECHNOLOGY, INC., JOSEPH M. HOGAN, and JOHN F. MORICI*
Case No. 5:18-cv-06720-LHK

## DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS OR OMISSIONS

| | Speaker, Date and Medium | False and/or Misleading Statements or Omissions | Reasons Why Statements Were False and/or Misleading When Made | Facts Giving Rise to Strong Inference of Scienter |
|---|---|---|---|---|
| #3 | Morici, Align<br><br>July 25, 2018<br>Earnings Call<br><br>Conference Call | "[W]e expect the third quarter to shape up as follows: . . . We expect Q3 gross margin to be in the range of 74% to 74.4%, reflecting higher expenses as we regionalize our treatment planning and manufacturing operations, partially ***offset by higher ASPs***." ¶ 114. | Defendant Morici's statement that Align expected "higher ASPs" in the third quarter of 2018 was materially misleading when made because he failed to disclose the highly material fact that Defendants had just implemented a steep discount program that applied to 75% of Align's clear aligner products, and which was already driving down Align's 3Q18 ASPs ***even before Morici made this statement on the 2Q18 earnings call***. ¶¶ 80, 86-87. Indeed, Morici himself had requested analyses concerning the declining ASPs to be performed in July; those analyses were delivered to Morici personally. ¶ 87. The 3Q18 Discounting Promotion did result in a significant decrease in Align's ASPs. ¶ 87. This fact was ultimately acknowledged in Align's October 24, 2018 earnings call, when Defendant Morici revealed that ASPs had declined approximately $85 in 3Q18, due in large part to the undisclosed promotion. ¶¶ 95-96. The Company's Form 10-Q for 3Q18 filed on November 1, 2018, confirmed that ***all*** of the non-FX-related decline was a result of | Morici's statements concerned Align's core operations, the manufacture and sale of clear aligners, which represented 86% of Align's worldwide revenues during the Class Period. ¶ 39. Moreover, the Company's comprehensive clear aligners made up the vast majority of its clear aligner sales. ¶ 44.<br><br>As the Company's CFO, there is no question that Morici was aware of the competitive threat to Align's comprehensive clear aligner business and the steep discounting program that the Company put in place to deal with those threats. Indeed, Morici himself specifically linked the 3Q18 Discounting Promotion to Align's concerns about competition, demonstrating his contemporaneous awareness of the program. ¶ 78. Nevertheless, Morici downplayed the competitive threat to Align's comprehensive business and omitted any reference to the 3Q18 Discounting Promotion, which was devised in direct response to competition in the comprehensive clear aligner market that constituted 70% to 75% of Align's revenues. ¶¶ 44, 76, 79.<br><br>Morici had direct access to negative material nonpublic information concerning the decline in |

*SEB INVESTMENT MANAGEMENT AB v. ALIGN TECHNOLOGY, INC., JOSEPH M. HOGAN, and JOHN F. MORICI*
**Case No. 5:18-cv-06720-LHK**

**DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS OR OMISSIONS**

| | Speaker, Date and Medium | False and/or Misleading Statements or Omissions | Reasons Why Statements Were False and/or Misleading When Made | Facts Giving Rise to Strong Inference of Scienter |
|---|---|---|---|---|
| | | | Align's 3Q18 promotional programs. ¶ 106. In the alternative, Morici's statement that Align's 3Q18 ASPs would be "higher" was false for these same reasons. | Align's ASPs that completely undercut his statement. More specifically, the decline in Align's ASPs had begun prior to the third quarter of 2018, and Morici knew that the steep $200 discounts that the Company had implemented for its comprehensive cases could only serve to drive down ASPs further. Indeed, by the time Morici made his statement, the 3Q18 Discounting Promotion had already caused the ASP decline to accelerate. ¶¶ 86-87. The accelerated decline in ASPs from the 3Q18 Discounting Promotion was apparent even before Align's July 25, 2018 earnings call and was reflected in the ASP data that was updated every few hours and regularly disseminated to Morici and other top executives. ¶¶ 56-57, 86-87. Moreover, Defendant Morici directed his Finance Department VPs to have analyses performed on ASPs in July, which were personally delivered to Morici. ¶ 87.<br><br>Morici had direct access to negative material nonpublic information concerning the threat of competition to Align's comprehensive case business. During monthly EMC meetings attended by Morici, the attendees discussed the negative impact of competition, revenues, and ASPs. ¶¶ 56, 57, 61. Morici attended the Company's quarterly |

*SEB INVESTMENT MANAGEMENT AB v. ALIGN TECHNOLOGY, INC., JOSEPH M. HOGAN, and JOHN F. MORICI*
**Case No. 5:18-cv-06720-LHK**

### DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS OR OMISSIONS

| | Speaker, Date and Medium | False and/or Misleading Statements or Omissions | Reasons Why Statements Were False and/or Misleading When Made | Facts Giving Rise to Strong Inference of Scienter |
|---|---|---|---|---|
| | | | | All-Hands meetings at which "all [the attendees] talked about" was the expiration of Align's patents and the fact that the Company's competitors would "get access to [the Company's] recipes" and sell the aligners for less (which they did). ¶ 62.<br><br>Align's executive team, including Morici, received bi-weekly reports that highlighted ASPs, among other metrics. ¶ 57. Align's executive team, including Morici, also received a monthly reporting package that reflected all of the financial figures for the prior month, including ASPs. ¶¶ 56-57. Morici had access to Sales Force, which reported ASPs in almost real-time. ¶¶ 58-59. All of this information informed Morici that the 3Q18 Discounting Promotion, which had been operational for nearly a month by this point, was already accelerating the decline in Align's ASPs.<br><br>Morici's executive compensation structure motivated Morici to artificially inflate the price of Align stock. Indeed, 84% of his total target annual compensation was subject to annual performance goals or tied to the value of Align's common stock. Morici received maximum annual incentive payments (bonuses) of 240% of his target award opportunity. ¶¶ 164-66. |

*SEB INVESTMENT MANAGEMENT AB v. ALIGN TECHNOLOGY, INC., JOSEPH M. HOGAN, and JOHN F. MORICI*
Case No. 5:18-cv-06720-LHK

### DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS OR OMISSIONS

| | Speaker, Date and Medium | False and/or Misleading Statements or Omissions | Reasons Why Statements Were False and/or Misleading When Made | Facts Giving Rise to Strong Inference of Scienter |
|---|---|---|---|---|
| #4 | Hogan, Align<br><br>July 25, 2018<br>Earnings Call<br><br>Conference Call | "[F]rom a competitive standpoint, there's nothing really different than what we saw from an AAO standpoint. . . . *I wouldn't say we've changed in any way our assessment of the competition that we saw at the AAO*." ¶ 115. | Defendant Hogan's claim that Align had not "changed in any way [its] assessment of the competition that [it] saw at the AAO" was materially false or misleading when made because, following the AAO, Defendants secretly designed and implemented the undisclosed 3Q18 Discounting Promotion, which began on July 1, 2018—nearly a month earlier. ¶¶ 73-79. The program provided aggressive $200-per-unit discounts on every comprehensive case purchased above the doctors' purchases during the prior period. ¶ 76. The 3Q18 Discounting Promotion was put in place because sales numbers were on a downward trend following the AAO. ¶¶ 79, 87. The discount was expressly implemented to regain market share lost to competition in the comprehensive clear aligner market. ¶ 79. Hogan's statement was also misleading because it omitted any mention of the undisclosed 3Q18 Discounting Promotion. | Hogan's statements concerned the competitive threat to Align's core operations, the manufacture and sale of clear aligners, which represented 86% of Align's worldwide revenues during the Class Period. ¶ 39. Moreover, the Company's comprehensive clear aligners made up the vast majority of its clear aligner sales. ¶ 44. As the Company's CEO, there is no question that Hogan was aware of the competitive threat to Align's comprehensive clear aligner business and the steep discounting program that the Company put in place to deal with those threats. Nevertheless, Hogan downplayed the competitive threat to Align's comprehensive business and omitted any reference to the 3Q18 Discounting Promotion, which was devised in direct response to competition in and applied only to comprehensive clear cases, the source of 70% to 75% of Align's revenues. ¶¶ 44, 76, 79.<br><br>Hogan had direct access to negative material nonpublic information concerning the threat of competition to Align's comprehensive case business. During monthly EMC meetings attended by Hogan, the attendees discussed Align's growing competition and ASPs. ¶¶ 56, 57, 61. Hogan attended the Company's quarterly All- |

*SEB INVESTMENT MANAGEMENT AB v. ALIGN TECHNOLOGY, INC., JOSEPH M. HOGAN, and JOHN F. MORICI*
**Case No. 5:18-cv-06720-LHK**

**DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS OR OMISSIONS**

| | Speaker, Date and Medium | False and/or Misleading Statements or Omissions | Reasons Why Statements Were False and/or Misleading When Made | Facts Giving Rise to Strong Inference of Scienter |
|---|---|---|---|---|
| | | | | Hands meetings at which "all [the attendees] talked about" was the expiration of Align's patents and the fact that the Company's competitors would "get access to [the Company's] recipes" and sell the aligners for less (which they did). ¶ 62.<br><br>The 3Q18 Discounting Promotion, which was fully operational on July 1, 2018, was specifically implemented to regain comprehensive case market share that had been recently lost to competitors. ¶ 79. Hogan's direct report, SVP Puco, approved the promotion, and Hogan later admitted that the promotion was not disclosed to the market. ¶¶ 78, 99. Puco resigned on November 1, 2018, only eight days after Hogan disclosed the 3Q18 Discounting Promotion to the market. ¶ 167.<br><br>Hogan's unequivocal denial that "I wouldn't say we've changed in any way our assessment of the competition that we saw at the AAO" in response to an analyst's question, "what, if anything, Joe, have you heard about these offerings [from competitors] over the past 2 months since the [AAO]?" further supports the strong inference of scienter. |

*SEB INVESTMENT MANAGEMENT AB v. ALIGN TECHNOLOGY, INC., JOSEPH M. HOGAN, and JOHN F. MORICI*
**Case No. 5:18-cv-06720-LHK**

**DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS OR OMISSIONS**

| | Speaker, Date and Medium | False and/or Misleading Statements or Omissions | Reasons Why Statements Were False and/or Misleading When Made | Facts Giving Rise to Strong Inference of Scienter |
|---|---|---|---|---|
| | | | | The timing, magnitude, and circumstances of Hogan's insider trading sales were highly suspicious. On June 1, 2018, just days after he made this false or misleading statement at Align's Investor Day, Hogan sold 85,998 shares—nearly 40% of his holdings—at $333.09 per share—its then-all-time high—for proceeds of more than $28,645,073. ¶ 161. The sale came approximately three weeks after the May 2018 AAO, when the threat of competition to Align's dominance in the comprehensive case market came into focus. ¶¶ 66-67. Then, on August 14, 2018, with Align's stock price still inflated, Hogan sold 25,000 shares of Align common stock at approximately $367.48 per share, resulting in total proceeds of $9,186,990. ¶ 161. This sale represented over 19% of Hogan's then-held Align stock. In contrast, during the three years leading up to these two sales, Hogan only sold 54,584 shares of Align stock for a total of $7,804,520 in proceeds. ¶ 162. |
| | | | | Hogan's executive compensation structure motivated Hogan to artificially inflate the price of Align stock. For 2018, 91% of Hogan's total target annual compensation was subject to annual performance goals or tied to the value of Align's |

*SEB INVESTMENT MANAGEMENT AB v. ALIGN TECHNOLOGY, INC., JOSEPH M. HOGAN, and JOHN F. MORICI*
**Case No. 5:18-cv-06720-LHK**

### DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS OR OMISSIONS

| | Speaker, Date and Medium | False and/or Misleading Statements or Omissions | Reasons Why Statements Were False and/or Misleading When Made | Facts Giving Rise to Strong Inference of Scienter |
|---|---|---|---|---|
| | | | | common stock (97% after taking the CEO equity award granted in June 2018 into account). ¶¶ 164-66. |
| #5 | Hogan, Align<br><br>July 25, 2018<br>Earnings Call<br><br>Conference Call | In response to an analyst's question about whether Align was seeing "[a]ny kind of impact from competition?" (¶ 116), Hogan stated "*[T]here's not a momentum piece or anything that we're adjusting the business around right now*." ¶ 117. | Defendant Hogan's statement that there was not "anything that we're adjusting the business around right now" was false or misleading because Align had just a month earlier made a critical adjustment following the emergence of competitors in the comprehensive case market at the AAO, which were priced lower than Align's comprehensive cases. ¶¶ 66, 69, 73-79. Specifically, Defendants secretly designed and implemented the 3Q18 Discounting Promotion, which began on July 1, 2018, and provided aggressive, $200-per-unit discounts. ¶¶ 76-77. The undisclosed 3Q18 Discounting Promotion was implemented specifically in response to competition in the comprehensive case market. ¶ 78. The $200-per-unit discount was expressly designed to regain market share lost to competitors in the comprehensive case market. ¶ 79. Hogan's statement was also misleading because it omitted any | Hogan's statements concerned the competitive threat to Align's core operations, the manufacture and sale of clear aligners, which represented 86% of Align's worldwide revenues during the Class Period. ¶ 39. Moreover, the Company's comprehensive clear aligners made up the vast majority of its clear aligner sales. ¶ 44. As the Company's CEO, there is no question that Hogan was aware of the competitive threat to Align's comprehensive clear aligner business and the steep discounting program that the Company put in place to deal with those threats. Nevertheless, Hogan downplayed the competitive threat to Align's comprehensive business and omitted any reference to the 3Q18 Discounting Promotion, which was devised in direct response to competition in and applied only to comprehensive clear cases, the source of 70% to 75% of Align's revenues. ¶¶ 44, 76, 79.<br><br>Hogan had direct access to negative material nonpublic information concerning the threat of competition to Align's comprehensive case business. During monthly EMC meetings attended |

12

*SEB INVESTMENT MANAGEMENT AB v. ALIGN TECHNOLOGY, INC., JOSEPH M. HOGAN, and JOHN F. MORICI*
**Case No. 5:18-cv-06720-LHK**

## DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS OR OMISSIONS

| | Speaker, Date and Medium | False and/or Misleading Statements or Omissions | Reasons Why Statements Were False and/or Misleading When Made | Facts Giving Rise to Strong Inference of Scienter |
|---|---|---|---|---|
| | | | mention of the undisclosed 3Q18 Discounting Promotion. | by Hogan, the attendees discussed Align's growing competition and ASPs. ¶¶ 56, 57, 61. Hogan attended the Company's quarterly All-Hands meetings at which "all [the attendees] talked about" was the expiration of Align's patents and the fact that the Company's competitors would "get access to [the Company's] recipes" and sell the aligners for less (which they did). ¶ 62.<br><br>The 3Q18 Discounting Promotion, which was fully operational on July 1, 2018, was specifically implemented to regain comprehensive case market share that had been recently lost to competitors. ¶ 79. Hogan's direct report, SVP Puco, approved the promotion, and Hogan later admitted that the promotion was not disclosed to the market. ¶¶ 78, 99. Puco resigned on November 1, 2018, only eight days after Hogan disclosed the 3Q18 Discounting Promotion to the market. ¶ 167.<br><br>Hogan also knew that the undisclosed pricing adjustments that the Company had made in response to competition were having a negative impact on its key ASP metric. More specifically, the decline in Align's ASPs had begun prior to the third quarter of 2018, and Hogan knew that the steep $200 discounts that the Company had |

*SEB INVESTMENT MANAGEMENT AB v. ALIGN TECHNOLOGY, INC., JOSEPH M. HOGAN, and JOHN F. MORICI*
**Case No. 5:18-cv-06720-LHK**

**DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS OR OMISSIONS**

| | Speaker, Date and Medium | False and/or Misleading Statements or Omissions | Reasons Why Statements Were False and/or Misleading When Made | Facts Giving Rise to Strong Inference of Scienter |
|---|---|---|---|---|
| | | | | implemented for its comprehensive could only serve to drive down ASPs further. ¶¶ 79, 87. Indeed, by the time Hogan made his statement, the 3Q18 Discounting Promotion had already caused the ASP decline to accelerate. ¶ 86-87. The accelerated decline in ASPs from the 3Q18 Discounting Promotion was apparent in before Align's July 25, 2018 earnings call and was reflected in the ASP data that was updated every few hours and regularly disseminated to Hogan and other top executives. ¶¶ 56-57, 86-87. In fact, Align's executive team, including Hogan, received bi-weekly reports that highlighted ASPs, among other metrics. ¶¶ 57. Align's executive team, including Hogan, also received a monthly reporting package that reflected all of the financial figures for the prior month, including ASPs. ¶¶ 56-57. Hogan had access to Sales Force, which reported ASPs in almost real-time. ¶¶ 58-59. <br><br> Hogan's unequivocal denial that "there's not a momentum piece or anything that we're adjusting the business around right now" in response to an analyst's question about whether Align was seeing "[a]ny kind of impact from competition" further supports the strong inference of scienter. |

*SEB INVESTMENT MANAGEMENT AB v. ALIGN TECHNOLOGY, INC., JOSEPH M. HOGAN, and JOHN F. MORICI*
**Case No. 5:18-cv-06720-LHK**

**DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS OR OMISSIONS**

| | Speaker, Date and Medium | False and/or Misleading Statements or Omissions | Reasons Why Statements Were False and/or Misleading When Made | Facts Giving Rise to Strong Inference of Scienter |
|---|---|---|---|---|
| | | | | The timing, magnitude, and circumstances of Hogan's insider trading sales were highly suspicious. On June 1, 2018, just days after he made this false or misleading statement at Align's Investor Day, Hogan sold 85,998 shares—nearly 40% of his holdings—at $333.09 per share—its then-all-time high—for proceeds of more than $28,645,073. ¶ 161. The sale came approximately three weeks after the May 2018 AAO, when the threat of competition to Align's dominance in the comprehensive case market came into focus. ¶¶ 66-67. Then, on August 14, 2018, with Align's stock price still inflated, Hogan sold 25,000 shares of Align common stock at approximately $367.48 per share, resulting in total proceeds of $9,186,990. ¶ 161. This sale represented over 19% of Hogan's then-held Align stock. In contrast, during the three years leading up to these two sales, Hogan only sold 54,584 shares of Align stock for a total of $7,804,520 in proceeds. ¶ 162. Hogan's executive compensation structure motivated Hogan to artificially inflate the price of Align stock. For 2018, 91% of Hogan's total target annual compensation was subject to annual performance goals or tied to the value of Align's |

*SEB INVESTMENT MANAGEMENT AB v. ALIGN TECHNOLOGY, INC., JOSEPH M. HOGAN, and JOHN F. MORICI*
Case No. 5:18-cv-06720-LHK

**DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS OR OMISSIONS**

| | Speaker, Date and Medium | False and/or Misleading Statements or Omissions | Reasons Why Statements Were False and/or Misleading When Made | Facts Giving Rise to Strong Inference of Scienter |
|---|---|---|---|---|
| | | | | common stock (97% after taking the CEO equity award granted in June 2018 into account). ¶¶ 164-66. |
| #6 | Morici, Align<br><br>September 5, 2018<br>Robert W. Baird Global Healthcare Conference<br><br>In-Person Conference | In response to an analyst question "earlier this year, you had a few of the larger companies come out with clear aligner systems. Now that some of the IP has come off late last year, first off, just a simple question, seeing any traction, anything that concerns you in the near term from these competitive launches?"(¶ 124), Morici responded "[T]here's ***nothing that – of note that was disruptive or different than what we would've seen or*** | Defendant Morici's statement that "there's nothing of note that was disruptive or different than what we would've seen or would've done in the past, both from a product standpoint or a pricing standpoint" was materially false and misleading because Defendants had already secretly developed and implemented a disruptive new pricing program, the 3Q18 Discounting Promotion, in direct response to competition—particularly the new products that competitors had announced at the May 2018 AAO, which were priced lower than Align's comparable products. ¶¶ 66, 69, 73-79. Defendants secretly designed and implemented the 3Q18 Discounting Promotion, which began on July 1, 2018, and provided aggressive, $200-per-unit discounts to customers. ¶¶ 76-77. The discount was specifically implemented to regain market share in the comprehensive clear | Morici's statements concerned the competitive threat to Align's core operations, the manufacture and sale of clear aligners, which represented 86% of Align's worldwide revenues during the Class Period. ¶ 39. Moreover, the Company's comprehensive clear aligners made up the vast majority of its clear aligner sales. ¶ 44. As the Company's CFO, there is no question that Morici was aware of the competitive threat to Align's comprehensive clear aligner business and the steep discounting program that the Company put in place to deal with those threats. Indeed, FE 5 recalled that Defendant Morici was "very, very aware of Align's competition," holding conversations with Align's Finance Department about competitors and explicitly linking the 3Q18 Discounting Promotion to concerns about competition. ¶ 78. Nevertheless, Morici represented with respect to the threat of competition that there was nothing disruptive or different from what Align would have done in the past from a pricing standpoint while he omitted any reference to the 3Q18 Discounting Promotion, |

*SEB INVESTMENT MANAGEMENT AB v. ALIGN TECHNOLOGY, INC., JOSEPH M. HOGAN, and JOHN F. MORICI*
Case No. 5:18-cv-06720-LHK

## DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS OR OMISSIONS

| | Speaker, Date and Medium | False and/or Misleading Statements or Omissions | Reasons Why Statements Were False and/or Misleading When Made | Facts Giving Rise to Strong Inference of Scienter |
|---|---|---|---|---|
| | | *would've done in the past, both from a product standpoint or a pricing standpoint.*" ¶ 125. | aligner space. ¶ 79. The 3Q18 Discounting Promotion was put in place because sales numbers were on a downward trend following the AAO. ¶¶ 79, 87.<br><br>Morici's statement that "there's nothing that – of note that was disruptive or different than what we would've seen or would've done in the past, both from a product standpoint or a pricing standpoint" was also materially false and misleading because the 3Q18 Discounting Promotion that Defendants secretly implemented was already having a materially disruptive impact on Align's key pricing metric—its ASPs. In particular, the 3Q18 Discounting Promotion was already accelerating the decline in Align's ASPs in July 2018, prompting management to conduct multiple rounds of analysis on the declining ASPs and ultimately focusing management's attention on trying to "figure out how to stop the bleeding" that was resulting from the undisclosed 3Q18 Discounting Promotion. ¶¶ 86-87, 93. | which was devised in direct response to competition in the comprehensive clear aligner market that constituted 70% to 75% of Align's revenues. ¶¶ 44, 76, 79.<br><br>Morici had direct access to negative material nonpublic information concerning the disruptive effect that the undisclosed 3Q18 Discounting Promotion was already having on Align's key pricing metric—its ASPs. More specifically, Morici knew that the steep $200 discounts that the Company had implemented for its comprehensive cases could only serve to drive down ASPs. Indeed, by the time Morici made his statement, the 3Q18 Discounting Promotion had already caused the ASP decline to accelerate. ¶¶ 86-87. The accelerated decline in ASPs from the 3Q18 Discounting Promotion was apparent even before Align's July 25, 2018 earnings call and was reflected in the ASP data that was updated every few hours and regularly disseminated to Morici and other top executives. ¶¶ 56-57, 86-87. Moreover, Defendant Morici directed his Finance Department VPs to have analyses performed on ASPs in July, which were personally delivered to Morici. ¶ 87. |

17

*SEB INVESTMENT MANAGEMENT AB v. ALIGN TECHNOLOGY, INC., JOSEPH M. HOGAN, and JOHN F. MORICI*
**Case No. 5:18-cv-06720-LHK**

## DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS OR OMISSIONS

| | Speaker, Date and Medium | False and/or Misleading Statements or Omissions | Reasons Why Statements Were False and/or Misleading When Made | Facts Giving Rise to Strong Inference of Scienter |
|---|---|---|---|---|
| | | | Additionally, Morici's statement was misleading because it omitted any mention of the 3Q18 Discounting Promotion. | Periodic meetings with Defendant Morici, among others, were held as part of the Finance Department's analysis of ASP. ¶ 93. During these meetings, the attendees, including Morici, discussed ASPs and different ways to try and stop the ASP decline. *Id.* Align had implemented the promotion in response to competition in the comprehensive case market, but the resulting decline in ASPs then prompted management to focus their attention on trying to "figure out how to stop the bleeding." ¶¶ 79, 93.<br><br>Morici had direct access to negative material nonpublic information concerning the threat of competition to Align's comprehensive case business. During monthly EMC meetings attended by Morici, the attendees discussed the negative impact of competition, revenues, and ASPs. ¶¶ 56, 57, 61. Morici attended the Company's quarterly All-Hands meetings at which "all [the attendees] talked about" was the expiration of Align's patents and the fact that the Company's competitors would "get access to [the Company's] recipes" and sell the aligners for less (which they did). ¶ 62.<br><br>Align's executive team, including Morici, received bi-weekly reports that highlighted ASPs, among |

*SEB INVESTMENT MANAGEMENT AB v. ALIGN TECHNOLOGY, INC., JOSEPH M. HOGAN, and JOHN F. MORICI*
Case No. 5:18-cv-06720-LHK

**DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS OR OMISSIONS**

| | Speaker, Date and Medium | False and/or Misleading Statements or Omissions | Reasons Why Statements Were False and/or Misleading When Made | Facts Giving Rise to Strong Inference of Scienter |
|---|---|---|---|---|
| | | | | other metrics. ¶ 57. Align's executive team, including Morici, also received a monthly reporting package that reflected all of the financial figures for the prior month, including ASPs. ¶¶ 56-57. Morici had access to Sales Force, which reported ASPs in almost real-time. ¶¶ 58-59. All of this information informed Morici that the 3Q18 Discounting Promotion, which had been operational for nearly a month by this point, was already accelerating the decline in Align's ASPs.<br><br>The 3Q18 Discounting Promotion, which was fully operational over two months before Morici made this statement, was specifically implemented to regain comprehensive case market share that had been recently lost to competitors. ¶ 79. Morici attended meetings during which he discussed the threat of Align's competitors and specifically linked the 3Q Promotion to the Company's concerns about competition. ¶ 78. Such promotions require a lead time of at least a few weeks and certainly more than two weeks. ¶ 75.<br><br>Morici's unequivocal denial that the Company had undertaken anything different or disruptive from a pricing standpoint, in response to the analyst's question, "earlier this year, you had a few of the |

*SEB INVESTMENT MANAGEMENT AB v. ALIGN TECHNOLOGY, INC., JOSEPH M. HOGAN, and JOHN F. MORICI*
**Case No. 5:18-cv-06720-LHK**

**DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS OR OMISSIONS**

| | Speaker, Date and Medium | False and/or Misleading Statements or Omissions | Reasons Why Statements Were False and/or Misleading When Made | Facts Giving Rise to Strong Inference of Scienter |
|---|---|---|---|---|
| | | | | larger companies come out with clear aligner systems. Now that some of the IP has come off late last year, first off, just a simple question, seeing any traction, anything that concerns you in the near term from these competitive launches?", further supports a strong inference of scienter. <br><br> The temporal proximity between Morici's unequivocal denial that Align had undertaken anything different or disruptive from a pricing standpoint on September 5, 2018, and Defendants' revelation of the 3Q18 Discounting Promotion and its negative effect on ASPs on October 24, 2018, further supports a strong inference of scienter. <br><br> Morici's executive compensation structure motivated Morici to artificially inflate the price of Align stock. Indeed, 84% of his total target annual compensation was subject to annual performance goals or tied to the value of Align's common stock. Morici received maximum annual incentive payments (bonuses) of 240% of his target award opportunity. ¶¶ 164-66. |